**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MATTHEW HECKMAN,

        Plaintiff,

    vs.

UPMC SUSQUEHANNA, and NORTH
PENN COMPREHENSIVE HEALTH
SERVICES,

        Defendants.

Docket No.

**JURY TRIAL DEMANDED**

## **COMPLAINT**

Plaintiff, Dr. Matthew Heckman, by and through his attorneys, Obermayer Rebmann Maxwell & Hippel LLP, files the following Complaint, and in support thereof avers the following:

### **PARTIES**

1.    Plaintiff, Dr. Matthew Heckman, is an adult individual residing in Tioga County, Pennsylvania.

2.    Dr. Heckman is a Board Certified Family Practice physician.

3.    Dr. Heckman was employed as a physician by Defendant UPMC Susquehanna ("UPMC") and assigned to work at the North Penn Comprehensive Health Services ("North Penn") locations in Tioga County, Pennsylvania.

4.    Defendant UPMC Susquehanna is a non-profit health system, and a subsidiary of University of Pittsburgh Medical Center. Defendant UPMC Susquehanna employed Dr. Heckman as a physician and assigned him to work as a leased employee at North Penn Comprehensive Health Services until his firing on April 3, 2020.

5.    Defendant North Penn Comprehensive Health Services ("North Penn") is a Federally Qualified Health Center ("FQHC"), with clinics in Blossburg, Lawrenceville,

Wellsboro, Elkland, Mansfield, and Westfield, Pennsylvania.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over Dr. Heckman's whistleblower claims under the False Claims Act and Fair Labor Standards Act under 28 U.S.C. § 1331, and supplemental pendent jurisdiction over his state law claims under 28 U.S.C. § 1367.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants employed Dr. Heckman in this District and because the events giving rise to this claim occurred in this District.

## FACTS

**A.  *Dr. Heckman's personal mission of providing medical care to underserved communities in Tioga County***

8.      Dr. Heckman was born and raised in medically underserved areas, primarily in the border region between Steuben County, New York and Tioga County, Pennsylvania. After earning a Bachelor's, Master's and Doctoral degrees in biomedical engineering from the University of Rochester, he decided to return to medical school after seeing disparities in medical care in underserved areas. He then attended medical school at Pennsylvania State University at Hershey, graduating in 2012. He sought employment in Tioga County because he felt strongly about providing medical care in this medically underserved community.

9.      Wishing to serve citizens in the community of Tioga County, Dr. Heckman sought employment with North Penn in 2011 while still in medical school, and was recruited by Ron Butler, then President and CEO of the Laurel Health System. Butler presented an offer that included student loan repayment, with contracted service to start with North Penn following Dr. Heckman's family medicine residency.

2

10.     Mr. Butler and Dr. Heckman negotiated a modification to this offer to accommodate Dr. Heckman's desire to complete a fellowship in obstetrics following his residency.

11.     Dr. Heckman's fellowship in obstetrics allows him to provide care to women with higher-risk pregnancies, a specialty that is sorely needed in Tioga County.

12.     After completing his residency and fellowship, Dr. Heckman began employment as a physician with North Penn in 2016. In the end of 2017, he was promoted to be North Penn's Medical Director. In March of 2018, his title changed to Chief Medical Officer. In this role, he supervised a medical staff of over thirty medical providers.

13.     Dr. Heckman was officially employed by UPMC and leased to North Penn, as were the vast majority of North Penn's employees.

### B. North Penn's role in Tioga County

14.     North Penn was founded in 1972 when Blossburg State General Hospital closed, leaving a vacuum in patient care in Tioga County. Over the next two decades, North Penn expanded to open clinics in Mansfield, Wellsboro, Westfield, and Lawrenceville, in addition to Blossburg.

15.     In 1988, North Penn entered into a partnership with Soldiers & Sailors Memorial Hospital in Wellsboro to form Laurel Health System.[1]

16.     In 2012, Laurel Health System was acquired by Williamsport-based UPMC Susquehanna, which then renamed Soldiers & Sailors Memorial Hospital as UPMC Wellsboro.

17.     According to its website, "North Penn elected to remain independent as federally qualified health centers to better care for vulnerable and underinsured patients on a sliding fee scale, but continues to partner closely with UPMC Wellsboro."[2]

---

[1] See https://www.laurelhc.org/index.php/about-us (accessed July 15, 2020).
[2] Id.

3

18.     North Penn's website further states that it offers "convenient primary care and behavioral health services for the whole family throughout Tioga County".[3]

### C. *North Penn's obligations as a Federally Qualified Health Center*

19.     FQHCs such as North Penn provide medical care to patients in federally-designated Health Professional Shortage Areas and in return receive grants from the Health Resources and Services Administration ("HRSA") of the U.S. Department of Health and Human Services ("HHS") under Section 330 of the Public Health Service Act, codified at 42 U.S.C. § 254(b) ("Section 330 Grants"), which allow North Penn to provide treatment regardless of ability to pay.

20.     HRSA has also promulgated several resources setting forth policies for Section 330 grant recipients, including Health Center Program Requirements summarizing the key requirements for the operation of FQHCs (the "Program Requirements"), Health Center Program Terms and Definitions (the "Terms and Definitions"), and a Health Center Compliance Manual (the "Compliance Manual").

21.     The Terms and Definitions contain a definition for "Federally Qualified Health Center," which state that it is a requirement of the Secretary of Health and Human Services that the recipient of a Section 330 Grant "may not be owned, controlled, or operated by another entity." (Terms and Definitions, at p. 3). This comports with 42 C.F.R. § 51c.103, which limits eligibility for Section 330 Grants to "any public or nonprofit private entity." 42 C.F.R. § 23.2 defines nonprofit private entity as an "entity which may not lawfully hold or use any part of its net earnings to the benefit of any private shareholder or individual and which does not hold or use its net earnings for that purpose."

---

[3] *Id.*

22.     Under 42 C.F.R. § 51c.301-305, setting out the federal regulations for public health grants for operating community health centers, a community health center must not exhibit a conflict of interest or the appearance of a conflict of interest. Specifically, 42 C.F.R. § 51c.304(b)(1) provides that "a majority of the board members shall be individuals who are or will be served by the center and who, as a group, represent the individuals being or to be served in terms of demographic factors, such as race, ethnicity, sex." Similarly, Section 51c.304(b)(2) provides that "no more than one-half of the remaining members of the board may be individuals who derive more than 10 percent of their annual income from the health care industry", and Section 51c.304(b)(3) provides that "the remaining members of the board shall be representative of the community in which the center's catchment area is located and shall be selected for their expertise in community affairs, local government, finance and banking, legal affairs, trade unions, and other commercial and industrial concerns, or social service agencies within the community."

23.     HHS has also promulgated a regulation establishing that any entity receiving a HHS grant (such as a Section 330 grant) must establish a conflict of interest policy. 45 C.F.R. § 75.112. The Program Requirements clarify that the policy must "include provisions that prohibit conflict of interest by board members, employees, consultants and those who furnish goods or services to the health center." (Program Requirements at ¶ 19).

24.     42 C.F.R. § 51c.107(a) provides that all Section 330 grant funds "may be expended solely for carrying out the approved project in accordance with section 330 of the Act…" The section further incorporates the cost principles set forth in 45 C.F.R. § 75(E), which state in relevant part that reasonable costs for a project are based on an expectation of "arms-length bargaining" and "market prices for comparable goods or services for the geographic area." 45 C.F.R. § 75.404(b) and (c).

25.     The Program Requirements also regulate the services that FQHCs must offer, requiring that they provide all Required Primary Health Care Services either directly or through established written agreements with other providers. The Program Requirements further require that these services must be available at times and locations that "assure accessibility and meet the needs of the population to be served." (Program Requirements, pg. 1). The Terms and Definitions state that required Primary Health Care Services include prenatal and perinatal services, family medicine, obstetrics, and gynecology. (Terms and Definitions, pp. 5-6).

26.     In order to be awarded a Section 330 Grant, the applicant must certify that it:

   a.   "Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain"; and

   b.   "Will comply with all applicable requirements of all other Federal Laws, executive orders, regulations, and policies governing this program."

(see Form SF424B – Assurances for Non-Construction Programs).

27.     Upon information and belief, North Penn repeatedly and falsely made these certifications on its Section 330 grant applications.

### D. UPMC utilizes conflict of interest to improperly control North Penn for its economic benefit, in violation of the FQHC Program Requirements

28.     North Penn submitted a Section 330 grant application on January 7, 2020, which states, "NPCHS is not part of a parent, affiliate, or subsidiary organization." (**Exhibit A**, at p. 45).

29.     UPMC exercises undue control over North Penn through North Penn's Board of Directors, all of whom are board members of or employed by UPMC Wellsboro, an improper conflict of interest.

30.     At all times during Dr. Heckman's employment, Janie Hilfiger was a prominent member of North Penn's Board and vetted agenda items prior to board meetings, while also serving as President of UPMC Wellsboro.

31.     In early2019, Steven Johnson, the President of UPMC, requested that North Penn hire an OB/GYN, using its Section 330 Grant funds, to practice mainly at UPMC Wellsboro. This would have effectively diverted Section 330 funds from North Penn to UPMC, which is ineligible to receive and use Section 330 funds because it is not an FQHC.

32.     In the course of a discussion regarding this direction with James Nobles, North Penn's CEO, Johnson also contended that North Penn was a subsidiary of UPMC, because UPMC had "bought" North Penn when it acquired Soldiers & Sailors Hospital, which became UPMC Wellsboro.

33.     When Dr. Heckman became Medical Director, UPMC had an ongoing practice of siphoning North Penn's Section 330 Grant funds for its ineligible purposes by charging North Penn above-market rates for contracts for items such as information technology support, physician recruitment and credentialing, and building lease and maintenance.

34.     This occurred notwithstanding North Penn's representation in its Section 330 grant applications that all purchases over $3,000 require three bids. (Ex. A, at p. 48).

35.     Moreover, the composition of North Penn's Board of Directors does not satisfy Section 51c.304's requirements. North Penn's Board does not have a majority made up of patients served by North Penn who are demographically representative of the population being served. Similarly, more than half of the non-patient board members make more than ten percent of their personal income in the health care industry.

36.     At all times during Dr. Heckman's employment, UPMC Wellsboro's Board of Directors met consecutively with North Penn's Board of Directors at the same location, creating the impression that the two consecutive board meetings were actually one, and that the two boards were actually one, and that North Penn was merely an instrumentality of UPMC Wellsboro, rather than an independent entity.

37.     UPMC also requested on multiple occasions during Dr. Heckman's employment that North Penn's physicians refer exclusively to UPMC Wellsboro, to the exclusion of nearby competing health systems Guthrie, Geisinger, and University of Rochester Medical Center. This violated the federal Stark Law and Anti-Kickback Statute, which collectively prohibit physicians from engaging in transactions designed to induce or reward patient referrals. Nobles carried out this directive by prohibiting physician liaisons from the competing health systems from initiating and engaging in typical outreach and coordination of care activities with North Penn physicians and practice locations. Dr. Heckman found out about this prohibition at a dinner with Guthrie's physician liaison in early-2018, and responded by personally facilitating coordination between the Guthrie liaison and North Penn physicians.

38.     Shortly thereafter, Dr. Heckman discussed this issue at a North Penn Executive Leadership meeting, voicing concerns that it was unethical and illegal for physicians to make referral decisions in the best interests of UPMC rather than their patients. As a result of Dr. Heckman's advocacy, North Penn's leadership team agreed that North Penn would no longer inhibit physician initiated contacts with physician liaisons and specialists from the competing health systems.

39.     Around July of 2019, UPMC replaced its idea to have North Penn fund an OB/GYN for UPMC Wellsboro with directing North Penn to terminate its obstetrics services, thereby

8

eliminating competition for UPMC Wellsboro in order to make obstetrics at UPMC Wellsboro more profitable. This was conveyed to Nobles by Hilfiger in conversation and relayed to Dr. Heckman by Nobles. In August of 2019, Hilfiger held a meeting in which she announced that she had decided that all North Penn obstetrics services must end by October 1, 2019 and that North Penn would contract obstetric services from a UPMC-controlled entity.

40.     When confronted again in February 2020 by Dr. Heckman about why he agreed to this at the conclusion of a meeting with Hilfiger, Nobles stated that it was not his decision, but rather imposed by Hilfiger under the pressure of a threat. "Matt, you know this was Janie's idea...and you know where we were at with her threats and The Board". Hilfiger meanwhile had stated directly to Dr. Heckman that it was Nobles' idea to stop OB services at North Penn.

41.     This decision was made by Hilfiger for the benefit of her employer—UPMC, and to the detriment of North Penn, to whom she held a fiduciary duty as a board member. It also caused North Penn to be in violation of the Program Requirements as obstetrics are a primary health service that FQHCs are required to provide.

**E.  Dr. Heckman repeatedly advocates against abuse of North Penn by UPMC**

42.     In his role as Chief Medical Officer, Dr. Heckman objected to UPMC's domination and control of North Penn because it violated the above federal requirements for FQHCs.

43.     Dr. Heckman complained directly to Nobles and Hilfiger about UPMC's ongoing efforts to undermine North Penn's independence and operations for the financial benefit of UPMC, in violation of the FQHC Program Requirements.

44.     In 2016, Dr. Heckman also opposed efforts by UPMC to drop North Penn's FQHC designation. This would have cost North Penn approximately $2 million in Section 330 funding, but would have allowed UPMC to exercise complete dominion and control over North Penn for UPMC's own financial benefit, to the detriment of patient care in the rural underserved

communities served by North Penn. Dr. Heckman attended a North Penn board meeting in 2016 to advocate against these efforts. Dr. Heckman, along with other physicians, shared their experience and belief that North Penn's FQHC status was a draw for physicians, refuting UPMC's argument that the FQHC status made it more difficult to recruit physicians. Dr. Heckman and another physician also advocated that loss of FQHC status would likely harm the scope of services provided to patients.

45.     In late-December 2019, Nobles and Dr. Heckman became aware that UPMC was again seeking to orchestrate a board vote to drop North Penn's FQHC status. Dr. Heckman then reached out to physicians, influencers and decision-makers through his contacts in the community to again voice concerns about the likely detrimental effects of UPMC's planned action. This resulted in an effective block of UPMC's plan to convert the FQHC clinics to Rural Health Clinics under formally under UPMC's control.

46.     Dr. Heckman also objected to UPMC's practice of charging North Penn above-market rates for services. Dr. Heckman insisted that either North Penn had to use its grant money to get services at fair market value from UPMC or that these contracts should be competitively bid.

47.     In July of 2019, Nobles related to Dr. Heckman that the relationship between North Penn and UPMC had deteriorated due to Dr. Heckman's challenges to the above fraudulent and wrongful conduct by UPMC. He stated: "I just had another 'wonderful' meeting with Janie - your name keeps coming up. It's causing problems for us and UPMC- she's accusing you of being disruptive" and "I need you to stop talking about the problems we have to anyone that asks or is willing to listen. You are an executive for North Penn and what you say has consequences for North Penn." Nobles went on to implore Dr. Heckman to leave advocacy to him.

10

48.     Dr. Heckman adamantly opposed the elimination of obstetrics services at North Penn's clinics because he believed this would be greatly detrimental to patient's well-being, and to North Penn's finances.

49.     Dr. Heckman was deeply concerned that this would have forced this vulnerable population of patients in Westfield and Elkland (many of whom do not have reliable transportation) to drive 45 minutes to their prenatal appointments and ancillary testing (e.g. twice weekly non-stress test) when needed. He was further concerned that this would increase the rate of caesarean sections for the population.

50.     North Penn's January, 2020 grant application describes the barriers to access to medical care in Tioga County resulting from geography, lack of transportation, and poverty:

> Rural areas often see regional geographic barriers to access and Tioga County is no exception. Towns in the county are separated not only by distance, but also by long mountain ranges and deep valleys. Traveling between towns is lengthy and time consuming. Because of its rural nature, public transportation is not conveniently available in the county. Approximately 13.4 percent of the Tioga County population lives in poverty; the rate has shown improvement in recent years, but is still slightly higher than the state average

(Ex. A at p. 16).

51.     Dr. Heckman opposed the elimination of obstetrics during a North Penn Executive Leadership Team Meeting in August of 2019, where he raised the issue of elevated caesarean section rates. Dr. Heckman provided data supporting his claims. He raised the issue again during a meeting with Nobles and Hilfiger on September 12, 2019, and in individual meetings with Nobles in November and December of 2019 and Hilfiger in January of 2020.

52.     Nonetheless, North Penn's January 2020 Section 330 grant claimed that North Penn "offers a "one-stop-shop" model where the organization and delivery of quality services are seamless, affordable, accessible, and culturally sensitive". (Ex. A, at p. 7). North Penn further

11

states that the services offered at its six health center locations include women's health, gynecology, and postnatal care. *Id.*, at p. 23-24. While the application states that obstetrics are offered through a contract with UPMC Wellsboro, North Penn omits to specify that obstetrics are only offered at UPMC Wellsboro's location and not at North Penn's six health center locations. *Id.*

53.     Dr. Heckman also requested that he be permitted to personally deliver the babies of his then-current patients, regardless of whether the deliveries occurred before or after the October 1, 2019 cutoff imposed by UPMC.

54.     Dr. Heckman further complained that this was an additional manifestation of UPMC's exertion of inappropriate control over North Penn and placement of UPMC's financial interests before those of patients served by North Penn. In Executive Leadership meetings in August of 2019 Dr. Heckman expressed this grave concern and accused Nobles of bowing to pressure from Hilfiger and UPMC stating, "This is not True North!", referencing a symbolic expression created by Nobles presented to North Penn employees stating that "True North" for the organization meant "putting the patient at the center of everything we do."

55.     In an individual meeting with Nobles in mid-2019 regarding clinician's frustration with poor support after North Penn's transition to the EPIC electronic medical records system, Dr. Heckman objected that UPMC was not providing adequate value for the funds it received from North Penn for this project and other IT and IT support services. Since this project was funded by a Section 330 grant and North Penn did not require UPMC to bid competitively for this work, Dr. Heckman believed this was a misuse of North Penn's Section 330 funds. Dr. Heckman stated in a meeting with Nobles that UPMC needed to "show North Penn value for the dollars we are spending," and that "we're not getting what we pay for." The response from Nobles was "I agree with you, but you need to figure out that at some point the juice isn't worth the squeeze. We have

12

tried everything, we're hitting walls." Nobles was referring to Dr. Heckman's ongoing efforts to advocate against UPMC's domination and control of North Penn.

56.     In response to Dr. Heckman's above-described and continued objections to this inappropriate activity, Nobles demoted him from Chief Medical Officer in October 2019.

57.     In March of 2020, UPMC plotted to force the closure of North Penn's Elkland and Westfield health centers. Dr. Heckman vociferously objected to this because it would force some of North Penn's most vulnerable and disadvantaged patients to travel over fifty minutes for primary care.

58.     UPMC's plan to force the closure of Elkland and Westfield was not in the financial interests of North Penn, as these centers (with Dr. Heckman seeing patients there) were very productive for North Penn. Rather, the closure was designed to increase emergency room visits for UPMC Wellsboro and UPMC Cole, shifting revenue to UPMC entities to offset losses associated with the COVID-19 pandemic.

59.     In North Penn's January 2020 Section 330 grant, however, it stated that a focus of its efforts was to reduce the non-urgent use of emergency room visits. (Ex. A, at p. 35).

60.     Dr. Heckman objected to this on a phone call with Nobles, and suggested that this was an attempt by UPMC to secure this major concession from North Penn while Nobles and others who would have normally objected were preoccupied with responding to concerns about potential equipment shortages and other challenges associated with the COVID-19 crisis.

61.     Hilfiger did not want Dr. Heckman raising this and other objections at the upcoming Board meeting. She told Nobles that she saw Dr. Heckman as a "liability," and directed Nobles to fire Dr. Heckman, which occurred on April 3, 2020.

OMC\4833-0637-6387.v5-9/15/20

### F. *Defendants conspire to use Dr. Heckman's non-compete agreement as pretext to prevent Dr. Heckman from serving as the only provider of obstetric care in Elkland and Westfield*

62. In order to continue to serve his patients, particularly prenatal patients in the Elkland and Westfield areas for whom Defendants no longer provide access to convenient prenatal care, Dr. Heckman procured an office location in Elkland and re-launched his medical practice leasing suitable office space immediately available in the All Natural Wellness Center.

63. Approximately twenty percent of prenatal patients in Elkland and fifty percent in Westfield lack reliable transportation to UPMC Wellsboro for prenatal care. Dr. Heckman observed these patients walking to their office visits, delaying or missing their care as a result. The area also has little public transportation available.

64. Elkland and Westfield have Health Professions Shortage Area ("HPSA") scores that qualify them as medically underserved areas.

65. Besides Dr. Heckman, there is no other physician providing obstetrics care in Elkland or Westfield.

66. On July 8, 2020, UPMC sent Dr. Heckman a letter demanding that he cease and desist from practicing medicine in the area pursuant to the covenants not to compete contained within his employment agreement.

67. When UPMC terminated Dr. Heckman, it requested that he resign his position on the medical staff of UPMC Wellsboro and terminated his access to his hospital email account and the hospital's electronic patient medical records systems.

68. Dr. Heckman was later informed by another physician that UPMC Wellsboro has an open medical staff and any qualified physician practicing in the area can join the staff and have admitting privileges at the hospital.

69.     While Dr. Heckman has not resigned from the medical staff, UPMC has ignored repeated requests by Dr. Heckman to return his physician badge, reinstate his hospital email account, and reinstate his access to the inpatient electronic medical records to facilitate Dr. Heckman's ability to admit and care for inpatient medical and obstetric patients in a manner consistent with his hospital privileges and as a member of the Medical Staff in good standing. UPMC has also delayed his patients' requests to fax copies of their medical records to Dr. Heckman.

70.     This, of course, is causing and continues to cause great detriment to Dr. Heckman and his patients, as it effectively prevents him from providing medical care. This is of the greatest urgency to his prenatal patients and in violation of requirements under The Health Insurance Portability and Accountability Act ("HIPAA").

71.     On August 14, 2020, North Penn sent Dr. Heckman and his wife a letter demanding the immediate repayment of Dr. Heckman's $60,000 signing bonus, plus interest. Under the terms of an agreement between Dr. Heckman and North Penn, this amount would have been forgiven had Dr. Heckman remained employed by North Penn for five years, ending on August 31, 2021. North Penn did not apply any set-off for the nearly four years that Dr. Heckman provided service.

## COUNT I: DECLARATORY JUDGMENT

72.     Plaintiff incorporates all preceding paragraphs as though stated fully herein.

73.     Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201 that alleged covenants not to compete contained in his Physician Employment Agreement are unenforceable as a matter of public policy with regard to his continued practice in Elkland and Westfield, and enjoin Defendants from preventing Dr. Heckman from utilizing his membership on the medical faculty of UPMC Wellsboro and accessing his patients' medical records.

15

## COUNT II: FALSE CLAIMS ACT RETALIATION

74.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

75.     The False Claims Act ("FCA") protects employees, contractors, and agents who engage in protected activity from retaliation in the form of their being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1).

76.     North Penn receives federal funding as a FQHC.

77.     North Penn knowingly presented, and UPMC caused to be presented, false or fraudulent claims for payment to the United States Government, and knowingly failed to disclose material facts, in order to obtain Government payments.

78.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to obtain United States Government payments for false and fraudulent claims.

79.     Dr. Heckman had an objectively reasonable belief that UPMC violated the FCA when it entangled itself in the business operations and effectively overtook business and care decisions of North Penn, overcharged North Penn for services, attempted to force exclusive referral agreements in violation of the Stark Law, and terminated vital obstetrics services offered at North Penn to drive business to UPMC medical providers.

80.     Dr. Heckman further had an objectively reasonable belief that UPMC caused North Penn to make false claims on its Section 330 grant applications to conceal this fraudulent activity.

81.     Dr. Heckman engaged in protected activity when he frequently objected to his supervisors, including the CEO of North Penn and President of UPMC Wellsboro and the Board of North Penn, regarding this fraudulent and illegal activity.

OMC\4833-0637-6387.v5-9/15/20

82.     These repeated and vociferous objections served to place Defendants on notice of Dr. Heckman's protected activity.

83.     Dr. Heckman was demoted from his position as North Penn's Chief Medical Officer, and then terminated from his position as a UPMC physician assigned to North Penn in retaliation for these repeated objections.

### COUNT III: PENNSYLVANIA WHISTLEBLOWER ACT

84.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

85.     Pennsylvania law protects employees who report or were about to report an instance of wrongdoing or waste. 43 P.S. 1421, *et seq.*

86.     Dr. Heckman had an objectively reasonable belief that UPMC's actions violated the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback provisions of the Social Security Act (42 U.S.C. §1320a-7b), and the Health Center Program Compliance Manual.

87.     Dr. Heckman engaged in protected activity when he frequently objected to his supervisors, including the CEO of North Penn and President of UPMC Wellsboro and the Board of North Penn, regarding this fraudulent and illegal activity.

88.     These repeated and vociferous objections served to place Defendants on notice of Dr. Heckman's protected activity.

89.     Dr. Heckman was demoted from his position as North Penn's Chief Medical Officer, and then terminated from his position as a UPMC physician assigned to North Penn in retaliation for these repeated objections.

### COUNT IV: RETALIATION FOR PATIENT ADVOCACY 40 P.S. § 991.2113

90.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

91.     Pennsylvania law prohibits the termination of a physician in retaliation for the physician advocating for medically necessary and appropriate health care or protesting a decision, policy, or practice that the physician reasonably believes interferes with the ability to provide medically necessary and appropriate health care. 40 P.S. § 991.2113.

92.     Dr. Heckman repeatedly advocated for making decisions in the best interest of patients in underserved areas with limited or no access to transportation to obtain medical treatment and adamantly opposed the closure of North Penn facilities that served those areas.

93.     Dr. Heckman also repeatedly objected to the prohibition on allowing him to perform obstetric care for patients as this meant denial of critical treatment and care to patients that would otherwise be unable to receive or severely limited in obtaining such care.

94.     These repeated and vociferous objections served to place Defendants on notice of Dr. Heckman's protected activity.

95.     Dr. Heckman was demoted from his position as North Penn's Chief Medical Officer, and then terminated from his position as a UPMC physician assigned to North Penn in retaliation for these repeated objections.

**COUNT V: FAIR LABOR STANDARDS ACT**

96.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

97.     The Fair Labor Standards Act ("FLSA") requires that employers pay employees 150% of their typical wages on hours they work in a week over 40. 29 U.S.C. § 207.

98.     Salaried employees lose their status as employees exempt from overtime requirements if an employer has an actual practice of making impermissible deductions to pay.

99.     North Penn and UPMC told Dr. Heckman he would be paid as a salaried employee for the completion of the requirements set forth in his contract.

18

100.    Dr. Heckman completed those requirements and typically exceeded all contractual obligations for patient care and service.

101.    Dr. Heckman frequently worked in excess of forty hours per week since his start date on September 1, 2016.

102.    However, UPMC deducted Dr. Heckman's pay by withholding payment for work as Medical Director of the Green Home.

103.    Dr. Heckman was no longer an exempt, salaried employee when these deductions were made.

104.    Neither North Penn nor UPMC paid Dr. Heckman for overtime hours worked.

105.    UPMC violated the FLSA by failing to pay Dr. Heckman all monies owed for overtime hours in excess of forty hours per week from July 1, 2018 to the present.

### COUNT VI: PENNSYLVANIA WAGE AND COLLECTION LAW

106.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

107.    The Pennsylvania Wage and Collect Payment Act requires that employers pay employees all wages due, including overtime, by the next succeeding pay period. 43 Pa.C.S. § 260.1.

108.    North Penn and UPMC told Dr. Heckman he would be paid as a salaried employee for the completion of the requirements set forth in his contract.

109.    Dr. Heckman completed those requirements and typically exceeded all contractual obligations for patient care and service.

110.    Dr. Heckman frequently worked in excess of forty hours per week since his start date on September 1, 2016.

OMC\4833-0637-6387.v5-9/15/20

111.    However, UPMC deducted Dr. Heckman's pay by withholding payment for work as Medical Director of the Green Home. UPMC violated the Wage Payment and Collection Law by failing to pay Dr. Heckman all monies owed for his salary and overtime hours in excess of forty hours per week from July 1, 2018 to the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant him the following relief:

    a.   A declaration that the alleged covenants not to compete contained in his Physician Employment Agreement are unenforceable as a matter of public policy with regard to his continued medical practice in Elkland and Westfield;

    b.   A declaration that Defendants have no claim against Dr. Heckman or his wife to recover his signing bonus;

    c.   An injunction enjoining Defendants from preventing Dr. Heckman from utilizing his membership on the medical faculty of UPMC Wellsboro, preventing Dr. Heckman from accessing his patients' medical records; or otherwise interfering in Dr. Heckman's medical practice;

    d.   An injunction enjoining Defendants from continuing to violate federal law as set forth above;

    e.   Reinstatement as Chief Medical Officer of North Penn;

    f.   Double back-pay;

    g.   Special damages (including but not limited to reasonable attorney's fees and litigation costs, pain, suffering, inconvenience, mental anguish, emotional

OMC\4833-0637-6387.v5-9/15/20

distress, loss of enjoyment of life, and other losses resulting from Defendants'

above-described wrongful conduct);

h.   Pre and post-judgment interest; and

i.   Any and all other relief that the Court deems just and proper.


Respectfully submitted,


Dated: September 15, 2020          */s/Bruce C. Fox, Esquire*
                                   Walter W. Cohen, Esquire (Pa. ID No. 12097)
                                   Bruce C. Fox, Esquire (Pa. ID No. 42576)
                                   Andrew J. Horowitz, Esquire (Pa. ID No. 311949)
                                   OBERMAYER REBMANN
                                   MAXWELL & HIPPEL LLP
                                   200 Locust Street, Ste. 400
                                   Harrisburg, PA 17101-1508
                                   717-234-9730
                                   *walter.cohen@obermayer.com*
                                   *bruce.fox@obermayer.com*
                                   *andrew.horowitz@obermayer.com*

                                   *Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Matthew Heckman, hereby declare under the penalties of perjury that the facts averred in the foregoing Complaint are true to the best of my knowledge, information, and belief.

Dated: _09/15/2020_

_____
MATTHEW HECKMAN, M.D.

OMC\4833-0637-6387.v5-9/15/20