# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MATTHEW HECKMAN,

Plaintiff,

v.

UPMC WELLSBORO, NORTH
PENN COMPREHENSIVE HEALTH
SERVICES, and THE GREEN HOME,

Defendants.

No. 4:20-CV-01680

(Judge Brann)

## MEMORANDUM OPINION

### JULY 7, 2021

On September 15, 2020, Dr. Matthew Heckman commenced this lawsuit against UPMC Wellsboro, North Penn Comprehensive Health Services, and the Green Home.[1] On November 23, 2020, Heckman filed a five-count amended complaint seeking a declaratory judgment regarding Heckman's employment agreement and relief for alleged violations of the False Claims Act ("FCA"), the Pennsylvania Whistleblower Law, the Fair Labor Standards Act ("FLSA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").[2] The Defendants subsequently filed three motions to dismiss.[3]

---

[1] Doc. 1.
[2] Doc. 26.
[3] Doc. 33; Doc. 39; Doc 49.

The Defendants' motions are now ripe for disposition; for the following reasons, the motions are denied.

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a pleading"[4] and "streamlines litigation by dispensing with needless discovery and factfinding."[5] Where applicable, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[6] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[7]

Following the Roberts Court's "civil procedure revival,"[8] the landmark decisions of *Bell Atlantic Corporation v. Twombly*[9] and *Ashcroft v. Iqbal*[10] tightened the standard that district courts must apply to 12(b)(6) motions.[11] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and

---

[4] *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)).

[5] *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

[6] *Id.* at 326 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).

[7] *Id.* at 327.

[8] Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20 (2012).

[9] 550 U.S. 544 (2007).

[10] 556 U.S. 662 (2009).

[11] *Id.* at 670.

replaced it with a more exacting "plausibility" standard.[12]  Accordingly, after

*Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"[13]

"A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[14]  "Although the plausibility standard does not impose a

probability requirement, it does require a pleading to show more than a sheer

possibility that a defendant has acted unlawfully."[15]  Moreover, "[a]sking for

plausible grounds . . . calls for enough facts to raise a reasonable expectation that

discovery will reveal evidence of [wrongdoing]."[16]

The plausibility determination is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."[17]  No

matter the context, however, "[w]here a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'"[18]  Likewise, "[t]hreadbare

---

[12]  *Id.*

[13]  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[14]  *Id.*

[15]  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotation marks and citations omitted).

[16]  *Twombly*, 550 U.S. at 556.

[17]  *Iqbal*, 556 U.S. at 679.

[18]  *Id.* at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[19]

Nevertheless, when disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[20] The Court is not, however, required to apply this tenet to legal conclusions.[21] As a matter of procedure, the United States Court of Appeals for the Third Circuit has directed district courts evaluating motions under Rule 12(b)(6) to proceed in three steps:

(1) The court must "tak[e] note of the elements [the] plaintiff must plead to state a claim";

(2) The court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and

(3) "When there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."[22]

## II. FACTS ALLEGED IN THE AMENDED COMPLAINT

### A. Heckman's Employment at UPMC Wellsboro, North Penn, and the Green Home

North Penn is a Federally Qualified Health Center ("FQHC") that provides medical services in Tioga County, Pennsylvania.[23] North Penn operates health

---

[19] *Id.*

[20] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[21] *Iqbal*, 556 U.S. at 678; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[22] *Connelly*, 809 F.3d at 787 (alterations in original) (internal quotation marks and citations omitted).

[23] Doc. 26 at ¶¶ 9, 13.

clinics in six municipalities within Tioga County, including Blossburg, Lawrenceville, Wellsboro, Elkland, Mansfield, and Westfield.[24]  In 1988, North Penn entered into a partnership with Soldiers & Sailors Memorial Hospital in Wellsboro to form Laurel Health System.[25]  In 2012, Laurel Health System was acquired by Williamsport-based UPMC Susquehanna, which then renamed the hospital to UPMC Wellsboro.[26]

After completing a fellowship in obstetrics, Dr. Heckman began employment at North Penn in 2016 as a primary-care and obstetrical-care physician.[27]  Heckman and North Penn executed a five-year employment contract on April 22, 2016 (the "North Penn Employment Agreement").[28]  The agreement set Heckman's base salary as a North Penn physician, although it allowed North Penn to adjust Heckman's base salary beginning in the second year of Heckman's employment.[29]  Adjustments (either upward or downward) could be made based on the "financial performance" of Heckman's practice in the prior contract year.[30]

---

[24]  *Id.* at ¶ 9.
[25]  *Id.* at ¶ 18.
[26]  *Id.* at ¶ 19.
[27]  *Id.* at ¶ 16.
[28]  Doc. 42-1.  UPMC Wellsboro attached the North Penn Employment Agreement to its brief in support of its motion to dismiss.  Because the agreement is integral to the amended complaint, and because there is no dispute as to its authenticity, the Court will consider it for purposes of resolving Defendants' motions.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).
[29]  Doc. 42-1 at § 4.
[30]  *Id.* at § 4.B.

The North Penn Employment Agreement also contained a restrictive covenant prohibiting Heckman from practicing medicine within a twenty-five mile radius for one year following the contract's termination.[31]  Heckman could nullify the covenant by forfeiting a year's salary.[32]  If Heckman opted not to do so, however, and instead breached the covenant, North Penn reserved the right to seek injunctive relief against him and to extend application of the covenant by a variable period of time.[33]  Additionally, the North Penn Employment Agreement stated that North Penn would be responsible for maintaining any medical records prepared by Heckman.[34]  Following termination of the agreement, Heckman would remain entitled to access and make copies of these records.[35]

Heckman was promoted to North Penn's Medical Director in late-2017, and then to North Penn's Chief Medical Officer in March 2018.[36]  As Chief Medical Officer, Heckman supervised a staff of over thirty medical providers.[37]  He also maintained his practice as a physician.[38]  Heckman does not allege that he entered into a new contract with North Penn or that the North Penn Employment

---

[31]  *Id.* at § 8.B.
[32]  *Id.* at § 8.B.
[33]  *Id.* at § 8.C.  If Heckman breached the agreement but North Penn did not seek an injunction, the covenant would be extended "for a period of time equal to the period of time during which any such breach should occur."  *Id.*  If North Penn ultimately sought and received an injunction, the covenant would extend for one year.  *Id.*
[34]  *Id.* at § 15.
[35]  *Id.*
[36]  Doc. 26 at ¶ 16.
[37]  *Id.*
[38]  *Id.* at ¶¶ 25-26.

Agreement was modified as a result of his promotions. Accordingly, the Court assumes that the North Penn Employment Agreement remained in effect throughout the course of Heckman's employment.

Then, on June 1, 2018, North Penn assigned its rights and obligations under the North Penn Employment Agreement to UPMC Wellsboro.[39] Heckman consented to this assignment and affirmed that all terms and conditions of the North Penn Employment Agreement would remain in effect.[40] It appears at this point that UPMC Wellsboro assumed responsibility for paying Heckman's salary and issuing his W-2.[41] At the same time, Heckman maintained his employment with North Penn as if nothing had changed; he continued practicing as a physician and serving as North Penn's Chief Medical Officer.[42] North Penn still retained control over Heckman's compensation (it paid Heckman's salary to UPMC Wellsboro which then paid Heckman), and Heckman reported directly to North Penn's CEO, James Nobles.[43]

On August 1, 2019, UPMC Wellsboro, North Penn, and the Green Home (a UPMC Wellsboro affiliate) executed a tri-party agreement leasing Heckman to the

---

[39] *Id.* at ¶ 25; Doc. 42-1 at 13. The parties have not attached the assignment agreement between UPMC Wellsboro and North Penn; rather, UPMC Wellsboro includes only a writing signed by Heckman confirming his consent to the assignment. Additionally, though the writing refers to the assignee as Soldiers & Sailors Memorial Hospital, the parties acknowledge that UPMC Wellsboro is the assignee.

[40] Doc. 42-1 at 13.

[41] Doc. 26 at ¶ 27.

[42] *Id.* at ¶ 26.

[43] *Id.* at ¶¶ 28, 34, 36, 52.

Green Home.[44]  Under this arrangement, Heckman was to serve as the Green

Home's Medical Director.[45]  The Green Home would then remit payment for

Heckman's services to UPMC Wellsboro.[46]  Heckman alleges that he had an

employment agreement with UPMC Wellsboro and the Green Home

memorializing this relationship.[47]  However, he also asserts that the parties

expected that Heckman would receive payment from the Green Home (via UPMC

Wellsboro) based on "custom and practice."[48]

## B.      North Penn's Receipt of Section 330 Grant Funds

As an FQHC, North Penn is eligible to receive federal grant funding from

the United States Department of Health and Human Services under Section 330 of

the Public Health Service Act (codified at 42 U.S.C. § 254b).[49]  To apply for a

Section 330 grant, an eligible health center must complete and submit a grant

application.[50]  The Health Resources and Services Administration sets forth

policies and conditions regarding Section 330 grant recipients.[51]  These policies are

---

[44]  *Id.* at ¶¶ 10, 31.
[45]  *Id.* at ¶ 31.
[46]  *Id.* at ¶ 32.
[47]  *Id.* at ¶¶ 33, 125.  Heckman cites, for example, an automatic-termination provision requiring the Green Home to terminate Heckman in the event that he was discharged by UPMC Wellsboro. *Id.* at ¶ 33.
[48]  *Id.* at ¶ 32.
[49]  42 U.S.C. § 254b.  Per the amended complaint, North Penn also receives Pennsylvania Medicaid reimbursements under the federal Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act.  Doc. 26 at ¶ 114.
[50]  42 U.S.C. § 254b.
[51]  Doc. 26 at ¶ 38.

located in the Health Center Program Requirements, the Health Center Program Terms and Definitions, and the Health Center Compliance Manual.[52]

On January 7, 2020, North Penn submitted a Section 330 grant application.[53] In this application, North Penn certified that it was "not part of a parent, affiliate, or subsidiary organization."[54] North Penn also stated that it required competitive bids for any purchase costing more than $3,000.[55] North Penn further acknowledged that it:

- "Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain"; and

- "Will comply with all applicable requirements of all other Federal Laws, executive orders, regulations, and policies governing this program."[56]

Heckman alleges that North Penn made these certifications "repeatedly and falsely" in several of its Section 330 grant applications.[57]

### C.    UPMC Wellsboro's and North Penn's Relationship

At all relevant times, Janie Hilfiger was the President of UPMC Wellsboro and a "prominent" member of North Penn's Board of Directors.[58] Heckman alleges that she used her position to "exercise control over all conditions" of Heckman's employment, and that this was connected to her effort to "dominate

---

[52]  *Id.*
[53]  *Id.* at ¶ 47; Doc. 26-1.
[54]  Doc. 26 at ¶ 47.
[55]  *Id.* at ¶ 54; Doc. 26-2 at 48.
[56]  *Id.*
[57]  *Id.* at ¶ 46.
[58]  *Id.* at ¶ 49.

and control North Penn."[59]  All other members of North Penn's Board were board

members of or employed by UPMC Wellsboro.[60]

Heckman alleges that when he became the Medical Director of North Penn

in 2017, UPMC Wellsboro had an ongoing practice of overcharging North Penn

for services such as information technology support, physician recruitment and

credentialing, and building leasing and maintenance.[61]  Despite representing to the

contrary on its Section 330 grant applications, North Penn did not require

competitive bids for these services.[62]  UPMC Wellsboro also apparently directed

physicians at North Penn to make referrals in violation of the Stark Law and Anti-

Kickback Statute.[63]  North Penn ceased enforcing this directive after Heckman

voiced concerns that it was illegal and unethical at a North Penn Executive

Leadership meeting.[64]

Prior to this, in 2016, and then later in December 2019, UPMC Wellsboro

attempted to "orchestrate a board vote" to remove North Penn's FQHC

designation.[65]  Successfully terminating North Penn's FQHC status would have

cost North Penn a significant amount in federal funding and would have allowed

UPMC Wellsboro to "exercise complete dominion and control over North Penn for

---

[59]  *Id.* at ¶ 29.
[60]  *Id.* at ¶ 48.
[61]  *Id.* at ¶ 53.
[62]  *Id.* at ¶ 54.
[63]  *Id.* at ¶ 56.
[64]  *Id.* at ¶ 57.
[65]  *Id.* at ¶¶ 63-64.

UPMC Wellsboro's own financial benefit."[66]  North Penn's FQHC status was ultimately not terminated.

In early-2019, Steven Johnson, the President of UPMC Susquehanna, asked North Penn to hire an OB/GYN to practice primarily at UPMC Wellsboro.[67] Johnson allegedly requested that this be done with Section 330 grant funds, even though UPMC Wellsboro is not an FQHC and is therefore not authorized to receive Section 330 funding.[68]  In meetings with Noble, Johnson stated that North Penn was a subsidiary of UPMC Susquehanna.[69]  Johnson contended that UPMC Susquehanna had "bought" North Penn when it acquired Soldiers & Sailors Hospital.[70]

Later, in July 2019, UPMC Wellsboro abandoned this request and instead directed North Penn to terminate its obstetric services.[71]  This was done to eliminate UPMC Wellsboro's competition and thereby increase its profitability.[72] To this end, Hilfiger announced in August 2019 that all obstetric services at North Penn would be discontinued by October 1, 2019, and that North Penn would contract with a UPMC-controlled entity for obstetrics.[73]  Nobles informed

---

[66]  *Id.* at ¶ 63.
[67]  *Id.* at ¶ 51.
[68]  *Id.*
[69]  *Id.* at ¶ 52.
[70]  *Id.*
[71]  *Id.* at ¶ 58.
[72]  *Id.* at ¶ 58.
[73]  *Id.*

Heckman that the decision to terminate North Penn's obstetrics practice was "imposed by Hilfiger under the pressure of a threat."[74]  Heckman lost his practice at North Penn as a result.[75]

In March 2020, UPMC Wellsboro allegedly "plotted to force the closure of North Penn's Elkland and Westfield health centers."[76]  As these centers were highly productive, closing them ran counter to North Penn's financial interests.[77]  The purpose of the closure was to "increase emergency room visits for UPMC Wellsboro and UPMC Cole, shifting revenue to UPMC entities to offset losses associated with the COVID-19 pandemic."[78]  This contradicted the reason North Penn offered for the closures in its 2020 Section 330 grant application, which was to "reduce the non-urgent use of emergency room visits."[79]

## D.    Heckman's Complaints

Heckman has an extensive history of advocating for or against various policies and practices at North Penn.  For example, in 2016, Heckman opposed UPMC Wellsboro's efforts to drop North Penn's FQHC designation.[80]  At a North

---

[74]  *Id.* at ¶ 59.
[75]  *Id.* at ¶ 82.  The amended complaint implies that Heckman continued to see patients at North Penn's Elkland and Westfield centers.  *Id.* at ¶ 75.  Nevertheless, because Heckman alleges that his practice at North Penn was terminated, the Court assumes that the medical care provided at these centers (if any) was unrelated to his obstetrics practice at North Penn.  *Id.* at ¶ 82.
[76]  *Id.* at ¶ 75.
[77]  *Id.* at ¶ 76.
[78]  *Id.*
[79]  *Id.* at ¶ 77.
[80]  *Id.* at ¶ 63.

Penn board meeting, Heckman (and other physicians) argued that the loss of North Penn's FQHC-status would negatively impact patient care and physician recruitment.[81]  Heckman later challenged UPMC Wellsboro's renewed attempt to terminate North Penn's FQHC designation in December 2019 on similar grounds (that it would be detrimental to the community).[82]

Heckman also objected to the termination of North Penn's obstetrics practice.  Heckman opposed the termination because it would be bad for patients and for "North Penn's finances."[83]  He raised these concerns on numerous occasions to both Nobles and Hilfiger in individual and executive leadership meetings from August 2019 to January 2020.[84]  In one meeting in August 2019, Heckman complained that the removal of North Penn's obstetrics services was "an additional manifestation of UPMC Wellsboro's exertion of inappropriate control over North Penn and placement of UPMC Wellsboro's financial interests before those of patients served by North Penn."[85]

In mid-2019, Heckman challenged UPMC Wellsboro's practice of overcharging North Penn for services during an individual meeting with Nobles.[86] The meeting was about an initiative to transition North Penn to UPMC's electronic

---

[81]  *Id.*
[82]  *Id.* at ¶ 64.
[83]  *Id.* at ¶¶ 67-68.
[84]  *Id.* at ¶ 69.
[85]  *Id.* at ¶ 72.
[86]  *Id.* at ¶ 73.

medical records system (the "EPIC project"). Heckman asserted that UPMC Wellsboro "was not providing adequate value for the funds it received from North Penn" regarding the EPIC project and other IT-related services.[87] He maintains that he complained because the EPIC project was funded by a Section 330 grant and North Penn had not required UPMC Wellsboro to bid for the contract.[88] Nobles stated that he agreed with Heckman's efforts to oppose UPMC Wellsboro's "domination and control" over North Penn but that "we're hitting walls."[89]

Sometime in March or April 2020, Heckman complained to Nobles regarding UPMC Wellsboro's plan to force the closure of the Elkland and Westfield health centers.[90] Heckman argued that the closure would harm patients in the area and was "an attempt by UPMC Wellsboro to secure a major concession from North Penn" while North Penn's executives were focused on issues related to COVID-19.[91] Heckman apparently planned to raise these concerns at an upcoming UPMC Wellsboro board meeting, although he was terminated before the board meeting happened.[92]

Throughout this time period, Heckman alleges that, in his role as North Penn's Chief Medical Officer, he "objected to UPMC Wellsboro's domination and

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.* at ¶ 78.
[91] *Id.*
[92] *Id.* at ¶¶ 75, 79.

control of North Penn because" the entities' relationship violated federal regulations and requirements regarding FQHCs.[93]  He further asserts that he "complained directly to Nobles and Hilfiger about UPMC Wellsboro's ongoing efforts to undermine North Penn's independence and operations for the financial benefit of Wellsboro, in violation of the FQHC Program Requirements."[94]  While Heckman does not explain on what dates he made these complaints, the Court finds it reasonable to infer that these objections were made during at least one of the meetings referenced above.

As an executive officer, Heckman claims that he was able to witness "the progression of UPMC Wellsboro's scheme to gain silent control of North Penn, eliminate North Penn's ability to compete with UPMC Wellsboro, and exploit North Penn's finances to effectively garner the federal and state subsidies flowing from North Penn's status as" an FQHC.[95]  Because Heckman "believed this was greatly detrimental to both North Penn and its patient population," he purposefully "engaged in a pattern of advocacy to protect North Penn and its patients."[96]

Finally, beginning in late-2019, Heckman started challenging two aspects of his compensation.[97]  Heckman alleges first, that the Green Home never paid UPMC Wellsboro for Heckman's work there, and second, that UPMC Wellsboro

---

[93]  *Id.* at ¶ 62.
[94]  *Id.* at ¶ 63.
[95]  *Id.* at ¶ 3.
[96]  *Id.*
[97]  *Id.* at ¶ 83.

likewise did not pay Heckman.[98]  He claims that he was "adversely affected" by the loss of his obstetrics practice.[99]  Heckman "repeatedly complained about having his obstetrics practice reinstated" and being paid for his work at the Green Home during "regular and frequent" meetings with Hilfiger and other UPMC Wellsboro officials.[100]  At these meetings, Heckman "insisted that he needed to be paid as contracted for his work at" the Green Home, and that "UPMC Wellsboro needed to set a date for the reinstatement of his obstetrics practice."[101]

## E.    Heckman's Termination

In July 2019, Nobles informed Heckman that "the relationship between North Penn and UPMC Wellsboro had deteriorated due to [Heckman's] challenges to" UPMC Wellsboro's conduct.[102]  During this conversation, Nobles stated that Heckman's name "keeps coming up" in meetings with Hilfiger and that Hilfiger accused Heckman of being "disruptive.[103]  Additionally, Nobles said "I need you to stop talking about the problems we have to anyone that asks or is willing to listen" because Heckman was a North Penn executive and his advocacy "has consequences for North Penn."[104]  Nobles then asked Heckman to cease his

---

[98]  *Id.* at ¶¶ 80-81.
[99]  *Id.* at ¶ 82.
[100]  *Id.*
[101]  *Id.* at ¶¶ 83-84.
[102]  *Id.* at ¶ 66.
[103]  *Id.*
[104]  *Id.*

complaints and "leave advocacy to him."[105]  Heckman was subsequently demoted

from his position as Chief Medical Officer of North Penn in October 2019.[106]

Then, in March or early April 2020, Hilfiger told Nobles that Heckman was

a "liability" and directed him to fire Heckman.[107]  Heckman alleges that she did

this, at least in part, to prevent Heckman from raising objections at the upcoming

board meeting.[108]  On April 3, 2020, during a meeting with North Penn and UPMC

Wellsboro officials, Nobles "followed Hilfiger's directive and fired Heckman."[109]

At the meeting, Heckman received letters of termination from both Nobles (firing

him from North Penn) and UPMC Wellsboro officials (firing him from UPMC

Wellsboro).[110]  North Penn also "purported to terminate [Heckman's] employment

with" the Green Home.[111]

Following Heckman's termination, Heckman relaunched his obstetrics

practice at the All Natural Wellness Center in Elkland to provide prenatal care to

patients in the Elkland and Westland areas.[112]  Heckman opened this practice

because approximately twenty percent of prenatal patients in Elkland and fifty

percent in Westland lack reliable transportation to UPMC Wellsboro.[113]  These

---

[105]  *Id.*
[106]  *Id.* at ¶ 74.
[107]  *Id.* at ¶ 79.
[108]  *Id.*
[109]  *Id.*
[110]  *Id.* at ¶ 30.
[111]  *Id.*  It is not clear precisely what this means, although the Court understands that Heckman's employment with the Green Home was effectively terminated.
[112]  *Id.* at ¶ 86.
[113]  *Id.* at ¶ 87.

areas are both considered medically underserved, and, at the time, had no local obstetrics physicians before Heckman opened his practice.[114]

On July 8, 2020, UPMC Wellsboro sent Heckman a letter demanding that he cease and desist from practicing medicine in Elkland because of the "covenants not to compete contained within his employment agreement."[115] On August 14, 2020, North Penn sent Heckman a letter demanding repayment of a $60,000 signing bonus (plus interest) that would have been forgiven had Heckman remained employed at North Penn through August 31, 2021.[116] Heckman's access to patient records at UPMC Wellsboro was also revoked.[117] Attempts to recover his physician badge and have his access reinstated have been unsuccessful.[118]

## III. DISCUSSION

Heckman asserts five claims against Defendants. The amended complaint contends that:

- The North Penn Employment Agreement's non-compete clause is unenforceable, neither UPMC Wellsboro nor North Penn may recover Heckman's signing bonus, and UPMC Wellsboro and North Penn have unlawfully prevented Heckman from utilizing his membership on UPMC Wellsboro's medical faculty and from accessing his patients' medical records (Count I);

- UPMC Wellsboro and North Penn unlawfully retaliated against Heckman in violation of the False Claims Act (Count II);

---

[114] *Id.* at ¶ 89.
[115] *Id.* at ¶ 90.
[116] *Id.* at ¶ 95.
[117] *Id.* at ¶ 93.
[118] *Id.*

- UPMC Wellsboro and North Penn unlawfully retaliated against Heckman in violation of the Pennsylvania Whistleblower Law (Count III);

- UPMC Wellsboro and North Penn unlawfully retaliated against Heckman in violation of the Fair Labor Standards Act (Count IV); and

- UPMC Wellsboro and the Green Home failed to pay Heckman contracted-for wages in violation of the Pennsylvania Wage Payment and Collection Law (Count V).

Defendants now move to dismiss all counts under Rule 12(b)(6) for failure to state a claim.

## A.    Count I: Declaratory Judgment

Count I requests declaratory and equitable relief regarding four aspects of Heckman's employment with UPMC Wellsboro and North Penn.  Heckman seeks declarations that (1) the North Penn Employment Agreement's non-compete clause is unenforceable as a matter of public policy; and (2) neither UPMC Wellsboro nor North Penn may recover his signing bonus.  He also asks for an injunction enjoining UPMC Wellsboro and North Penn from preventing Heckman from (3) utilizing his membership on the UPMC Wellsboro medical faculty; and (4) accessing his patients' medical records.

UPMC Wellsboro and North Penn argue that Count I should be dismissed for being nonjusticiable, for failure to state a claim against North Penn, and for failure to state a claim that the North Penn Employment Agreement's non-compete clause is unenforceable as a matter of public policy.  The Court concludes that Heckman's claim is justiciable, and that he has stated a claim for declaratory and

injunctive relief.  Accordingly, UPMC Wellsboro's and North Penn's motions to dismiss Count I are denied.

### 1. Justiciability

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such a declaration."[119]  But "[t]he Supreme Court, in upholding the constitutionality of the Act, has interpreted the remedy as limited to cases and controversies in the constitutional sense."[120]  As a result, to survive a motion to dismiss, a plaintiff seeking a declaratory judgment must show that he alleges a justiciable case or controversy under Article III.[121]

In an action for a declaratory judgment, the case-or-controversy requirement often implicates two questions of justiciability.  The first is whether the plaintiff has standing, and the second is whether the plaintiff's claim is ripe.  A plaintiff can prove standing by showing the three elements of injury-in-fact, causation, and redressability.[122]  By comparison, ripeness asks "whether a party has brought an action prematurely," and if so, "counsels abstention" until the claim satisfactorily

---

[119] 28 U.S.C. § 2201(a).
[120] *Wyatt, V.I., Inc.*, 385 F.3d 801, 805 (3d Cir. 2004) (citing *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240 (1937)).
[121] *Id.*
[122] *Wayne Land & Min. Grp. L.L.C. v. Del. River Basin Comm'n*, 894 F.3d 509, 524-25 (3d Cir. 2018).

ripens into an actionable case or controversy.[123] North Penn asserts both that Heckman lacks standing and that his claims are unripe.

### a.  Standing

"To establish Article III standing, a plaintiff must allege '(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'"[124] "Injury in fact requires 'the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical.'"[125] "The determination of what is imminent is somewhat elastic, but it is fair to say that plaintiffs relying on claims of imminent harm must demonstrate that they face a realistic danger of sustaining a direct injury from the conduct of which they complaint."[126]

In general, "[a]llegations of possible future injury do not satisfy the requirements of Article III."[127] "And a party seeking equitable relief for a prospective injury . . . must show a 'likelihood of substantial and immediate irreparable injury' to establish standing."[128] "Allegations of possible injury" are

---

[123] *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (internal quotation marks omitted) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)).

[124] *Finkelman v. Nat'l Football League*, 877 F.3d 504, 510 (3d Cir. 2017) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 272 (3d Cir. 2016)).

[125] *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020) (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016)).

[126] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011)).

[127] *Sherwin-Williams Co.*, 968 F.3d at 269.

[128] *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

insufficient; rather, "[a] threatened injury must be 'certainly impending' to constitute injury in fact."[129] Further, the standing inquiry is remedy-specific, and injury-in-fact must be demonstrated for each form of requested relief.[130] As the party invoking federal jurisdiction, Heckman bears the burden of establishing standing.[131]

North Penn argues that Heckman lacks standing because he has not shown injury-in-fact. North Penn first challenges Heckman's claim regarding the non-compete clause for failure to allege the invasion of a legally protected interest; North Penn appears to base this conclusion on the assertion that reasonable non-compete clauses are regularly enforced in Pennsylvania. North Penn next contends that Heckman's claims requests for injunctive relief must be dismissed as they are not connected to the covenant not to compete contained within the North Penn Employment Agreement.[132]

The Court is not persuaded. First, that non-compete clauses are regularly enforced in Pennsylvania does not mean that questions regarding a specific clause's enforceability are necessarily outside the realm of Article III standing. If North Penn were to attempt to enforce the North Penn Employment Agreement's non-compete clause against Heckman, Heckman would be able to proffer defenses

---

[129] *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks and citations omitted).
[130] *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).
[131] *Wayne Land*, 894 F.3d 509 at 525 (citation omitted).
[132] North Penn does not argue that Heckman lacks standing regarding his signing bonus.

to evade enforcement just as he would regarding any other contract claim. Because such a situation would certainly create a case or controversy within the meaning of Article III, the Court cannot accept that the *subject matter* of Heckman's claim does not establish an injury-in-fact.[133]

Second, Heckman has standing to seek injunctive relief preventing North Penn (and UPMC Wellsboro) from interfering with Heckman's membership on UPMC Wellsboro's medical faculty and having his access to patient medical records reinstated. To begin with, North Penn cites no law supporting the proposition that Heckman's claims for injunctive relief must be dismissed because they are not directly related to his claim regarding the enforceability of the non-compete clause. As far as the Court is concerned, claims brought under the Declaratory Judgment Act may be asserted in one count. And doing so is not a basis for dismissal under Rule 12(b)(6).

Moreover, the North Penn Employment Agreement confers upon Heckman a contractual entitlement to review his patient records. Section 15 of the agreement states that, while all patient records remain the property of North Penn, the records "shall be available for review" by Heckman upon request.[134] And Heckman's allegations that he has not been able to review these records plainly establishes the

---

[133] Notably, North Penn does not contend that Heckman's injury is not sufficiently imminent under the rubric of injury-in-fact, instead reserving that argument under the doctrine of ripeness.
[134] Doc. 42-1 at § 15.

invasion of a concrete legal interest.[135]  Further, because Heckman's ability to

access patient records may be connected to his reinstatement onto UPMC

Wellsboro's medical faculty, the Court finds that Heckman has standing to seek

this remedy as well.[136]

## b.     Ripeness

Just as plaintiffs must have standing to bring suit in federal court, claims

must ripen before they can constitute a justiciable case or controversy.[137]  The

doctrine of ripeness exists to prevent federal courts, by avoiding premature

adjudication, "from entangling themselves in abstract disagreements."[138]  In

evaluating whether a dispute has properly ripened, "courts must consider 'the

fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration.'"[139]  A claim is not ripe if it "rests upon

---

[135] The Court notes that none of the parties attempt to clarify the distinction between the rights and obligations under the North Penn Employment Agreement (i.e., the obligation to pay Heckman), which were assigned to UPMC Wellsboro, and the agreement's terms (i.e., Heckman continuing to work on North Penn's behalf), which were not assigned.  Because the parties have not submitted the assignment agreement between UPMC Wellsboro and North Penn, the Court declines to consider the implications of assignment at this point in the litigation.

[136] To the extent North Penn contends that equitable relief is unavailable under the Declaratory Judgment Act, that argument is rejected.  The Declaratory Judgment Act explicitly authorizes any "further" relief where "necessary and proper."  28 U.S.C. § 2202.  This includes equitable or injunctive relief.  *Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can . . . be used as a predicate to further relief, including an injunction." (citations omitted)).

[137] *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011).

[138] *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[139] *Wyatt*, 385 F.3d at 806 (quoting *Abbott Labs*, 837 U.S. at 149).

'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[140]

"The parameters of 'ripeness' are especially difficult to define within the context of declaratory judgment actions."[141]  This is because "declaratory judgments are, of necessity, rendered before an 'accomplished' injury has been suffered."[142]  Nevertheless, the Third Circuit has articulated a three-factor test for courts to use when analyzing whether a claim is ripe.  Under this test, courts look to: "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment."[143]  North Penn contests only the adversity of the parties' interests.

The adversity factor is satisfied where "harm will result if the declaratory judgment is not entered."[144]  In general, adversity of the parties' interests will only exist in a case involving the threat of future harm if the plaintiff demonstrates "that the probability of that future event occurring is real and substantial" and is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[145]

---

[140] *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

[141] *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995) (citing *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646 (3d Cir. 1990)).

[142] *Id.* (citation omitted).

[143] *Cook*, 866 F.3d at 540 (internal quotation marks omitted) (quoting *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004)).

[144] *Travelers*, 72 F.3d at 1154 (citation omitted).

[145] *Id.* (cleaned up) (quoting *Salvation Army v. Dep't of Cmty. Affs.*, 919 F.2d 183, 192 (3d Cir. 1990)).

But a plaintiff may be able to show adversity when faced with the threat of private, civil prosecution.[146]  This rule was aptly articulated in *MedImmune, Inc. v. Genentech, Inc.*[147]  There, the defendant sent the plaintiff a letter informing the plaintiff that it might be infringing upon one of the defendant's patents and demanding that the plaintiff pay royalties under a patent-licensing agreement.[148]  The plaintiff, believing that the patent was invalid, unenforceable, and not infringed upon, filed a suit for a declaratory judgment to determine the validity of the patent.[149]

*MedImmune* found that the plaintiff stated a case or controversy for purposes of Article III even though the plaintiff had not yet infringed upon the patent and the defendant had not taken any further steps to initiate a civil action.[150]  *MedImmune* reasoned that, like the threat of criminal prosecution, the threat of private enforcement of a contractual right constitutes coercion where it puts a plaintiff in the dilemma between "abandoning his rights or risking prosecution."[151]  Further, *MedImmune* rejected the proposition that plaintiffs are required to "bet the farm" or "risk treble damages" before seeking a declaratory judgment as unsupported by Article III.[152]

---

[146]  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 134 (2007).
[147]  *Id.*
[148]  *Id.* at 121-22.
[149]  *Id.* at 122.
[150]  *Id.* at 137.
[151]  *Id.* at 129.
[152]  *Id.* at 134.

While *MedImmune* was determined in the context of patent infringement, its reasoning is equally applicable here.  Heckman alleges that he received demand letters from UPMC Wellsboro and North Penn informing him that he was in breach of contract.  The first, from UPMC Wellsboro, demanded that Heckman cease and desist from practicing medicine at the All Natural Wellness Center in violation of the North Penn Employment Agreement's non-compete clause.  The second, from North Penn, demanded that Heckman immediately repay a $60,000 signing bonus to which North Penn claims it was contractually entitled.

The Court is satisfied that the UPMC Wellsboro letter establishes adversity of the parties' interests because it puts Heckman into the same dilemma as that faced by the plaintiff in *MedImmune*: he could either comply with the non-compete clause, foregoing his right to challenge the clause's enforceability, or risk the extension of the clause's effective date and an action for damages.  Likewise, North Penn's letter requesting immediate payment is sufficient to show the risk of immediate harm.  While this dilemma is somewhat mitigated by the threat of an injunction, the Court concludes it is of sufficient immediacy to render the claim ripe.

### 2.     Failure to State a Claim Against North Penn

North Penn next asserts that Count I fails because Heckman does not allege that North Penn signed the agreement, and because Heckman's requests for injunctive relief are directed at UPMC Wellsboro, not North Penn.  While it is true

that Heckman does not allege that North Penn signed the North Penn Employment Agreement, North Penn's contentions are contradicted by the contract itself; the last page of the agreement, attached by UPMC Wellsboro, contains the President of North Penn's signature.[153]

Moreover, per the discussion above, the Court finds that Heckman adequately establishes a claim for injunctive relief against North Penn. The North Penn Employment Agreement states that North Penn *owns* the medical records to which Heckman seeks access. And while it is not clear what control North Penn has over UPMC Wellsboro's medical faculty, it is at least plausible that Heckman would be able to receive adequate relief from North Penn. This is especially true given the complicated and interconnected nature of UPMC Wellsboro's and North Penn's relationship (as alleged in the amended complaint). Accordingly, Heckman adequately states a claim against North Penn under Count I.

### 3. Failure to State a Claim that the Non-Compete Clause Is Unenforceable as a Matter of Public Policy

The Commonwealth of Pennsylvania has a "long history of disfavoring restrictive covenants."[154] Nevertheless, public policy permits enforcement of covenants not to compete in employment agreements where four criteria are satisfied.[155] Non-compete clauses are enforceable only if: (1) they are "ancillary to

---

[153] Doc. 42-1 at 12.
[154] *Socko v. Mid-Atl. Sys. of C.P.A., Inc.*, 126 A.3d 1266, 1268 (Pa. 2015).
[155] *Records Ctr., Inc. v. Comprehensive Mgmt., Inc.*, 525 A.2d 433, 435 (Pa. Super. 1987).

an employment relationship between an employee and employer"; (2) they are "supported by adequate consideration"; (3) "the restrictions are reasonably limited in duration and geographic extent"; and (4) "the restrictions are designed to protect the legitimate interests of the employer."[156]

Generally speaking, the "avoidance of contract terms on public policy grounds requires a showing of overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards."[157] Parties thus may look to past caselaw in determining whether Pennsylvania's public policy would void a non-compete clause and render it unenforceable.[158] Even so, the burden of showing that such a clause is unreasonable and unenforceable as a matter of public policy falls on the employee.[159]

In *New Castle Orthopedic Associates v. Burns*, the Supreme Court of Pennsylvania discussed public interest factors relevant to evaluating whether to issue an injunction enforcing a restrictive covenant against a physician.[160] The primary factors the court considered included the number of physicians already practicing in a specific area, as well as the negative impact enforcement would

---

[156] *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021) (citation omitted).

[157] *Id.* (quotation marks omitted) (quoting *Camelback Ski Corp.*, 47 A.3d 1190, 1199 (Pa. 2012)).

[158] *See id.*

[159] *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1169-70 (Pa. 1977) (citations omitted).

[160] 392 A.2d 1383, 1387 (Pa. 1978).

have on patients.[161]  As the Court put it, "[i]n an area where the availability of and the rising cost of medical services are matters of national concern, the law must consider the impact of the enforcement of these non-competitive clauses upon the problem."[162]

UPMC Wellsboro argues that Heckman's claim fails because Heckman does not "plead the existence of a single public policy that would render the agreement unenforceable."[163]  Heckman responds that he alleges facts plausibly establishing that enforcing the North Penn Employment Agreement's non-compete clause would run contrary to the factors set forth in *Burns*.  Specifically, Heckman points to the allegation that, when he began working at the All Natural Wellness Center, he was the only practicing obstetrician in all of Elkland and Westfield.  He also cites averments that a significant number of prenatal patients in the area lack reliable transportation to UPMC Wellsboro.

The Court concludes these factual allegations are sufficient to state a claim that the non-compete clause is void as against public policy.  The reasoning in *Burns* is deeply rooted in considerations of public policy relating to the impact of restrictive covenants in the medical context.  And while the Pennsylvania Supreme Court has not revisited this question since deciding *Burns*, the Court is convinced that the Pennsylvania Supreme Court would consider *Burns* to have created a rule

---

[161] *Id.* at 1388.
[162] *Id.* at 1387.
[163] Doc. 42 at 8.

of public policy.[164]  As Heckman pleads facts plausibly establishing the application of this rule to the non-compete clause at issue here, the Court concludes that he adequately states a claim.

### B.     Count II: Retaliation Under the False Claims Act

Enacted in 1863 "to combat fraud and price-gouging in war procurement contracts,"[165]  the FCA makes liable any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" from the government.[166]  The FCA is punitive in nature,[167] and extends broadly any type of fraud committed against the government.  A claim under the FCA may be brought by a private citizen in a *qui tam* suit, or by the government in a direct action for damages.[168]

The FCA also protects employees who aid the government in investigating or prosecuting FCA violations, or who attempt to stop FCA violations before they happen or recur.[169]  The FCA's "whistleblower" provision shields employees from

---

[164] *See also West Penn Specialty M.S.O., Inc. v. Nolan*, 737 A.2d 295, 298 (Pa. Super. 1999) ("[W]here the covenant in question seeks to limit the professional practice of a physician, the court must scrutinize the effect of the resulting loss of medical services on the public interest." (citing *Burns*, 392 A.2d at 1385)).  "In the absence of a controlling decision by the Pennsylvania Supreme Court, [a federal court] must predict how it would rule if faced with the issue." *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 216 (3d Cir. 2010) (citation omitted).  The Court believes the Pennsylvania Supreme Court's forceful articulation in *Burns* weighs heavily in favor of finding that its ruling recognized a public policy under Pennsylvania law.

[165] *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994).

[166] 31 U.S.C. § 3729(a)(1).

[167] *See Vt. Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000) (describing the FCA's fines as "essentially punitive in nature").

[168] *United States ex rel. Stinson, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir. 1991).

[169] 31 U.S.C. § 3730(h).

retaliation in such circumstances because "[f]ew individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment" or any other adverse action.[170]  Consequently, where an employer retaliates against its employee for engaging in protected activity under the FCA, the employee is entitled to "all relief necessary to make that employee . . . whole."

To state a claim for retaliation under the FCA, a plaintiff must establish that: (1) he engaged in protected activity; (2) the employer knew he was engaged in such activity; and (3) he was retaliated against because of the activity.[171]  Both UPMC Wellsboro and North Penn challenge Count II for failure to plead the first and second elements.[172]

### 1.    Legal Standard

"In 1986, Congress added a retaliation provision [to the FCA], protecting employees from being targeted for actions taken 'in furtherance of an action [under the FCA], including investigation for, initiation of, testimony for, or assistance in

---

[170] *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (internal citations omitted); *see also* 31 U.S.C. § 3730(h)(1).

[171] *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citations omitted); *see United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) ("For a plaintiff to demonstrate that he was discriminated 'against "because of" conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct."'" (quoting *Hutchins*, 253 F.3d at 186).

[172] While both parties frame their notice argument as one of causation, neither directly address the issue.  Cognizant of the overlap between the questions of notice and causation, the Court does not address the third element at length.

an action filed or to be filed under [the FCA]."[173]  Based on this language, a

number of Circuits (including this one) interpreted the provision as protecting

activity only where there was "a distinct possibility that a viable FCA action could

be filed."[174]

To succeed under this standard, an employee must show that he was acting

in furtherance of a viable FCA action (requiring a demonstration of the employer's

underlying liability),[175] and that he put his employer "on notice of the 'distinct

possibility' of [FCA] litigation."[176]  The Third Circuit imported the distinct

possibility standard into the notice analysis on the basis that the type of knowledge

necessary to predicate a finding of retaliatory intent must mirror the type of

protected activity in which the employee engaged.[177]

Congress then amended the FCA's whistleblower provision in 2009 to

expand the scope of protected activity.[178]  Where the pre-2009 provision defined

protected activity as only that done in furtherance of an FCA action, the 2009

version stated that protected activity also encompasses conduct done in furtherance

of "other efforts to stop [one] or more violations" of the FCA.[179]  "In other words,

---

[173] *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021) (quoting 31 U.S.C. § 3730(h)).
[174] *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002) (collecting cases).
[175] *Id.*
[176] *Hutchins*, 253 F.3d at 188.
[177] *Id.* (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998)).
[178] *Hickman*, 985 F.3d at 1288 (discussing the impact of the 2009 amendments); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012).
[179] 31 U.S.C. § 3730(h)(1).

the amendments expanded retaliation coverage to at least some set of people who 'make efforts to stop' [FCA] violations—even if those efforts do not lead to a lawsuit or to the 'distinct possibility' of a lawsuit."[180]

Since 2009, several Circuits have addressed the applicability of the "distinct possibility" standard to the newly added "other efforts" prong of the whistleblower provision. Virtually every court that has squarely taken up the issue has ruled that the standard cannot apply to this latter category of protected activity.[181] Courts have done so on grounds that the added text decouples protected activity from the requirement of future FCA litigation.[182] Courts have also noted the inconsistency of requiring a plaintiff to show the viability of future litigation when the statute protects efforts to *prevent* FCA violations.[183]

---

[180] *Hickman*, 985 F.3d at 1288 (citing *United States ex rel. v. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95-98 (2d Cir. 2017)).

[181] *Singletary v. Howard Univ.*, 939 F.3d 287, 296-97 (D.C. Cir. 2019); *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201-02 (4th Cir. 2018); *see also Hickman*, 985 F.3d at 1288-89; *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 765 (10th Cir. 2019) (questioning the viability of case law interpreting the scope of protected activity under the FCA pre-amendments); *Chorches*, 865 F.3d at 95-96 (holding that a plaintiff adequately alleged protected activity by pleading that he intentionally refused to engage in a fraudulent scheme in a way that "reasonably could be expected to prevent the submission of a false claim to the government"). *But see United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 n.8 (1st Cir. 2017) (holding that a plaintiff still needed to show that conduct "reasonably could lead to an FCA action" to constitute protected activity because pre-2009 precedent had already interpreted the 1986-version of the whistleblower provision as extending to conduct not directly in furtherance of an FCA lawsuit).

[182] *Singletary*, 939 F.3d at 295-96; *Reed*, 923 F.3d at 766 ("Congress added the 'other efforts to stop' language for a reason—namely, to stretch the 'protected activity' umbrella to cover additional conduct.").

[183] *Carlson v. DynCorp Int'l LLC*, 657 Fed. Appx. 168, 171 (4th Cir. 2016).

As a result, at least two Circuits have replaced the "distinct possibility" standard with one asking whether the employee's belief that an employer was violating (or was about to violate) the FCA was "objectively reasonable," at least when considering activity under the "other efforts" prong.[184]  Courts which have rejected application of the distinct possibility standard but not adopted the objectively reasonable test generally ask whether an employee has shown that he acted in furtherance of an effort to stop a future FCA violation.[185]  The new standards also frame what notice a plaintiff must show to state a claim for retaliation.[186]

As the Third Circuit has not directly interpreted the "other efforts" language added to the whistleblower provision in 2009,[187] the Court must now consider what standard to apply in evaluating Heckman's claim.  After careful consideration, the Court concludes that the "objectively reasonable" test is most appropriate.  The

---

[184]  *Singletary*, 939 F.3d at 297; *Grant*, 912 F.3d at 201.

[185]  *Reed*, 923 F.3d at 765-66; *Chorches*, 865 F.3d at 96-97 (finding an employee's refusal to participate in making a false claim protected activity under the amended version of the FCA's whistleblower provision).

[186]  *See Reed*, 923 F.3d at 766 ("Once Congress expanded the scope of protected activity, the universe of conduct that a plaintiff could allege to show notice also necessarily expanded." (citing *United States ex rel. Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 & n.6 (4th Cir. 2015)).

[187]  In *United States ex rel. Petras v. Simparel, Inc.*, the Third Circuit suggested that the "distinct possibility" standard would continue to apply when it stated that the whistleblower provision applies "only to actions taken in furtherance of a *viable* FCA case." 857 F.3d 497, 507-08 (3d Cir. 2017) (emphasis in original); *accord. Ascolese v. Shoemaker Constr. Co.*, 2021 WL 1534505, at *12 (E.D. Pa. Apr. 19, 2021); *United States ex rel. Perri v. Novartis Pharm. Corp.*, 2019 WL 6880006, at *20 (D.N.J. Feb. 21, 2019).  However, because the retaliation claims in *Petras* were almost certainly asserted under the "FCA action" prong of § 3730 (as the plaintiff had filed a *qui tam* action), the Court finds the Third Circuit's reaffirmance of the "distinct possibility" standard limited to that element of the whistleblower provision.

2009 version of the whistleblower provision lifted the requirement that protected activity be connected to present or future FCA litigation.[188]  Accordingly, a standard which premises success on a plaintiff's ability to show the viability of litigation is simply untenable under the statutory text.[189]

The Court's analysis therefore proceeds as follows.  First, the Court determines whether Heckman adequately alleges that he engaged in protected activity under the "other efforts" prong of the whistleblower provision.  This requires assessing whether Heckman sufficiently pleads that he had an objectively reasonable belief that UPMC Wellsboro and North Penn were in violation of, or were about to violate, the FCA.  Second, the Court considers whether Heckman's alleged objections plausibly put UPMC Wellsboro and North Penn on notice that Heckman was attempting to stop one or more violations of the FCA.

---

[188] *Singletary*, 939 F.3d at 296 ("[T]he plain statutory text focuses on the whistleblower's 'efforts to stop' violations of the statute before they happen or recur . . . To put it simply, the focus of the second prong is preventative—stopping 'violations'—while the first prong is reactive to an (alleged) actual violation of the statute." (internal citations omitted)).

[189] This is even more evident in the context of notice, as a plaintiff who successfully stops an FCA violation from occurring would have no opportunity to show that his employer had notice of future litigation.  *See also Grant*, 912 F.3d at 201 ("A plain reading of this provision suggests the incongruousness of attempting to subject it to the 'distinct possibility' standard.  The apparent purpose of the amendment is to untether these newly protected efforts from the need to show that an FCA action is in the offing."); *Carlson*, 657 Fed. Appx. at 171 ("It would be nonsensical to say that [other] efforts only become protected activity if a lawsuit under the FCA becomes a distinct possibility—the second prong is explicitly untethered from any such action.").

## 2. Protected Activity

As discussed above, for a plaintiff to establish that he acted in furtherance of "other efforts" to stop one or more violations of the FCA, he must allege that his actions were "motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA."[190]  The objectively reasonable standard requires a demonstration of four elements, that: (1) the employee believed that his employer was violating the FCA; (2) this belief was reasonable; (3) the employee took action based on that belief; and (4) his actions were "designed to stop one or more violations of the FCA."[191]

The Court is convinced that Heckman satisfies all four elements.  The first and third are met as Heckman alleges that he believed UPMC Wellsboro and North Penn were about to violate the FCA, and that he objected to various practices on this basis.  The Court determines that the second and fourth elements, though warranting an extended discussion, are also satisfied because Heckman alleges conduct by UPMC Wellsboro and North Penn demonstrating a plausible violation of the FCA and satisfactorily pleads that his objections were intended to stop the FCA violation from occurring.

---

[190] *Grant*, 912 F.3d at 201.
[191] *Id.*

### a. Reasonable Belief

Heckman establishes that he had an objectively reasonable belief that UPMC Wellsboro and North Penn were about to violate the FCA because he pleads conduct showing a plausible claim under the FCA.[192] A claim under the FCA includes four elements: falsity, knowledge, causation, and materiality.[193] Falsity may be premised on an express statement or an omission.[194] The latter type of falsity, also known as an implied false certification, occurs where a claimant "submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the [claimant's] noncompliance with a statutory, regulatory, or contractual requirement."[195]

A statement or misrepresentation is material "if: (1) a reasonable person would attach importance to it in determining a choice of action in the transaction, or (2) the defendant had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, regardless whether a reasonable person would do so."[196] In general, that the government requires compliance with a particular statutory, regulatory, or

---

[192] The Court does not imply that pleading conduct establishing the existence of the elements of an FCA claim is *necessary* to proving reasonableness, only that doing so satisfies the requirement.

[193] *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

[194] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016); *United States ex rel. Kester v. Novartis Pharma. Corp.*, 23 F. Supp. 3d 242, 261 (S.D.N.Y. 2014) (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).

[195] *Escobar*, 136 S. Ct. at 1995.

[196] *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 Fed. Appx. 101, 106 (3d Cir. 2018) (citing *Escobar*, 136 S. Ct. at 2002-03).

contractual requirement as a condition on payment is not enough, on its own, to establish materiality.[197]

Heckman offers at least two theories of liability premised on false certifications made by North Penn in its 2020 Section 330 grant application. These false certifications include North Penn's statements that it would: (1) "establish safeguards to prohibit employees from using their positions for a purpose" that constitutes or creates the appearance of a conflict of interest; and (2) "comply with all applicable requirements" of federal law.[198] Heckman contends that UPMC Wellsboro caused North Penn to make these statements and is therefore also liable under the FCA.[199]

### i.    Heckman's Knowledge of FQHC Program Requirements

Before reaching the merits of Heckman's proffered theories of liability, the Court determines it appropriate to infer that Heckman had both general and specific knowledge of North Penn's obligations as an FQHC. Heckman was an executive at North Penn and knew that North Penn was an FQHC and received federal funding; he thus presumably was aware that North Penn, as an FQHC, had

---

[197] *Escobar*, 136 S. Ct. at 2003.

[198] Other allegedly false statements include that North Penn was "not part of a parent, affiliate or subsidiary organization," and that North Penn required at least three bids for purchases made over $3,000. Because Heckman's primary claims involve challenging the alleged conflict of interest between UPMC Wellsboro and North Penn, as well as their violation of federal program requirements, the Court considers only those.

[199] Accepting as true that every member of North Penn's board is employed by UPMC Wellsboro and that UPMC Wellsboro's president played a significant role in North Penn's operations, the Court finds that a viable claim against North Penn necessarily extends to UPMC Wellsboro.

special duties and obligations under federal law.  Further, it is reasonable to infer that Heckman was aware of specific conditions regarding North Penn's conflict-of-interest requirements and federal obligations because, as an employee, he would have had to comply with them.[200]

### ii. Promise to Create Safeguards Preventing Actual and Apparent Conflicts of Interest

Heckman first claims that North Penn falsely certified in its 2020 Section 330 grant application that it would take steps to prevent employees from using their positions for a purpose that constitutes or creates the appearance of a conflict of interest.  Heckman plausibly establishes the falsity and knowledge element of this claim by alleging that he repeatedly complained to both UPMC Wellsboro and North Penn that their relationship was improper, thus putting them on notice of at least the appearance of a conflict of interest.[201]  Allegations that North Penn was aware of these complaints and yet stated it would take steps to prevent such a result was occurring plausibly demonstrates that North Penn knew its certification was false.

---

[200] The Court does not believe it necessary under these circumstances to require Heckman to specifically plead knowledge of North Penn's grant-application process.

[201] Several allegations also demonstrate the existence of an actual conflict of interest.  This includes claims that North Penn's board membership was entirely comprised of UPMC Wellsboro employees, that UPMC Wellsboro directed North Penn to hire a physician using federal funds to practice at UPMC Wellsboro, that the President of UPMC Susquehanna referred to North Penn as a subsidiary, and that Hilfiger used her position on North Penn's board to pursue policies to the financial benefit of UPMC Wellsboro.

Heckman also satisfies the materiality requirement, as he alleges that North Penn's application would have been rejected had North Penn included information that its current relationship with UPMC Wellsboro had created, at the very least, the appearance of a conflict of interest.  It is entirely plausible that the government, armed with this information, would have chosen to reject North Penn's application.  As a result, because Heckman pleads that UPMC Wellsboro and North Penn may have actually violated the FCA, the Court finds that Heckman sufficiently establishes that his belief that UPMC Wellsboro and North Penn were about to violate the FCA when he began raising his complaints was objectively reasonable.

### iii.    Promise to Comply with Federal Law

Heckman similarly challenges North Penn's promise to comply with applicable federal law.  To receive a Section 330 grant, entities must satisfy a number of requirements.  For example, recipients must be "public or nonprofit private entit[ies]."[202]  They also must meet specific board-composition requirements; for example, a majority of board members must be "individuals who are or will be served by the center and who, as a group, represent the individuals served in terms of demographic factors, such as race, ethnicity, sex."[203]  And "[n]o more than one-half of the remaining board members of the board may be

---

[202]  42 C.F.R. § 51c.103.  A nonprofit private entity is defined by federal regulation as an "entity which may not lawfully hold or use any part of its net earnings to the benefit of any private shareholder or individual."  42 C.F.R. § 23.2.
[203]  42 C.F.R. § 51c.304(b)(1).

individuals who derive more than 10 percent of their annual income from the health care industry."[204]

Regulations additionally mandate that Section 330 grant funds be expended solely upon projects approved under section 330.[205] Money must be spent in a reasonable manner, with consideration being given to certain factors, including whether a contractor or service provider engages in "arms-length bargaining," and what market prices for comparable goods or services for are in a given geographic area [206] Heckman additionally claims that the Section 330 Terms and Definitions specify that a Section 330 grant recipient "may not be owned, controlled, or operated by another entity."[207]

Heckman argues that North Penn was in violation of several of these requirements prior to submitting its 2020 grant application, namely those regarding North Penn's non-profit status, board composition, payment practices, and independence. In response, UPMC Wellsboro characterizes Heckman's objections as challenges to internal business decisions. Neither UPMC Wellsboro nor North Penn squarely address whether Heckman's allegations regarding their conduct might plausibly violate federal law.

---

[204] *Id.* at (b)(2).
[205] 42 C.F.R. § 51c.107.
[206] 45 C.F.R. § 75.404(b), (c).
[207] Doc. 26 at ¶ 39.

The Court concludes that Heckman's pleadings show a plausible violation of the FCA. His allegations establish that these federal requirements were not met at the time that North Penn submitted its 2020 grant application,[208] and thus that North Penn's certification that it planned to comply with federal law was misleading. Though somewhat vaguely, Heckman adequately pleads that he informed both UPMC Wellsboro and North Penn that they were in violation of federal law and federal program requirements prior to North Penn's submission of the grant application. Accordingly, the Court finds the elements of an FCA claim satisfied, and Heckman's belief regarding an impending FCA violation objectively reasonable.

**b.      Designed to Stop One or More Violations of the FCA**

Both UPMC Wellsboro and North Penn argue that Heckman insufficiently pleads that he acted in furtherance of an effort to stop one or more violations of the FCA. In support, they point to the absence of allegations establishing that Heckman's objections informed either party that their conduct would specifically result in a fraud against the government or a violation of the FCA. Heckman responds that he told both parties that they were violating federal law and federal program requirements; he claims this is sufficient to constitute an "effort" to stop the alleged FCA violation.

---

[208] These allegations include that North Penn's board was entirely populated by employees of UPMC Wellsboro, that North Penn did not require bidding from UPMC Wellsboro, and that North Penn was treated as an affiliate or subsidiary of UPMC Wellsboro (a non-FQHC).

The Court agrees with Heckman that informing UPMC Wellsboro and North Penn that North Penn is in violation of FQHC program requirements constitutes an effort to stop a violation of the FCA. Though the amended complaint lacks specific allegations that Heckman referenced the FCA in his conversations with UPMC Wellsboro and North Penn officials, the Court is satisfied that Count II survives, at least under the rubric of a motion to dismiss. To be sure, Heckman's efforts are at least one step removed from the typical "efforts" involving complaints of fraud. Nevertheless, the Court concludes they are sufficient to state a claim.

### 3.     Notice

UPMC Wellsboro and North Penn next contend that Heckman fails to plead that either party had notice of Heckman's protected activity. In doing so, they essentially rehash their arguments that Heckman's generalized complaints are not sufficient to put either party on notice that Heckman was attempting to stop a violation of the FCA. But just as the Court declined to adopt these arguments in the context of establishing Heckman's protected activity, it declines to do so now in considering whether Heckman's complaints put UPMC Wellsboro and North Penn on notice of his protected activity.[209] Consequently, the Court concludes that Heckman states a claim for retaliation under the FCA.

---

[209] The Court further notes that much of the Defendants' arguments are premised on the distinct possibility standard, which, as discussed above, is inapplicable to this case.

## C. Count III: Retaliation Under the Pennsylvania Whistleblower Law

"Generally speaking, the Whistleblower Law precludes a public body from taking any adverse employment action against an employee in retaliation for the employee's good faith report of wrongdoing or waste."[210] "By its terms, the Whistleblower Law applies only to public employees."[211] Accordingly, an employee is only protected under the Whistleblower Law where he can demonstrate that his employer was either "a public body" or an "employer" (an entity "which receives money from a public body" to perform work or provide services for the public body).[212]

UPMC Wellsboro and North Penn argue that: (1) they are neither public bodies nor employers; (2) Heckman was not North Penn's employee; and (3) Heckman did not make a good faith report regarding an instance of waste or wrongdoing. The Court respectfully disagrees, and finds that Heckman states a claim for retaliation under the Whistleblower Law.

### 1. Public Body and Employer

The Pennsylvania Whistleblower Law defines a public body as any entity "which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision

---

[210] *Scrip v. Seneca*, 191 A.3d 917, 925 (Pa. Commw. 2018) (citing 43 P.S. § 1423).
[211] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 332 (3d Cir. 1993).
[212] 43 P.S. § 1422.

authority or a member or employee of that body."[213]  An employer is defined as a public body or an entity "which receives money from a public body to perform work or provide services" for the public body.[214]

District Courts in this Circuit have generally held that mere receipt of Medicaid reimbursements from state funds is insufficient to turn an otherwise private entity into a public body for purposes of Whistleblower Law liability.[215] The main justifications for this rule are the statue's text, which can be read as requiring funding to come from a specific legislative appropriation (not an automatic reimbursements system),[216] and concerns that any other interpretation would be too broad.[217]

By contrast, the Superior Court of Pennsylvania has consistently and repeatedly ruled that the receipt of *any* Medicaid funding is sufficient to bring a private entity into the reach of the Whistleblower Law.[218]  The Superior Court has

---

[213] *Id.*

[214] *Id.*

[215] *Eaves-Voyles v. Almost Family, Inc.*, 198 F. Supp. 3d 403, 409 (M.D. Pa. 2016); *Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 743-44 (E.D. Pa. 2011); *Cohen v. Salick Health Care, Inc.*, 772 F. Supp. 1521, 1527 (E.D. Pa. 1991); *Ortiz v. Priority Healthcare Group LLC*, 2019 WL 3240016, at *4 (M.D. Pa. July 18, 2019); *Grim v. May Grant Assocs.*, 2019 WL 358520, at *4 (E.D. Pa. Jan. 29, 2019).

[216] *E.g.*, *Eaves-Voyles*, 198 F. Supp. 3d at 409; *Tanay*, 810 F. Supp. 2d at 743-44; *Cohen*, 772 F. Supp. at 152.

[217] *E.g.*, *Grim*, 2019 WL 358520, at *4 ("A contrary result would unreasonably expand the scope of the [Pennsylvania Whistleblower Law] to include any private business that accepts payment from a recipient of government assistance, i.e. a grocery store that accepts food stamps.  In limiting the retaliation provision to the report of wrongdoing by a 'public body,' the legislature could not have intended such a large scope.").

[218] *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 475 n.8 (Pa. Super. 2017) ("This Court has held that an entity that receives Medicaid funding is a 'public body' for purposes of the Whistleblower Law." (citations omitted); *Harrison v. Health Network Labs.*

done so on grounds that the phrase "funded in any amount" necessarily extends to all entities which "receive public monies under the administration of the Commonwealth."[219] The Superior Court has also expressly rejected reasoning offered by federal courts in this Circuit holding to the contrary.[220]

While the Pennsylvania Supreme Court has not yet addressed this issue directly, it recently accepted without reservation the Superior Court's interpretation for purposes of resolving a question under the Whistleblower Law. In *Harrison v. Health Network Laboratories Limited Partnerships*, the Pennsylvania Supreme Court presumed as true the assertion that an entity, "as a recipient of Medicare and other forms of public assistance payments," is a "'public body' . . . as defined by the Whistleblower Law."[221]

Given the Superior Court's consistent interpretation of the Whistleblower Law as covering entities which receive Medicaid reimbursements, and the recent decision in *Harrison*, the Court concludes it most appropriate to adopt the Superior Court's holding and reasoning.[222] As a result, the Court finds that an entity which

---

Limited P'ships, 2018 WL 6520982, at *4 n.6 (Pa. Super. Dec. 12, 2018), aff'd, 232 A.3d 674, 677 (Pa. 2020); *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 576 (Pa. Super. 1999); *see also Gratz v. Ruggiero*, 2017 WL 2215267, at *7 (E.D. Pa. May 19, 2017) (citing legislative history as supporting a broad interpretation of the term "public body").

[219] *Denton*, 739 A.2d at 576; *accord. Saltzman*, 166 A.3d at 475 n.8.

[220] *Denton*, 739 A.2d at 576; *Harrison*, 2018 WL 6520982, at *4 n.6.

[221] 232 A.3d 674, 677 n.3 (Pa. 2020) (citations omitted).

[222] "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 254 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d

receives Medicaid reimbursement is a "public body" under the Pennsylvania Whistleblower Law. As North Penn is alleged to receive Medicaid reimbursements from the Commonwealth, the Court determines that it is a public body.

The Court also determines that UPMC Wellsboro, though not a public body, is an "employer" as defined by the Whistleblower Law. Because North Penn is a public body, UPMC Wellsboro constitutes an employer if it receives money from North Penn in exchange for the provision of services.[223] Since the amended complaint alleges that UPMC Wellsboro provides services such as information and technology support to North Penn in exchange for money, Heckman adequately states that UPMC Wellsboro is an employer and thus subject to Whistleblower Law liability.

### 2. Employee

Under the Whistleblower Law, an employee is a "person who performs a service for wages or other renumeration under a contract of hire, written or oral, express or implied," for an employer or public body.[224] North Penn argues that Heckman fails to allege that he was an employee of North Penn, and that such an assertion is contradicted by allegations that UPMC Wellsboro was Heckman's

---

166, 174 (3d Cir. 2005)); *see also Romer v. MHM Prof'ls*, 2020 WL 6747418, at *3-6 (M.D. Pa. Nov. 17, 2020).

[223] 43 P.S. § 1422.

[224] 43 P.S. § 1422.

formal employer. North Penn cites, for example, contentions that UPMC Wellsboro issued Heckman's W-2 forms and was responsible for issuing his paychecks.

But North Penn's assertions are untenable under the text of the Whistleblower Law and in light of the existence of the North Penn Employment Agreement. An employee is covered by the Whistleblower Law where he provides services under a contract of hire *for* a public body; there is no requirement that an employee be under contract *with* the public body. Thus, North Penn's claim that Heckman must allege more than that he worked as a physician for North Penn under an employment contract is meritless.[225] Consequently, the Court finds that the amended complaint sufficiently establishes that Heckman is an employee under the Whistleblower Law.

### 3. Waste or Wrongdoing

The Whistleblower Law protects employees who make a good-faith report or attempt to make a good-faith report regarding "waste" *or* "an instance of wrongdoing."[226] Waste is defined as "conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from the Commonwealth or political subdivision sources."[227] By contrast,

---

[225] *See also Rankin v. City of Philadelphia*, 963 F. Supp. 463, 470 (E.D. Pa. 1997). The North Penn Employment Agreement further forecloses North Penn's arguments, as it establishes the existence of an employment agreement between Heckman and North Penn.
[226] 43 P.S. § 1423(a).
[227] 43 P.S. § 1422.

the term "wrongdoing" encompasses an "actual 'violation' of the laws, regulations, ordinance, or code of conduct or ethics 'which is not of a merely technical or minimal nature.'"[228]

UPMC Wellsboro curiously argues that Heckman's claim must be dismissed because he does not allege that UPMC Wellsboro's conduct resulted in waste. However, it neglects the fact that Heckman may show either waste *or* wrongdoing. The Court concludes that Heckman's allegations that UPMC Wellsboro violated federal law is sufficient to establish a plausible instance of wrongdoing, and therefore that Heckman has satisfied the good-faith reporting requirement of a retaliation claim under the Whistleblower Law.[229]  Consequently, UPMC Wellsboro's and North Penn's motions to dismiss Count III are denied.

### D.    Count IV: Retaliation Under the Fair Labor Standards Act

"[T]o establish a *prima facie* case of discriminatory retaliation [under the FLSA], 'a plaintiff must show that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action.'"[230]  North Penn asserts that Heckman has not adequately alleged that North Penn was his employer.  Additionally, both North Penn and UPMC Wellsboro

---

[228] *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 505 (M.D. Pa. 2015).

[229] UPMC Wellsboro does not challenge whether Heckman's reports were made in "good faith," so the Court does not address the issue.

[230] *Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477, 499 (W.D. Pa. 2013) (quoting *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 Fed. Appx. 936, 939 (3d Cir. 2003)).

challenge the amended complaint under the protected activity and causation prongs.

### 1. Employer

To be covered by the FLSA, a plaintiff must be an employee and not an independent contractor.[231]  The question of whether a person is an employee or an independent contractor "is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes."[232]  It is instead dependent upon the "economic reality" of the parties' relationship.[233]  Under the "economic reality" theory, "the FLSA defines employer 'expansively' . . . and with 'striking breadth.'"[234]  "The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'"[235]

"Under the FLSA, multiple persons or entities can be responsible for a single employee's wages as 'joint employers' in certain situations."[236]  This can occur where two employers "exert significant control" over an employee.[237]  The Third

---

[231]  29 U.S.C. § 203.

[232]  *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950) (Frankfurter, J., dissenting).

[233]  *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).

[234]  *In re Enterp. Rent-A-Car Wage & Hour Emp. Prac. Litig.*, 683 F.3d 462, 467 (3d Cir. 2012) (internal citations omitted) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

[235]  *Id.* at 467-68 (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)).

[236]  *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) (quoting 29 C.F.R. § 791.2).

[237]  *Id.* (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)).

Circuit, in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, set forth a four-factor test evaluating whether a joint-employment relationship exists under the FLSA.[238]  Pursuant to the *Enterprise* test, courts must consider the following:

(1)    The alleged employer's authority to hire and fire relevant employees;

(2)    The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

(3)    The alleged employer's involvement in day-to-day employee supervision, including employee discipline; and

(4)    The alleged employer's actual control of employee records such as payroll, insurance, or taxes.[239]

"[T]his list is not exclusive, and cannot be 'blindly applied.'"[240]  Rather, "[i]f a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors" specified by the Third Circuit.[241]

The amended complaint adequately pleads that North Penn was Heckman's joint employer.  Heckman alleges that he served as the Chief Medical Officer of North Penn, that North Penn directed and controlled his compensation, and that

---

[238]  683 F.3d at 469.
[239]  *Id.*; *Thompson*, 748 F.3d at 149.
[240]  *Enterprise*, 683 F.3d at 469-70 (citations omitted).
[241]  *Id.* at 470.

Heckman received a letter of termination from North Penn. These assertions alone are sufficient to establish North Penn's status as joint employer, although they are further supported by the North Penn Employment Agreement, which lays out Heckman's duties to North Penn as an *employee*. Consequently, the Court finds that Heckman satisfies the requirement of pleading that North Penn was his joint employer under the FLSA.

## 2. Protected Activity

Unlike the FCA, the FLSA only protects employees who have "filed" a "complaint" regarding an employer's violation of the FLSA.[242] A complaint may be made orally or in writing[243] to either the employer or the government.[244] However, a complaint will only be considered filed when it is made in such a way that "'a reasonable, objective person would have understood the employee' to have 'put the employer on notice that [the] employee is asserting statutory rights under the [FLSA].'"[245]

---

[242] 29 U.S.C. § 215(a)(3).

[243] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011).

[244] While the United States Supreme Court left the question unresolved in *Kasten v. Saint-Gobain Performance Plastics Corp.*, the Court notes that the majority of courts interpret the FLSA's anti-retaliation provision as protecting intracompany complaints. *E.g.*, *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 115-16 (2d Cir. 2015); *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 439 (4th Cir. 2012); *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 626 (5th Cir. 2008); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44-45 (1st Cir. 1999); *EEOC v. Romeo Community Schools*, 976 F.2d 985, 989-90 (6th Cir. 1992); *Brock v. Richardson*, 812 F.2d 121, 124-25 (3d Cir. 1987).

[245] *Id.* at 14.

"Although no magic words are required, to qualify as protected [activity] the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful" by the FLSA.[246]  Thus, "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice."[247]  "[C]omplaints that a reprimand was undeserved, or of unfair treatment, or merely disagreeing with disciplinary practices, do not constitute protected activity."[248]  However, "the key to construing the anti-retaliation provision is the need to prevent employees' fear of economic retaliation for voicing grievances about substandard conditions."[249]

UPMC Wellsboro and North Penn challenge Count IV for failing to allege: (1) conduct giving rise to an FLSA violation; and (2) that Heckman filed a complaint within the meaning of the FLSA.  North Penn additionally contends that Heckman's allegations do not establish that it received notice because he alleges only that he complained to Hilfiger and members of UPMC Wellsboro's board. Heckman responds by citing his allegations that UPMC Wellsboro and North Penn terminated him in response to requests that he be paid for work done at the Green Home and that he have his obstetrics practice reinstated at North Penn.

---

[246] *Braden v. Cnty. of Wash.*, 749 F. Supp. 2d 299, 305 (W.D. Pa. 2010) (internal quotation marks omitted) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).
[247] *Id.* (internal quotation marks omitted) (quoting *Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).
[248] *Id.* (citations omitted).
[249] *Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir. 1987).

Substantively, "[t]he FLSA provides that employers may not require employees to work more than forty hours per workweek unless those employees receive overtime compensation at a rate of not less than one-and-a-half times their regular pay."[250]  But certain classes of employees are exempted from the overtime-pay requirement, including employees who work in a "bona fide executive, administrative, or professional capacity."[251]  The parties appear to agree that Heckman falls within such an exemption.

Nevertheless, "[a]n employer who makes improper deductions from [an exempted employee's] salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis."[252]  An employee is paid on a "salary basis" where the employee receives consistent compensation "which amount is not subject to reduction because of variations in the quality or quantity of the work performed."[253]  Showing that the employer had an "actual practice of making improper deductions" to the employee's salary is sufficient.[254]  However, deductions are generally only improper where they impact the employee's salary, not fringe benefits or bonus compensation.[255]

---

[250] *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009) (citing 29 U.S.C. § 207(a)(1)).

[251] 29 U.S.C. § 213(a)(1).

[252] 29 C.F.R. § 541.603(a).

[253] 29 C.F.R. § 541.602(a).

[254] 29 C.F.R. § 541.603(a).

[255] *See Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1043 (8th Cir. 2020) (citations omitted).

Heckman asserts that his salary was subject to improper deductions when he was not paid for work he completed at the Green Home, and when North Penn terminated his obstetrics practice. He maintains that he properly filed a complaint by objecting to these deductions beginning in late 2019 during regular meetings with Hilfiger and members of UPMC Wellsboro's board. He further claims that he repeatedly insisted at these meetings that he be "paid for his work" done for the Green Home and "be allowed to earn his contracted wage" by resuming his obstetrics practice at North Penn.

Though the case is close, the Court finds that Heckman adequately alleges that he engaged in protected activity. First, UPMC Wellsboro's and North Penn's alleged conduct could constitute a plausible violation of the FLSA. As discussed above, receiving less money than the base-level salary provided for in a contract may destroy an FLSA exemption where the employee shows that the employer had an actual practice of making improper deductions. Refusing to pay Heckman for work completed at the Green Home to which he was contractually or otherwise entitled to may constitute such a practice. Additionally, terminating Heckman's obstetrics practice (a factor considered in adjusting Heckman's yearly salary) may also demonstrate an intent not to pay Heckman on a salary basis.

Second, Heckman's complaints, while vague, are extremely broad. He asserts that he repeatedly complained about the purported violations to Hilfiger and UPMC Wellsboro board members. Although Heckman does not allege that he

objected to these alleged violations on the basis that they violated the FLSA, the Court finds his pleadings sufficient to state a claim.[256] The Court further agrees with Heckman that complaining to a "prominent" member of North Penn's board satisfies the requirement that Heckman's complaint give North Penn notice of potential FLSA violations.

### 3. Causal Link

A plaintiff may establish a causal link between his protected activity and an adverse employment action by two methods. First, he may point to "the temporal proximity between the employee's protected activity and the adverse employment action."[257] "[T]his is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was likely the reason for the adverse action.'"[258] But "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."[259]

The Court finds that the amended complaint adequately states a causal link. Heckman pleads that Hilfiger referred to him as a "liability" immediately before terminating him, and that Hilfiger fired him to prevent him from raising objections

---

[256] *See Hong Nguyen v. KARAG Ford of Pittsburgh, LLC*, 2020 WL 6063490, at *4 (W.D. Pa. Oct. 14, 2020) (denying a motion to dismiss an FLSA-retaliation claim where the plaintiff did not explicitly reference the FLSA but complained only that his employer had not made overtime payments).

[257] *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

[258] *Id.* (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)).

[259] *Id.* (citing *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)).

at a UPMC Wellsboro board meeting.  This, combined with other alleged instances of antagonism preceding Heckman's FLSA complaints[260] and the temporal proximity between Heckman's complaints and his termination,[261] is sufficient to establish a plausible inference of discriminatory intent.  Consequently, UPMC Wellsboro's and North Penn's motions to dismiss Count IV are denied.

### E.    Count V: Pennsylvania Wage Payment and Collection Law

The WPCL "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them."[262]  The WPCL defines "wages" as "all earnings of an employe[e], regardless of whether determined on time, task, piece, commission or other method of calculation."[263]  "To present a wage-payment claim," a plaintiff must "aver that he was contractually entitled to compensation from wages and that he was not paid."[264]  UPMC Wellsboro and the Green Home argue that Heckman fails to state a claim because he alleges that he was "leased" to the Green Home pursuant to a tri-party agreement, thus precluding

---

[260] Examples include Nobles' statement in July 2019 that Heckman's name "keeps coming up" in conversation with Hilfiger, that Hilfiger accused Heckman of "causing problems" and being "disruptive," and that Hilfiger led the push (and directed) Heckman's termination.

[261] While the amended complaint does not offer specific dates upon which this Court might base a temporal-proximity analysis, the Court does not believe this necessitates dismissal as Heckman claims that he objected during "regular and frequent" meetings over a five-month period.

[262] *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 953 (Pa. Super. 2011) (internal quotation marks omitted) (quoting *Oberneder v. Link Comp. Corp.*, 696 A.2d 148, 150 (Pa. 1997)).

[263] 43 P.S. § 260.2a.

[264] *Sullivan v. Chartwell Inv. Partners, L.P.*, 873 A.2d 710, 716 (Pa. Super. 2005) (citing *Hartman v. Baker*, 766 A.2d 347 (Pa. Super. 2000)).

a determination that he had a contractual entitlement to compensation for his work at the Green Home.

UPMC Wellsboro and the Green Home ignore, however, that the amended complaint also alleges that an agreement existed between him, UPMC Wellsboro, and the Green Home which provided for the terms of Heckman's compensation. Heckman thus satisfies the requirement that he plead the existence of a contract. Further, he adequately alleges that both UPMC Wellsboro and the Green Home have breached that contract. Accordingly, UPMC Wellsboro's and the Green Home's motions to dismiss Count V are denied.

## IV.    CONCLUSION

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge