**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MATTHEW HECKMAN,

Plaintiff,

v.

NORTH PENN COMPREHENSIVE HEALTH SERVICES, and UPMC WELLSBORO,

Defendants.

No. 4:20-CV-01680

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JUNE 10, 2024**

## I. PROCEDURAL BACKGROUND

On September 15, 2020, Plaintiff Matthew Heckman initiated this litigation with the filing of a Complaint against Defendants North Penn Comprehensive Health Services and UPMC Susquehanna.[1] Heckman subsequently amended his Complaint, substituting UPMC Susquehanna for UPMC Wellsboro and adding The Green Home as a Defendant.[2] In the Amended Complaint, Heckman alleged four claims for relief against North Penn and UPMC Wellsboro: Declaratory Judgment (Count I) and retaliation under the False Claims Act (Count II), Pennsylvania Whistleblower Law (Count III), and Fair Labor Standards Act (Count IV). Heckman also brought a claim

---

1 Compl. Doc. 1.

2 Am. Compl., Doc. 26.

for unpaid wages under the Pennsylvania Wage Payment and Collection Law against UPMC and The Green Home.[3]

The Court denied motions to dismiss the Amended Complaint filed by each Defendant.[4] The Defendants then filed Answers in which each brought counterclaims against Heckman for breach of contract.[5] On September 6, 2023, Heckman dismissed his claims against The Green Home, leaving North Penn and UPMC Wellsboro as the remaining Defendants.[6]

On November 20, 2023, North Penn and UPMC Wellsboro filed Motions for Summary Judgment as to each of Heckman's claims, and their own counterclaims against Heckman.[7] On January 19, 2024, while Defendants' Motions were pending, the parties stipulated to the dismissal of Heckman's Declaratory Judgment claim against both North Penn and UPMC Wellsboro and UPMC Wellsboro's counterclaim.[8] Accordingly, the only remaining live claims are the retaliation claims, Counts II-IV, against both North Penn and UPMC Wellsboro and North Penn's breach of contract counterclaim.

---

3 *Id.* Count V.

4 July 7, 2021 Mem. Op. and Ord., Docs. 64-65.

5 UPMC and The Green Home Ans., Docs. 68, 77; North Penn Ans., Docs. 69, 78.

6 Sept. 6, 2023 Stipulation of Dismissal, Doc. 114; Sept. 6, 2023 Ord. Approving Stipulation of Dismissal, Doc. 115.

7 UPMC Mot. Summ. J., Doc. 122; North Penn Mot. Summ. J., Doc. 125.

8 Jan. 19, 2024 Stipulation of Dismissal, Doc. 131.

Concurrent with its Reply brief in support of its Motion for Summary Judgment, North Penn also filed a Motion to Strike Heckman's Response to North Penn's Statement of Material Facts ("RSMF").[9] North Penn asks the Court to deem admitted all but two of the 205 paragraphs of North Penn's Statement of Material Facts ("SMF") on the basis that Heckman's Responses are deficient.[10] That Motion is fully briefed and ripe for disposition, and, for the reasons below, it is denied.[11]

## II. DISCUSSION

Federal Rule of Civil Procedure 12(f) provides that a Court may, either on its own or on motion, strike "an insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter." "In proceeding on a motion to strike for relevancy, the movant must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial."[12] "Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), 'striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record.'"[13]

---

9 Mot. to Strike, Doc. 149.

10 Br. Supp. MTS, Doc. 150.

11 *Id.*; Opp'n. MTS, Doc. 160; MTS Reply, Doc. 162.

12 *Karpov v. Karpov*, 307 F.R.D. 345, 348 (D. Del. 2015).

13 *Id.* at 349 (quoting *Dann v. Lincoln Nat'l Corp.,* 274 F.R.D. 139, 142 (E.D. Pa.2011); citing *Thornton v. UL Enters.,* No. 09-287E, 2010 WL 1005021, at *2 (W.D. Pa. Mar. 6, 2010)).

### A. Local Rule 56.1

Local Rule 56.1 requires all motions for summary judgment to be "accompanied by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then include with its papers an answer to the movant's statement of facts in which it identifies, in corresponding numbered paragraphs, those material facts which the non-movant contends there is a genuine issue to be tried.[14] "Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."[15] Where the non-movant fails to abide by these requirements of Rule 56.1, the movant's uncontroverted statements of fact may be deemed admitted.[16]

Ultimately, "the proper sanction for violating Rule 56.1 is within the district court's discretion."[17] In determining the proper sanction, the Court is mindful of Rule 56.1's purpose: to structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration to

---

[14] LR 56.1.

[15] *Id.*

[16] *Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 413 (M.D. Pa. 2013), *aff'd,* 574 F. App'x. 188 (3d Cir. 2014); *see also Conn v. Bull*, 307 F. App'x 631, 633 (3d Cir. 2009) (upholding district court's decision to deem facts admitted under Local Rule 56.1).

[17] *Hickey v. Merritt-Scully*, No. 4:18-cv-01793, 2021 WL 949448, at *2 (M.D. Pa. Mar. 12, 2021) (citing *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 614 (3d Cir. 2018)).

the motion."[18] The movant's statement and the non-movant's response should enable "the court to identify contested facts expeditiously."[19]

### 1. Additional Facts

North Penn first suggests that "[t]he Court should strike all additional information in Heckman's RSMF" on the grounds that "a counter-statement of facts submitted by the non-movant is 'neither contemplated nor permitted by the Local Rules.'"[20] Though "[c]ourts in this district have repeatedly held that 'Local Rule 56.1 does not permit a non-moving party to file an additional statement of material facts that does not respond to the moving party's statement,'" that is not what Heckman has done here.[21] Where Heckman has included qualifying statements of fact or additional facts in response to non-contested paragraphs, they are contained within the corresponding numbered paragraphs of his RSMF. He did not submit the sort of separate, counterstatement of facts that courts in this District have held to be improper.[22]

---

18 *Park v. Veasie*, 3:09–CV–2177, 2011 WL 1831708, at *3 (M.D.Pa. May 11, 2011) (quoting *Hartshorn v. Throop Borough*, No. 3:07–cv–013332009, WL 761270, at *3 (M.D. Pa. Mar. 19, 2009)).

19 *See id.* at *3 (quoting *Pinegar v. Shinseki*, No. 1:07–CV–0313, 2009 WL 1324125, at *1 (M.D. Pa. May 12, 2009)).

20 Doc. 150, at 5-6 (quoting *Barber v. Subway*, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015)).

21 *Williams v. Pennsylvania State U.*, No. 4:20-CV-00298, 2023 WL 6626789, at *3 (M.D. Pa. Oct. 11, 2023) (quoting *Evans v. Kaye*, No. 4:19-CV-01112, 2021 WL 5416282, at *5 (M.D. Pa. Nov. 19, 2021) and collecting cases).

22 *E.g.*, *id.* ("Williams' answer to Defendant's Statement of Facts responded to each paragraph and included 107 paragraphs of 'Additional Material Facts.'"); *Barber*, 141 F. Supp. 3d at 322 n.1 ("In response to Subway's Rule 56.1 statement, Barber filed an omnibus document containing both a response to Subway's statement of facts and a separate counter-statement of

"[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"[23] Thus, it must be the case that, where North Penn has supported its motion for summary judgment, Heckman can set forth additional specific facts to demonstrate that there is a genuine issue for trial.[24] To the extent that Heckman has done so by setting forth such facts in the corresponding paragraphs of his RSMF, that serves to "enable 'the court to identify contested facts expeditiously.'"[25]

### 2. Mischaracterizations and Lack of Citations

North Penn separately argues that "in every instance where Heckman either 'disputed' or failed to define whether a paragraph was undisputed or disputed, Heckman argues irrelevant information that does not affect the veracity of the related

---

material facts the latter of which is non-responsive to Subway's statement and is neither contemplated nor permitted by the Local Rules."); *Evans*, 2021 WL 5416282, at *5 ("In this case, Defendants filed a statement of material facts as required by Local Rule 56.1, but Plaintiff did not respond to Defendants' statement and instead filed his own independent statement of material facts."). *But cf. Weitzner*, 2017 WL 3894888, at *12 (granting motion to strike where non-movant's statements "regularly include long excerpts from deposition testimony in an attempt to explain or contextualize a fact"). Heckman's response does not suffer from the same defects as that of Plaintiffs in *Weitzner*. There, despite responding to only one-third of the defendants' SMF, the RSMF was over twice as long. *Id.* at *12 n.6. Here, Heckman's RSMF, which responds to the entirety of North Penn's SMF, is shorter once the incorporated SMF paragraphs are excised. The Court also notes that several of North Penn's statements include long excerpts from record documents. *E.g.*, North Penn SMF ("NP SMF"), Doc. 127 ¶¶ 22, 24, 25, 27, 28 (reproducing lengthy excerpts from Heckman's employment agreement); *id.* ¶¶ 69-72, 74-82, 84-89, 94, 95, 106, 108 (reproducing over four pages of memorandum in SMF paragraphs).

[23] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

[24] *Dolan v. Community Med. Ctr. Healthcare System*, No. 06CV2365, 2008 WL 11499207, at *3 (M.D. Pa. Dec. 29, 2008).

[25] *Supra* n.19.

statement of fact."[26] In support, North Penn directs the Court to SMF and RSMF paragraphs 51 and 53 in which North Penn quoted Heckman's deposition testimony and Heckman responded that North Penn had mischaracterized the quoted testimony[27] or that he misspoke during the deposition.[28] Heckman's RSMF identifies several similar purported mischaracterizations or statements he believes lack important context.[29]

Parties will often dispute the interpretation or effect of certain facts. In such cases, the Court simply "look[s] to the parts of the record cited by each party and make its own determination as to whether the fact in question is disputed. If a party has not supported its stated fact or its denial of that fact with a record citation, then the Court will either assume that the fact is disputed or admitted accordingly. No more, no less."[30] Rule 56.1 does not require the Court to make a line-by-line determination as to each statement, excising each of the rejected assertions. The ordinary process by which the Court evaluates competing statements of fact is sufficient, without the Court taking the extra step of striking each rejected assertion.

The Court also notes that certain of Heckman's responses raise an issue that is not expressly contemplated by Rule 56.1. Several of Heckman's responses do not

---

26 Supp. Br. 9.
27 NP RSMF, Doc. 137 ¶ 51.
28 *Id.* ¶ 53.
29 *E.g.*, *id.* ¶¶ 33-6, 38, 39, 44, 49, 50, 56-59, 63, 65, 66, 88, 134.
30 *Williams*, 2023 WL 6626789, at *3.

contain any citation to the record. Ordinarily, the Court would simply deem the movant's statement admitted. However, the Court notes that Heckman is often disputing the characterization of the record evidence cited by North Penn. In such instances, the Court clarifies that it will look to the portion of the record cited by North Penn, consider the competing interpretations of the cited record evidence, and, viewing the evidence in the light most favorable to Heckman as the Court must, determine whether Heckman has offered a plausible interpretation. If he has, then the Court will accept it for the purposes of evaluating the pending motions for summary judgment. If not, then the Court will accept the fact as stated by North Penn.

North Penn's Motion to Strike appears to rest on the premise that Heckman is not entitled to set forth facts which demonstrate that there is an issue for trial, or that, when the Court reviews responses to statements of fact, that it uncritically accepts the non-movant's assertions that certain facts are disputed at face value. Neither is the case.[31] Heckman's RSMF does not suffer from the sorts of deficiencies which warrant striking it in its entirety.[32] North Penn's Motion to Strike Heckman's RSMF is denied.

---

31 *Cf. id.* (denying motion to strike counterstatement of facts where plaintiff argued that granting of motion would preclude plaintiff from pointing to facts from which a jury could find in her favor and finding that striking of counterstatement was unwarranted).

32 *Supra* n.22.

### B. Sham Affidavit

North Penn also argues in its Motion to Strike that the Court should disregard Heckman's Declaration which he filed as an exhibit to his opposition to Defendants' Motions for Summary Judgment.[33] North Penn suggests that the Heckman Declaration is nothing more than Heckman "suddenly remember[ing] facts that he did not remember" when he "answered interrogatories under oath and gave sworn testimony for three full days in a deposition, including questioning by his own counsel."[34]

An affidavit may be excluded under the "sham affidavit doctrine" "[w]hen a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation."[35] That is because a sham affidavit "indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."[36] The doctrine rests on the principle "that prior depositions are more reliable than affidavits,"[37] because "the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination."[38]

---

33 Supp. Br. Section III.D. *See also* Doc. 141-14 (Heckman Decl.).

34 Supp. Br. 12.

35 *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 392 (3d Cir. 2017).

36 *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

37 *Id.*

38 *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). *See also Darnell v. Target Stores*, 16 F.3d 174 (7th Cir. 1994) ("Inherently depositions carry an increased level of reliability. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination.").

The Third Circuit has instructed that, in applying the doctrine, courts should not inflexibly disregard any contradictory affidavit. Instead, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."[39] "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition."[40] The Third Circuit has "also held that an affiant has the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit."[41]

North Penn suggests that the Court should deem admitted the statements where "Heckman relies on his 'Heckman Declaration' to assert facts purporting to contradict those drawn from his own testimony cited in North Penn's SMF paragraphs 33, 56, 57, 71, and 144."[42]

SMF paragraph 33 cites the testimony of North Penn's 30(b)(6) designee, not Heckman. Accordingly, Heckman relies on his Declaration to dispute that testimony, rather than contradict his own. In all events, that Heckman believes the purpose of the staffing agreement between North Penn and UPMC "was to cement UPMC Wellsboro's control over North Penn" is consistent with his overarching theory of

---

39 *Jiminez*, 503 F.3d at 254 (quoting *Baer v. Chase,* 392 F.3d 609, 625 (3d Cir.2004)).
40 *Id.* (citing *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991)).
41 *Id.* (citing *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991)).
42 Supp. Br. 14.

the case.[43] To be sure, Heckman's belief is, on its own, sufficient to survive summary judgment. But that that does not render his declaration a sham.

Declaration paragraph 3, which Heckman relies upon in RSMF paragraphs 56, 57, and 71, addresses a relatively narrow issue regarding concerns raised by colleagues of Heckman that they could not safely provide obstetrical services.[44] Rather than contradict his deposition testimony, Heckman's statement is consistent with *North Penn's* SMF.[45] Notably, North Penn does not object to Heckman relying on his Declaration in RSMF paragraph 58, which squarely addresses and is consistent with the relevant issue.[46]

Heckman's response to North Penn SMF paragraph 144 does not reference the Heckman Affidavit.[47] On the contrary, it extensively cites to Heckman's deposition.[48]

---

43 NP RSMF ¶ 33; Doc. 141-14 (Heckman Decl.) ¶ 2.

44 NP RSMF ¶¶ 56-57; Heckman Decl. ¶ 3.

45 NP SMF ¶¶ 57-58 (discussing concerns of Heckman's colleagues regarding lack of experience and qualified personnel to offer obstetrics services).

46 *Compare* NP SMF ¶ 58 ("Dr. Stepanski raised concerns about the OB coverage within the hospital, including backup coverage where a family medicine physician was providing OB services. As a family medicine physician, Dr. Stepanski recommended that the hospital 'go on divert' because of the lack of a board-certified OB/GYN within the area that could help provide backup services.") *with* Heckman Decl. ¶ 3 (comparing Stepanski's qualifications with his own and also noting that the stated concerns were regarding the coverage within the hospital). The Court notes that the term "hospital" is used by the parties to refer to UPMC. *E.g.*, NP SMF ¶¶ 4, 22, 76, 100, 108, 175; *see also* UPMC SMF, Doc. 123 ¶ 19 ("North Penn provided primary care services; UPMC provided hospital services.").

47 NP RSMF ¶ 144.

48 North Penn cites to its own Exhibit 14—the same exhibit number used for the Heckman Declaration—in SMF paragraph 144. It seems that North Penn simply searched for "Ex. 14" in Heckman's RSMF and noted each time it appeared in its brief. This would also explain the

Accordingly, North Penn's Motion to Strike is denied as to the Heckman Declaration and the corresponding SMF and RSMF paragraphs.

## III. EVIDENTIARY ISSUES

Having resolved North Penn's Motion to Strike, the Court now turns to other evidentiary issues which must be resolved prior to reaching the merits of the pending Motions for Summary Judgment.

### A. Heckman Performance Memorandum

In its SMF, North Penn details Heckman's performance issues and counseling during the relevant period.[49] In support of its version of the events leading up to Heckman's demotion from his role as Chief Medical Officer and his subsequent removal from North Penn altogether, North Penn largely relies on a memorandum drafted by the Chief Executive Officer of North Penn, James Nobles.[50] According to North Penn, Nobles "documented Heckman's performance issues in a document he maintained, entitled 'Chronological History of Performance.'"[51] Regarding the creation of the document, Nobles explained: "I keep detailed notes on all of my executives when we have discussions, particularly those that are related to

failure to include RSMF paragraph 58, which simply incorporates by reference RSMF paragraph 56.

49 NP SMF Section II.E.a.

50 *See generally id.* (citing Performance Memo, NP Exh. H, Doc. 126-8).

51 *Id.* ¶ 68.

performance. So, if I need to reference that during annual performance reviews or other instances, I can refer back to my notes."[52]

Heckman disputes that the Performance Memo "reflects contemporaneous notes, rather than a document that Mr. Nobles prepared retroactively as part of the process of terminating Dr. Heckman."[53] Absent other evidence of unreliability, an employer's retroactive documentation of performance issues is insufficient to give rise to an inference of improper motive.[54] On the contrary, "an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than as devious."[55]

Here, the Court finds that there exists "at least 'some' evidence in the record [which] casts doubt on [Nobles'] justifications."[56] In addition to testifying that he "keep[s] detailed notes on all of my executives when we have discussions,"[57] Nobles also testified that he does not keep these notes "as a matter of record" and that they are "just notes on a scratchpad."[58] Then, "[o]nce the legal pad fills up, it's disposed of, shredded, and discarded."[59]

---

52 *Id.* (quoting Nobles Dep., Doc. 141-7, 99:9-21).
53 NP RSMF ¶ 68.
54 *See Fuentes v. Perskie*, 32 F.3d 759, 766 (3d Cir. 1994) (holding that post hoc "documentation of the reasons for rejecting an applicant is insufficient, in and of itself, to give rise to a reasonable inference of discriminatory motive" under Title VII).
55 *Id.*
56 *Ziegler v. Steelton-Highspire Sch. System*, No. CIV.A.1:04-CV-0788, 2005 WL 2030440 (M.D. Pa. Aug. 3, 2005) (Conner, J.) (citing *Fuentes*, 32 F.3d at 764-65).
57 *Supra* n.52
58 Nobles Dep. 106:20-22.
59 *Id.* 107:2-4.

As to when he drafted the Performance Memo, Nobles testified that he "can't recall the actual date that it was prepared."[60] When asked if he "prepared the document all at once," Nobles responded: "No, I don't believe so. I believe this was prepared over a period of time. As you can see, it spans from March all the way up through November."[61] However, Nobles also testified that he could not remember the date he drafted it and that he drafted it by referencing his calendar, both statements that make little sense if the document was prepared over a period of time.[62] On November 8, 2019, Nobles emailed Krysta Wagner, North Penn's Chief Operating Officer,[63] telling her that he put the "Chronological History of Performance" together that morning and asked her to "work on a similar document from an operations [perspective] outlining the challenges you've endured over the past 6 months."[64]

Other evidence in the record also casts doubt on the substance of certain entries in the Performance Memo. In an entry dated September 5, 2019, Nobles stated that he reported the misalignment between Heckman, then the CMO, and North Penn leadership to Board Chairman, Glenn Poirier.[65] Nobles and Poirier

---

60 *Id.* 100:8-9.

61 *Id.* 107:5-9. *See also id.* 107:15:17 (Q: Do you have any prior drafts of this report? A: I think it's an ongoing document in Word. I don't think it saves as prior drafts, No.").

62 *Id.* 100:6-9, 105:24-16. *See also id.* 332:14-21 (responding to question from UPMC counsel that he could not remember when he drafted the document, other than it was prepared in 2019).

63 *Id.* 202:7.

64 Pl Exh. 28, Doc. 141-28.

65 NP SMF ¶ 87.

purportedly "[d]iscussed formal removal of Dr. Heckman as CMO," a decision Poirier supported.[66] However, Poirier testified that the Board played no role in Heckman being relieved of his responsibilities as CMO; rather, the Board was merely advised of Noble's decision.[67] A recurring theme of Heckman's reported conduct in the Performance Memo is the frequent "misalignment" between Heckman and North Penn management and its mission.[68] During his deposition though, Nobles struggled with questions regarding what it meant to have an alliance or be aligned with Heckman or other executives.[69]

As North Penn relies on the Performance Memo as factual support for its assertion that "Heckman had a significant number of performance-related issues,"[70] the memo is hearsay—an out of court statement "offered in evidence to prove the truth of the matter asserted."[71] "[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."[72]

---

66 *Id.*

67 Poirier Dep., Doc. 141-6, 71:6-72:15.

68 *E.g.*, Performance Memo entries of June 16, June 26, Aug. 14, Aug. 19, Aug. 27, Aug. 29, Sept. 5, Sept. 6, Sept. 11, Sept. 13, Sept. 19, Sept. 24, Oct. 31. *See also*, *e.g.*, *id.* entries for Sept. 4 (discussing necessity of "united voice"); Sept. 12 (discussing attack of UPMC Wellsboro CEO Jamie Hilfiger's leadership); Nov. 5, and Nov. 7 (discussing behavior "counterproductive" to North Penn's mission). The Court notes that certain of these entries are discussions of the same incident which occurred across multiple dates. *E.g.*, *id.* entries of Nov. 5 and Nov. 7.

69 *E.g.*, Nobles Dep. 111:1-21, 171:9-172:3.

70 NP SMF ¶¶ 66, 68.

71 Fed. R. Evid. 801(a)(2).

72 *Shelton v. U. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) (citing *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n. 17 (3d Cir. 1995)).

Relevant here, Federal Rule of Evidence 803(6) excludes from hearsay business records which meet certain requirements:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.[73]

According to Nobles, the Performance Memo was either a running document drafted over the course of several months or drafted in a single morning, and was compiled of informal notes which he disposed of or detailed notes which he keeps for review purposes. Further, certain entries contradicted by other evidence in the record. Therefore, the Court finds that it is unlikely that North Penn could establish at trial that the Performance Memo meets the conditions for admissibility as a business record.

---

73 *U.S. v. Browne*, 602 F. Supp. 3d 687, 693 (D.N.J. 2022).

### B. Deposition Objections and Conduct

That the Performance Memo itself is inadmissible is not the end of the inquiry. To the extent that Nobles could testify to the contents of the Memo at trial, the statements contained therein can be considered at summary judgment.[74] To determine whether it is likely Nobles could offer such testimony, the Court reviews Nobles' deposition.

Before doing so, the Court briefly recounts a prior dispute between the parties regarding Heckman's deposition. After taking his deposition, North Penn advised the Court that it "was forced to suspend the deposition due to Dr. Heckman's continued obstinance."[75] North Penn complained that Heckman "acted to purposefully frustrate and convolute the record, responding with canned statements only marginally related to North Penn's questioning."[76] North Penn also accused Heckman's counsel of doing "little to assist in furthering the deposition, instead interjecting with admonitions to 'move on' to another line of questioning."[77] North Penn asserted that "[t]he transcript shows that Dr. Heckman was continuously unwilling to provide an answer to the question asked, instead making canned, non-

74 *Howley v. Experian Info. Sols., Inc.*, 813 F. Supp. 2d 629, 636-37 (D.N.J. 2011).
75 July 19, 2023 Letter to Court, Doc. 111, at 1.
76 *Id.*
77 *Id.*

responsive statements and declining to provide his own understanding" of documents or other basic facts.[78]

The Court agreed. After a hearing, the Court required Heckman to sit for another deposition and pay the costs associated with the first, aborted deposition. Now, after having reviewed the transcripts of other depositions in this case, the Court finds it alarming that counsel was able to complain about Heckman's conduct with a straight face.

During his deposition, Nobles was asked if he had any discussions with Heckman regarding UPMC's influence within North Penn, specifically regarding the board of directors. Over the course of several pages, the transcript shows Nobles avoiding answering questions on the basis that he cannot remember a specific conversation, even when asked if *any* conversation occurred in general.[79] Nobles also testified that he cannot remember any specific details of any conversation which may have occurred,[80] except that he is sure that any concerns Heckman expressed were simply Nobles' concerns "that were then articulated back to [him]."[81]

When questioned whether Heckman temporarily served as medical director for The Green Home, Nobles asked counsel to define temporarily. When counsel responded, "for any length of time," Nobles said that "he does not believe that's

---

78 *Id.* at 3.
79 Nobles Dep. 51:24-52:16, 54:9-15.
80 *Id.* 52:9-16.
81 *Id.* 53:3-55:3, 56:2-10.

temporary. So, no."[82] Counsel then asked if Heckman had served in that capacity "[f]or a short period of time," which Nobles, again, needed defined. Counsel asked Nobles his "understanding of a short period of time," to which Nobles responded, "[a]n hour."[83] So counsel reverted back to the original question, asking if Heckman agreed to serve as medical director "for any period of time" to which Nobles finally responded in the affirmative.[84]

During his 30(b)(6) deposition, Nobles relied on notes that he prepared for the deposition at various points. At the outset, Nobles was asked if the notes were prepared after he met with counsel. Nobles responded that, because he met with counsel months prior and prepared the notes the night before the deposition, it could be said that he prepared the notes after meeting with counsel, or that, because he met with his counsel the morning of the deposition, he actually prepared them beforehand.[85]

---

[82] *Id.* 60:6-20.

[83] *Id.* 60:12-16.

[84] *Id.* 60:17-20.

[85] Nobles 30(b)(6) Dep., Doc. 141-10, 19:6-23. The Court also notes that the privilege objection raised during the deposition appears to have been without merit. The topic of conversations with counsel are not privileged. Questions regarding the broad subject matter of communications are permissible, if not necessary, to evaluate a claim of privilege. *See* Fed. R. Civ. P 26(b)(5) (requirement that a party withholding information on the basis of privilege "describe the nature of the . . . communications . . . in a manner that, without revealing information itself privileged . . . will enable other parties to assess the claim"). Though simply characterizing a meeting with counsel as "deposition prep" may ordinarily be sufficient to establish the subject matter of that meeting as privileged, the issue here is whether Nobles *waived* that privilege. Nobles testified that he met with counsel for over five hours a week prior, then drafted notes for his deposition. Nobles 30(b)(6) Dep. 19:17-20:9. Whether Nobles' notes were the product of that meeting is hardly a logical leap or improper line of inquiry. Nor is the fact that counsel did not participate in the drafting of the notes of any significance. The

No reasonable person, much less the CEO of an organization of any size, would understand "short period of time" or "after," in the context they were used, to have the meanings Nobles claimed. Nevertheless, Nobles' inane quibbles over basic questions was also a recurring theme. When asked if minutes were prepared for Board meetings, Nobles asked for counsel to define "prepared," then disputed the definition before eventually answering the question.[86] Nobles testified that North Penn was conducting an "obstetric needs assessment" for the area but was confused by what it meant for there to be a "shortage" of providers.[87] During his 30(b)(6) deposition representing North Penn, when asked if criticism of his performance as CEO was "off base," Nobles responded that he was "not even really sure what [off base] means outside of a baseball game."[88] It strains credulity that Nobles, North Penn's CEO whose communications frequently "take a military flare," is unfamiliar with the term "off base" outside of a baseball game.[89] Further, Nobles continually

---

privilege belongs to North Penn, and if North Penn disclosed the substance of the communication, with or without assistance from counsel, the privilege is waived. *Brigham and Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, 707 F. Supp. 2d 463, 469-70 (D. Del. 2010).

86 Nobles Dep. 71:5-21.

87 *Id.* 287:20-12.

88 Nobles 30(b)(6) Dep. 79:2-9.

89 *Id.* 198:17-199:2. *See also* Off-base (adj.), Oxford English Dictionary Online Ed. (July 2023) ("1. *North American.* In predicative use: off-target; misguided, mistaken; wrong. 2. Situated or occurring away from a military base.").

objected to questions about "concerns" HRSA may have had during their review of North Penn,[90] despite using the word himself in a nearly identical context.[91]

Relatedly, Nobles also routinely offered "canned" answers to questions about his role in Heckman's removal from North Penn and termination from UPMC. When asked if there were "issues where [he] aligned with Dr. Heckman in terms of pushing back against UPMC's influence on North Penn," Nobles offered a broad, non-responsive answer that he and Heckman "shared a common interest that North Penn Comprehensive Health Services as a federally qualified health center operating in Tioga County had a responsibility to the patients we served. And as a member of our executive staff, he shared that vision, that I did as well . . . that we put the patient at the center of all our care delivery model."[92] When asked if he recommended Heckman be terminated, Nobles responded that he did not because the staffing agreement did not allow him to terminate Heckman.[93] When asked if he told Heckman that Heckman would be terminated, Nobles again responded: "I don't have the ability to terminate staff. So, no, those conversations would not have taken place."[94] Neither of these answers, or the several similar responses given during the

90 Nobles 30(b)(6) Dep. 14:1-15:15, 24:23-25:10, 32:6-33:3.

91 Nobles Dep. 53:19-25 (testifying regarding his "concerns" that North Penn had a board of directors that followed the HRSA compliance manual).

92 *Id.* 171:9-3.

93 *Id.* 113:16-24.

94 *Id.* 117:10-16.

deposition,[95] are responsive to the questions. Whether Nobles had the authority to fire Heckman is an issue distinct from whether he recommended Heckman be terminated or told Heckman he would be terminated; evidence in the record shows that Nobles did both.[96] Further, as noted above, Nobles appeared to read from his notes for much of his 30(b)(6) deposition.[97]

Finally, counsel engaged in conduct similar to the above and that which it complained about to the Court. At one point, counsel claimed to be confused about the meaning of the word "affiliation" during a line of questioning about an *affiliation agreement* entered into by her client.[98] Despite Rule 30(c)(2)'s "require[ment] that a deponent answer all deposition questions—notwithstanding counsel's objections,"[99] counsel repeatedly instructed Nobles not to answer certain questions.[100] Further, counsel made several speaking objections which, in addition to being improper, misconstrued the relevant testimony or question.[101]

---

95 *E.g.*, *id.* 120:2-17, 267:23-268:1, 274:13-276:5, 286:7-287:7,

96 *See, e.g.*, *id.* 205:5-14 (discussing Nobles' note that "continued disruptive behavior will result in immediate termination"); Pl. Exh. 38, Doc. 141-38, at 4423 (note by UPMC Wellsboro CEO Janie Hilfiger stating that "by the time approval for termination was obtained Jim changed his mind").

97 *E.g.*, Nobles 30(b)(6) Dep. 101:8-102:7 (North Penn's counsel objecting to questions regarding the contents of Nobles "canned outline").

98 *Id.* 45:21-47:6.

99 July 19, 2023 Letter at 1 (citing Fed. R. Civ. P. 30(c)(2)).

100 *E.g.*, Nobles 30(b)(6) Dep. 36:8-20; 65:5-68:18, 81:5-20, 86:6-88:6, 101:8-102:7, 140:12-141:10, 153:10-17, 154:18-155:8, 163:2-17. The Court notes that none of these objections implicate the narrow exceptions in Rule 30(c)(2).

101 *See, e.g.*, Nobles Dep. 52:18-53:7 (Nobles' testimony that he was not aware that Heckman had expressed concerns about UPMC influence in 2018 is not the same as testifying that he was never aware, as suggested by counsel's objection); 170:19-25 (that Nobles was not on a particular email does not mean that Nobles would have "no idea" why the drafter might say he

Due to the foregoing issues, Nobles' deposition is of little utility in trying to determine whether Nobles would be able to provide fulsome testimony regarding its contents.[102]

**C. Oral Argument**

By the Court's count, thirty-six of North Penn's SMF statements rely solely on the Performance Memo for support.[103] As North Penn notes in support of its Motion to Strike, SMF paragraphs without record support violate Local Rule 56.1. Therefore, those thirty-six paragraphs are deficient under the Rule.

However, the Court also notes that, broadly, Heckman does not dispute that the events in the Performance Memorandum occurred. Rather, he disputes only Nobles' characterization of those events.[104] Further, Heckman also relies on the Performance Memorandum to establish the timeline of events which he argues led to his termination.[105] It seems, then, that the Court cannot simply disregard the relevant SMF paragraphs or the document they rely in in their entirety.

The Court is also cognizant of the fact that Defendants need not prove that they had a legitimate reason for terminating Heckman if he cannot first establish a

---

does not trust Nobles); Nobles 30(b)(6) Dep. 148:15-18 (improperly objected to question regarding *how* Nobles determined no federal funds were used to pay physicians on the ground that Nobles had they were not, which says nothing about how that determination was made).

[102] *See Howley*, 813 F. Supp. 2d at 637 (party offering evidence needs to show at least "some likelihood" that witness could testify to hearsay at trial for it to be considered at summary judgment).

[103] NP SMF ¶¶ 69-72, 74-82, 84-89, 94, 95, 106, 108-121.

[104] *E.g.*, NP RSMF ¶¶ 72, 74-76, 79, 84, 106, 108, 110-114, 117-21.

[105] Doc. 136, at 34.

*prima facie* case.[106] On that front, the Court's initial review of Heckman's opposition seems to reveal that his claims often rest upon his own spotty recall of events.[107] Though the Court is required to draw all reasonable inferences in Heckman's favor at summary judgment, it cannot stack inference upon inference to preserve an issue for the jury.[108] "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."[109]

It appears that this may be such a case. Heckman purports to have frequently complained about UPMC's influence over North Penn but is generally unable to offer specifics of what he said and when, instead relying on his assertion that he complained about it so frequently, that he must have raised the issue at key moments.[110] Simply put, Heckman's argument seems to be that he frequently blew the whistle on UPMC's improper influence, Nobles and UPMC CEO Janie Hilfiger were frequently frustrated with Heckman, therefore they must have been frustrated about his whistleblowing.

---

106 *See* Doc. 128, at 23 (UPMC asserting that, because Heckman cannot establish a *prima facie* case, it need not demonstrate that Heckman would have been terminated in the absence of any protected conduct). The Court recognizes that who was responsible for terminating Heckman is a matter of some dispute and emphasizes that, for present purposes, the reference to his termination by Defendants collectively is merely for ease of discussion.

107 For example, Heckman has no memory of being put on a performance improvement plan, which remains admissible evidence of at least some of the conduct detailed in the Performance Memorandum discussed above. Heckman June 15, 2023 Dep., Doc. 141-1, 150:9-153:4.

108 *In re Asbestos Litig.*, No. CV 17-56-MN-SRF, 2019 WL 325130, at *6 (D. Del. Jan. 25, 2019).

109 *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

110 *E.g.*, Heckman June 15 Dep. 153:7-154:9.

Yet, discovery does not appear to have turned up any documentary evidence in which Heckman, Nobles, or Hilfiger expressed their frustrations in so many words. When Heckman submitted a letter of resignation, he did not cite any specific frustrations with UPMC influence.[111] Heckman's argument that Nobles removed him as Chief Medical Officer and eventually terminated him to placate Hilfiger requires the Court to infer both that Hilfiger wanted Heckman to be removed (or that Nobles believed as much), and that Nobles was willing to do so as an "olive branch."[112] Whether Heckman "reasonably saw [his termination] as being an 'olive branch' to Hilfiger"—that is, his belief about why he was ultimately terminated—is not significantly probative as to Nobles' motivations.[113]

* * *

Though this case presents some interesting and complex legal questions, the Court cannot reach those issues without first resolving some more basic evidentiary issues. It is the Court's intention to, by highlighting the above issues, provide the parties with notice of what it sees as the gating issues in evaluating the pending motions for summary judgment ahead of oral argument.[114] Of course, the parties

---

[111] NP SMF and RSMF ¶ 96.
[112] *E.g.*, Doc. 136, at 39.
[113] *Id.*
[114] The Court emphasizes that it has erred on the side of brevity for the sake of giving the parties as much notice as is practical ahead of argument. The parties should not take reference to specific exhibits, testimony, or arguments to mean that the Court has disregarded others, nor should the parties feel constrained to the specific examples cited herein.

should also be prepared to discuss the more substantive legal issues presented in their respective motions, as well as any other issues they believe warrant additional consideration.

## IV. CONCLUSION

For the foregoing reasons, North Penn's Motion to Strike is denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge