IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAMSPORT DIVISION

MATTHEW HECKMAN            :   CASE NO.
                          :
        v.                :
                          :
NORTH PENN COMPREHENSIVE  :
HEALTH SERVICES and       :   4:20-CV-01680
UPMC WELLSBORO            :


TRANSCRIPT OF PROCEEDINGS

Oral Argument on Motions for Summary Judgment

Held before the HONORABLE MATTHEW W. BRANN,
July 11, 2024, commencing at 10:20 a.m., Courtroom No. 1,
Federal Building, Williamsport, Pennsylvania.


APPEARANCES:

ANDREW J HOROWITZ, ESQUIRE
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
525 William Penn Place
Suite 1710
15219
Pittsburgh, PA 15219
412-566-1500
Andrew.horowitz@obermayer.com
      For the Plaintiff


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.
_____
              Colleen V. Wentz, RMR, CRR
              Official Court Reporter
          colleen_wentz@pamd.uscourts.gov

APPEARANCES (cont'd)

ERIN J MCLAUGHLIN, ESQUIRE
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
412.392.2090
Erin.mclaughlin@bipc.com
        For Defendant North Penn Comprehensive Services


AUSTIN WHITE, ESQUIRE
MCCORMICK LAW FIRM
835 West Fourth Street
Williamsport, PA 17701
570-326-5131
Awhite@mcclaw.com
        For Defendant UPMC Wellsboro

(Proceedings commenced at 10:20 a.m.)

THE COURT:  This is the matter of Matthew Heckman against North Penn Comprehensive Health Services and UPMC Wellsboro.  This matter is docketed in this Court at Civil No. 4:20-CV-1680.  We're here for an oral argument on Motions for Summary Judgment that have been filed.

So I have with me -- are you Mr. Horowitz?

MR. HOROWITZ:  Yes, Your Honor.

THE COURT:  Thank you.  So I have Andrew J. Horowitz with Obermayer, Rebmann, Maxwell & Hippel from Pittsburgh for the Plaintiff, along with Dr. Heckman.  And for North Penn, Erin J. McLaughlin, Esquire, with Buchanan Ingersoll & Rooney, along with Austin White for UPMC Wellsboro.

I have questions for you.  I don't -- I'll entertain whatever else you want to tell me after these questions are responded to.  But that's how I generally conduct oral argument.  I mean I've read your papers, and I already have a large draft Memorandum Opinion written, so this is the fill-in-the blanks, as it were.

In my -- and so I'll begin with you, Mr. Horowitz. In my prior Memorandum Opinion, I suggested that Dr. Heckman is asking this Court to stack inference upon inference to survive summary judgment.  How do you respond to that?

MR. HOROWITZ:  Your Honor, I think that where it --

the Court is suggesting that we're doing that is to provide -- we are providing context.  But we're not required to prove exactly what's going on in either Nobles' or Hilfiger's heads.

So, you know, I don't think that the Court needs to believe that Dr. Heckman's termination was, for example, an olive branch to Hilfiger.  And we submit that, but that's not material to us surviving summary judgment.  What's material is that he engaged in protected activity by complaining about infringement of North Penn's independence.  A day or two later, he's called into a meeting where he's demoted.  And Nobles, his expressed reason for the demotion is the, quote, Lack of alignment with him on that exact issue.

And then he's terminated, and Nobles claims that the termination is because he sent an e-mail or a series of e-mails where, among other issues, he is raising the issue of restarting North Penn Obstetrics, which is something that by that point, while he doesn't mention North Penn's independence in that e-mail, he has said it enough times that Nobles understands what his argument is, that basically, this was a decision that was made for the benefit of UPMC improperly and we should reverse it.

So it's not even really disputed why these adverse actions happened.  It's disputed that they were -- that the actions that Dr. Heckman took that Nobles claim triggered them were protected activity.

And, you know, we cited the Burke and the Yazdian cases in our briefs, which basically say that the Court can't, on summary judgment, claim that protected activity is not protected because it's somehow insubordinate or disruptive. And that -- and I don't think that Dr. Heckman's activity was insubordinate or disruptive, but that's what Defendants are claiming is their legitimate reason.

And again, you know, our argument is basically that that can't be a legitimate reason for the -- at least not for the purposes of summary judgment.

THE COURT:  Thank you.  As I alluded to in my prior memorandum opinion regarding North Penn's Motion to strike, there appears to be a dispute, amongst all of the parties, regarding who employed and subsequently terminated Dr. Heckman.  To the extent that UPMC and North Penn cannot agree, which are the two entities which were Dr. Heckman's employer or who fired him, does that not create a genuine issue of fact on that issue?

Ms. McLaughlin, I'll begin with you.

MS. MCLAUGHLIN:  Thank you, Your Honor.  The answer to your question is, I think, no.  I think regardless of how you resolve that question, the genuine issue -- or, I'm sorry, the factual record here supports that putting aside who was his actual employer, he cannot make out a prima facie case of retaliation under any of the three statutes that he

identifies.

So regardless of whether you make the decision that Mr. Nobles actually made the termination decision and that North Penn employed Mr. Heckman directly or whether you make the decision that he recommended the termination to UPMC and UPMC made that decision directly as his employer.  Regardless, the claims suffered the same fate.

THE COURT:  Who did employ him?

MS. MCLAUGHLIN:  Our opinion is, because it was pursuant to a staffing agreement, Your Honor, that it was -- that UPMC actually employed him, was his employer of record.

Now, Your Honor, I'll be honest with you.  You know, in terms of who was directing his day-to-day control, you've seen the transcripts.  Mr. Nobels was his mentor.  Mr. Nobels was the one having mentoring conversations with him.  So I don't believe -- I think it would be disingenuous of me to tell you that there's no argument to the fact that North Penn jointly employed him with UPMC.

THE COURT:  And there's not much doubt that North Penn actually fired him, is there, based on -- at least on what I have read?

MS. MCLAUGHLIN:  There was certainly no separation in that decision.  So that decision was communicated to Mr. Heckman at the same time that UPMC communicated its decision.  I don't believe that UPMC was going to continue --

and I'm speaking for UPMC -- I don't think that UPMC was going to continue to employ Dr. Heckman, short of his responsibilities and role for North Penn.

So I think when those roles and responsibilities were concluded, his employment with both entities, either/or, also concluded.

THE COURT:  Mr. White, what are your thoughts?

MR. WHITE:  Your Honor, I agree with Attorney McLaughlin.  I think she characterized the relationship well. I don't think that there's any dispute as to who was controlling Dr. Heckman on a day-to-day basis, and that this was a staffing agreement that ultimately, from UPMC's perspective, there was a contract, and the decision -- or North Penn had certain rights under that contract, as far as who was provided under the staffing agreement, and there was just no place for him once he was no longer desired to be working under that staffing agreement.  I think they just -- they didn't have a spot with him.

THE COURT:  So your opinion is no genuine issue of fact there.

MR. WHITE:  I do not see a genuine issue of fact.

THE COURT:  All right.  So does everyone -- I'm going to move on from the removal from chief medical -- to the removal of the chief medical officer position and I have a series of questions here.

Does everyone agree with the basic premise that Dr. Heckman's removal as the chief medical officer is an adverse employment action that can support a retaliation claim?  Mr. Horowitz, I assume you agree?

MR. HOROWITZ:  Yes, Your Honor.

THE COURT:  Do you want to expand on that at all?

MR. HOROWITZ:  I'm sorry?

THE COURT:  Do you want to expand on that at all?

MR. HOROWITZ:  Yes.  Thank you, Your Honor.  And I should have asked you before.  May I sit?  It's easier with my notes and everything.

THE COURT:  Yes.

MR. HOROWITZ:  Thank you.

Yeah.  I mean I -- there was a stipend associated with the position, so as a basic matter, it reduces compensation in a material way.  But, you know, beyond that, it reduced his -- the scope of his position, the prestige, his ability to influence in the organization in the community.  It was very humiliating to him.  There is all kinds of reasons why it would be an adverse employment action.  And then for retaliation purposes, under Burlington Northern, it only has to be a materially-adverse action such that it would dissuade a reasonable employee from engaging in protected activity, which the Courts have found can be all kinds of things, you know, that wouldn't be an adverse employment action for the

purposes of a discrimination claim.

THE COURT:  Ms. McLaughlin, do you recall my question?

MS. MCLAUGHLIN:  I do.

THE COURT:  So really directed at a retaliation.  So do you agree?

MS. MCLAUGHLIN:  Your Honor, I don't.

THE COURT:  Tell me why.

MS. MCLAUGHLIN:  And I'll tell you why I don't.  His compensation under the employment agreement didn't change.  I -- his roles and responsibilities for North Penn continued.  As you will see from the deposition testimony, he continued to have the same conversations that he was having with Mr. Nobels.  He continued to have a voice within the organization.  I don't view his -- the fact that he was no longer the chief medical officer as an adverse employment action in this scenario.

I also -- I'll leave it at that.

THE COURT:  What about the Burlington Northern case that Mr. Horowitz has referenced?  Am I bound by that?

MS. MCLAUGHLIN:  That's a good question, Your Honor, and that's one I have to look at.  I -- I would like to -- I'll take a look real quickly to see if I have any arguments against that.  I don't believe you're bound by that because that was a really different circumstance, if I'm

recalling it correctly.

This is a situation where Dr. Heckman admittedly did not share the -- the views of, whether it be UPMC or North Penn, on continuing to provide OB services directly, North Penn's continuance of providing those services directly.

In that regard, if you ask me potentially was the suspension associated with his -- the disciplinary action that ensued, the three-day pause, that could have been a -- an adverse employment action had he complied with it.

So the removal of the title alone, I think -- and Burlington Northern are two very different -- two very different topics, but I want to reserve, to the extent that I can find something quickly.

THE COURT:  Mr. White, what are your thoughts?

MR. WHITE:  Your Honor, I would -- I would defer to Attorney McLaughlin on her thoughts as far as the significance of that title.  I think the question is really whether or not anything changed, other than the title.  You know, it doesn't sound like it did.

So to me, it doesn't seem like an adverse -- an adverse action as far as a retaliation claim.

MR. HOROWITZ:  May I respond?

THE COURT:  You may, Mr. Horowitz.  Go ahead.

MR. HOROWITZ:  Thank you.  Counsel stated that Dr. Heckman continued to have a voice, which that's disputed

in the record.  He testifies -- and I don't have the page cites handy -- but in relation to when Mr. Nobles approached him for his help organizing against the UPMC's attempt to convert North Penn to a rural health center at the end of 2019.  Dr. Heckman testifies well, at that point, I was no longer attending the weekly executive team meetings for North Penn because I wasn't an executive.  I was no longer attending board meetings.

So, you know, while Mr. Nobles did occasionally talk to him about things, it -- he didn't -- clearly was no longer an executive, and he no longer had the level of access that an executive has.

And I think also Counsel, you know, just, you know, hit the nail on the head here in saying that Dr. Heckman did not share Nobles' views on the OB services.  And, you know, that is really the big disputed issue, is that is it just a -- you know, what North Penn claims is an interpersonal disagreement about something, or is it a disagreement about something that is protected activity.  And the only way to determine that is -- is there's enough corroborating evidence in the record that I will go through with you in a little while, to -- where Dr. Heckman told Nobles and Hilfiger that he felt there was improper influence on the FQHC in violation of HERSA guidelines, that the only way to find for Defendants on that issue would be for the Court to rule that that wasn't

really Dr. Heckman's motive, which would be totally improper on summary judgment and would fly in the face of the record evidence.

THE COURT:  All right.  Well, it seems like there was, what I think has been described as a misalignment between James Nobles and Dr. Heckman in the year 2019.  Is Mr. Nobles not entitled to a chief medical officer with whom he is, in fact, aligned?  That is to say, is this the sort of employment decision for which a CEO has greater latitude?  Mr. Horowitz?

MR. HOROWITZ:  Your Honor, I would again point to the Burke and Yasnian cases here.  You know, yes, in general, a CEO is entitled to hire and, you know, whoever he wants as a CMO and expect that a CMO be somebody he gets along with and has a shared vision with.

But when it comes to, you know, just because now there's a disagreement over whether something is illegal or not, the right way to deal with that is to -- to resolve that issue, you know, to say -- seek an opinion from HERSA or something like that not to --

THE COURT:  That's required?

MR. HOROWITZ:  No, but it's required to -- to find some way to deal with the issue that he's blowing the whistle about, not to just say well, we disagree with you and we're going to fire you because we have this disagreement.  And in some sense, it's no different from firing the person who

complains about workplace safety or anything else that's protected whistle blowing.  That would be like saying that, you know, Enron was, you know, entitled to fire an executive who said guys, what you're doing is illegal.

MS. MCLAUGHLIN:  Your Honor, if I may?

THE COURT:  Just a moment.

Ms. McLaughlin, you want to respond to that?  Go ahead.

MS. MCLAUGHLIN:  So two things.  Going back to the Burlington decision, I took a look and I'm glad my memory is -- somewhat serves me these days.  But that is a situation in which there -- it involved a shift.  And in that case, the employee, after going forward with the EEUC came back and wanted a different shift.  He wanted a different shift change because of, like, a hostile work environment.  And the Court said -- and the Court in that case said context matters.  And in that case, the Court found there was an adverse action.

Here, Your Honor, I think we're missing the foundation.  We don't have any protected activity, and therefore, there's no causation to even get to an adverse employment action.  So if you're viewing the chief medical officer role, that, in and of itself, was a title.  And that really did not affect the terms and conditions of Mr. Heckman's employment.  And that dovetails into my second point.

I think we're trying to fit a square peg into a round hole in many respects because we don't have protected activity. You asked Mr. Horowitz a very good question. And that question is isn't Mr. Nobles entitled to have a chief medical officer who is aligned with his vision. And the challenge here is immediately the response we get, that he should have gone to HERSA. But, Your Honor, the reason that he was put -- taken out of that position had nothing to do with HERSA. The reason he was taken out of that position was because of the way in which he was behaving and that he disagreed with the fact that North Penn -- and there is no record evidence to dispute -- Jim Nobles made that decision. And that decision, Jim Nobles thought was in the best interest of North Penn.

There is nothing to dispute that that action -- that decision was illegal in any way. In fact, the record evidence, set aside Mr. -- or, I'm sorry -- Dr. Heckman's speculation, is that Ms. Hilfiger really played no part in that decision.

THE COURT: All right. Thank you. Your thoughts?

MR. WHITE: Your Honor, in terms of Mr. Nobles and, you know, what he should be able to -- what he should be entitled to expect of his CMO, I -- I think Your Honor's drilling down on something very important here. I mean I think it's pretty clear that Dr. Heckman has made, in all of

his testimony, in all of his -- everything he's provided in this case, he's made it clear that his number one priority in everything is patients, and the patients -- and that's what he cares about.  And that's -- he's a physician.  That makes sense, you know.  Nobles was a CEO of the organization; and although they both cared about the patients, Nobles was entitled to have a CMO at his side that had the same view of where the organization is going, you know, for the good of the organization as a whole, which ultimately flows down to the patients.

And so Nobles has these larger views and -- and concerns of how North Penn is operating, that Dr. Heckman was very much focused on the patients that -- you know, they -- that's a misalignment.  And if there's no reason why Nobles shouldn't be able to have someone who views -- views the organization, where is it going, is it in the same way that he does.

THE COURT:  If I recall correctly, Dr. Heckman was in place, hired as a physician by North Penn in 2016.  He's promoted to chief medical director in 2017 -- excuse me.  He was promoted to medical director in 2017, then chief medical officer in 2018.  And Mr. Nobles is hired as the chief executive officer of North Penn in November of 2017.  Do you agree with my chronology?

MR. HOROWITZ:  Yes, Your Honor.

THE COURT:  Ms. McLaughlin, you agree?

MS. MCLAUGHLIN:  Yes, Your Honor.

THE COURT:  Mr. White?

MR. WHITE:  Yes.

THE COURT:  Thank you.  Next question.  Is there anything in the record that suggests that Dr. Heckman's removal as chief medical officer, not his termination, was influenced by Janie Hilfiger or UPMC?

MR. HOROWITZ:  Your Honor --

THE COURT:  And if so, point to it.

MR. HOROWITZ:  Yes.  I mean there's testimony that when Nobles comes back from meetings with Hilfiger and says, Dr. Heckman, your objections are causing problems to our relationship with UPMC; I had another great meeting with Janie; she called you a liability.

So from there, it can be -- there's a reasonable inference that UPMC was motivating his decision.  Now, I mean, do we have any evidence that anyone at UPMC told him, you know, you've got to demote Dr. Heckman?  No.  But Dr. Heckman does even testify that he had an understanding that part of the reason for that demotion was so that he could advocate and distance himself a little bit from the organization to protect the organization from retaliation.

So yeah, I guess the answer is yes, it's -- UPMC is -- we believe is part of Nobles' motive, but, you know, there

probably wasn't a direction by -- from UPMC to demote him.

THE COURT:  And there's nothing in the record that would suggest that, is there?

MR. HOROWITZ:  No.

THE COURT:  Ms. McLaughlin, I assume you agree?

MS. MCLAUGHLIN:  I do agree.

THE COURT:  Do you want to speak to that at all?

MS. MCLAUGHLIN:  I do.  This goes to inference upon inference.

Your Honor, there is absolutely nothing in the record that Ms. Hilfiger played any role in the decision to remove him from medical director or really with North Penn's decision to remove him ultimately from the position -- the roles and responsibilities he had with North Penn.

This -- it's really a conspiracy that the reason that Jim was doing that was to appease Ms. Hilfiger there. There is no actual evidence of that anywhere.

THE COURT:  Do you want to speak to that at all?

MR. WHITE:  Your Honor, I agree with Attorney McLaughlin.  I think Dr. Heckman made it clear that a lot of his conclusions were coming from pattern recognition that he was performing.  And he's asking the Court to operate the same way his brain is operating, which is trying to recognize patterns.

And when the Court -- when Your Honor suggests or

said in your opinion that this is inference upon inference, that's what that is.  It's trying to recognize patterns that don't really exist and there's no actual evidence of it.

THE COURT:  All right.  I'm going to move on to a line of questioning that I have described, for my own purposes, as a gap of time between November of 2019 and April of 2020.  You'll see where I'm going here momentarily.

My review of the record suggests that there appears to be a gap from November of 2019 when Mr. Nobels appeared to decide to terminate Dr. Heckman, before changing his mind, until April of 2020, about five months later, when Dr. Heckman was finally terminated.  I have a couple of questions regarding how I should approach this.

So let me start with North Penn first, and then I'll allow everyone to respond.

First, North Penn maintains that Mr. Nobles documented Dr. Heckman's performance issues, the counseling that led to his termination, but for whatever reason, whether because Mr. Nobles changed his mind or because he does not have the authority or for some other reason, Dr. Heckman was not terminated then for another five months -- in other words, between November of 2019 and then the ultimate termination in April of 2020.

So there are then no documented performance issues over that period until he's terminated.

Doesn't that suggest that those performance issues were not related to his termination?  On the other hand, was the lack of a record not also suggest that Dr. Heckman wasn't engaged in any protective activity.  It cuts potentially both ways.  Do you want to speak to that?

MS. MCLAUGHLIN:  Yes, Your Honor.  First of all, I want to speak to the point that favors my position, and that is I think it really cuts against the argument that any protected activity was temporally related and there was any causation with respect to the ultimate decision to remove Dr. Heckman.

Putting that aside, we have a memorandum, and there are clearly discussions that are occurring in November about removing Dr. Heckman.  Quite frankly, that gap, I don't think, makes it any less believable that the -- Dr. Heckman was ultimately removed because he was having the same exact performance issues in April of 2020 as he had demonstrated throughout 2019.  And, quite frankly, whether or not it was documented, there was a lot going on in the world at that time.

So in December of 2019, I don't know whether or not the health systems were aware of Covid at that point, but certainly beginning in January, they were.  And I think much of the focus at that time was focused less on documenting Dr. Heckman's performance issues, which I believe still

continued, but more focused on let's figure out what we need to do in this time of pandemic.

Moving forward, when it came down to starting to negotiate his -- his employment agreement, Dr. Heckman began to display the exact same performance deficiencies, the issues that he was -- the interpersonal relationship issues that he had had previously in the negotiations.  He actually, essentially, refused to do the job duties that were specifically articulated in his employment agreement or resign from having hospital privileges, which he needed to have to perform the job duties as a physician working for North Penn.

So I don't view it as an issue.  I don't view it as even something that needs to be addressed.  Quite frankly, in the Union world, we have last-chance agreements.  And in last-chance agreements, you're really looking at the discipline, generally-speaking, for six months or a 12-month period.

Those -- clearly, if you look back 12 months, you had that full gamut of Dr. Heckman's performance deficiencies that were well documented in 2019.

THE COURT:  Mr. White, do you want to speak -- do you recall my question?

MR. WHITE:  Yes, Your Honor.  I -- but I don't really have much to add, other than what Attorney McLaughlin already said.  And the time would be better used for

Mr. Horowitz.

THE COURT:  Mr. Horowitz, do you recall my question?

MR. HOROWITZ:  Yes, Your Honor.

THE COURT:  Sort of two-pronged.

MR. HOROWITZ:  Yeah.  And I agree with Counsel that it cuts both ways.  I mean I think a few things.  One is regardless of Mr. Nobles continued to document what he claims were performance deficiencies, the protected activity continued.  The -- you know, had the ongoing attempt by UPMC to take over North Penn, which Dr. Nobels even sought Dr. Heckman's assistance in advocating against, there is -- and then in the lead-up to the pandemic, there's a plan to potentially close some of the North Penn's health centers, which Dr. Heckman advocates against, and he states that it was, again, an improper influence by UPMC.

And then you have the final protected activity in the e-mail chain asking to restart obstetrics, which wasn't new.  He was negotiating all along with Nobels to try to restart obstetrics.  And that's all documented in the record.

So if there's no gap in the protected activity, all there's a gap in is Nobles' documentation, which I'm not sure is that important.

THE COURT:  Okay.  But the lack of a record would suggest that Dr. Heckman wasn't engaged in any protected

activity, wouldn't it?

MR. HOROWITZ:  Not in face of the documentation we have and the record showing that he was, in fact, engaging in protected activity.  All it shows, perhaps, is that --

THE COURT:  Well should I ignore the fact that there's a lack of a record?  And if there is a record, where is it?  I haven't seen it, looking at everything.

MR. HOROWITZ:  Well, in Dr. Heckman's testimony, he talks about in March of 2020, he's advocating against the potential closure of the Elkland and Westfield Health Centers.  And there's the final e-mail chain where he says I want to -- he asks to restart obstetrics again, and Krista Wagner, who is North Penn's chief operating officer, basically gives him a one-sentence brushoff to that saying we're not going to consider that.

And then he responds and says basically, if -- you know, we're not going to restart obstetrics, then, you know, I'm just going to frank this as a family medicine physician in Elkland, which is, you know, really the rest of his job, other than obstetrics; and I'm not going to do all of these other things that I had volunteered to do that weren't really part of his job description.

So -- and that's what Nobels claims that he fired him for.

THE COURT:  All right.  Anything else on that

point?

MS. MCLAUGHLIN: Yes. Two things. So we -- we're going to talk about protected activity. And I think it's really important to note, the two things that Mr. Horowitz objected to was that UPMC was going to take over North Penn. To be clear, that -- there was a conversation among UPMC's board regarding potentially converting North Penn in November of 2019. There is no record evidence that those conversations resumed, and, quite frankly, the record evidence establishes that, in fact, the staffing agreement between UPMC and North Penn ceased, no longer exists.

So UPMC didn't have the ability -- did not exercise that ability to take over North Penn.

And secondly, closed health centers. When Mr. Horowitz talks about closing health centers, we were in the middle of a pandemic and we were having issues with staffing. Mr. Nobels made the decision to consolidate where services would be provided. That had nothing to do with UPMC, and, quite frankly, there is no record evidence that -- that UPMC played any part in Mr. Nobles' decision as to where services would be provided during the pandemic.

THE COURT: Anything else?

MR. WHITE: No. I think that's accurate, Your Honor.

MR. HOROWITZ: May I respond, Your Honor? I think

that -- not to belabor this too much, but most of those facts are disputed.  Also, Dr. Heckman stated that he believed that North Penn had -- was influencing that decision at the time and said -- told Nobels that he believed that.  And that's protected activity, regardless of whether or not he's ultimately right.

But the other thing, I think, that needs to be said here about this gap from November to April is that the Courts -- the Third Circuit has said that there's not a hard and fast rule to how many months are temporal proximity; you've got to consider that includes the holidays, November, December, less is happening then; people are focused on other things.

And then as Counsel said, we had the lead up to the pandemic and people were distracted with things.  So, you know, was Nobels totally focused on Dr. Heckman at that time. He, in his testimony, says he wasn't because of the pandemic.

So, you know, I think that that gap may appear to be more on paper than, you know, whether it's practically speaking.

THE COURT:  Of course that's what I need to look at, isn't it?

MR. HOROWITZ:  Well, I think that -- you know, again, Courts tend to look, with some flexibility, at what constitutes temporal proximity and just pointing at two dates on the calendar is, in some ways, misleading under these

circumstances.

THE COURT:  It's not that misleading, is it? Ms. McLaughlin?

MS. MCLAUGHLIN:  I don't -- I don't believe it's --

THE COURT:  I mean aren't those really -- isn't it really that five-month gap that I need to look at?  I'm calling it a gap, that's my language, between November of 2019 and April of 2020 when Dr. Heckman's terminated.  I mean is -- if there's a longer look-back period, what is it?  Where does it go back to, because I don't see it in the record.

It seems to me that it begins in the November of 2019 time frame.  When there's a discussion about it, nothing's done.  Nothing's done in 2019.  Five months elapse. I know full-well what happened.  I recall the pandemic as well as anybody.  And I know when that occurred; I appreciate all of that.  But nevertheless, that's the five-month gap.  So if you're telling me there's a different look-back period, what is it?  What does it go back to?  The summer of 2019?  The beginning of 2019?  All the way back to the first date of his employment?  And what is the date, and then you need to justify that to me.  But I don't -- I don't, frankly, see that.  I am prepared to be persuaded, but I don't see it.

MR. HOROWITZ:  Well, the Courts have also said that -- I think you're raising a good point, Your Honor, that there's a -- there can either be temporal proximity or there

can be a pattern of ongoing conduct and antagonism.  And here, we have Dr. Heckman raising objections to the influence of UPMC on the organization; he's retaliated against and the demotion.  He continues to raise that objection.  And it may be it quiets down for a little while because he's no longer CMO.  Again, he no longer is in executive team meetings, which was when he was often raising those objections.  So he only raises those objections when specific events happen that cause him to do so.

THE COURT:  So give me a sense of when did that start?

MR. HOROWITZ:  When did what start?  I'm sorry.

THE COURT:  What you've raised.  He's raising objections at meetings.  And in the meantime, just while you're answering that question, Ms. McLaughlin, and for that matter, Mr. White, can you tell me, based on what you have -- maybe this is helpful, maybe it's not hopeful -- but when did Janie Hilfiger become the chief executive officer of UPMC Wellsboro, if you can tell me.  And the reason I'm asking is Mr. Nobles -- well, everything I've seen, Mr. Nobles becomes the chief medical officer of North Penn in November of 2017, and it seems that based on what I'm looking at, that Ms. Hilfiger is already in place as the Chief Executive Officer of UPMC Wellsboro in that time frame.  And if you don't know, that's fine.  I'm sure you can find that.  All

right.  Back to you, Mr. Horowitz; go ahead.

MR. HOROWITZ:  While I think it's difficult to pinpoint exactly when it started and at least escalated and became a major issue in 2019.

THE COURT:  When?  Before November of 2019?

MR. HOROWITZ:  Yes.  Yes.  Whenever the discussion about obstetrics started, which I believe was in March or April of 2019.

THE COURT:  So you think it really went on for a year; it went on from March or April of 2019 until Dr. Heckman was terminated in April of 2020?

MR. HOROWITZ:  Correct.

THE COURT:  That that's -- that that's, in fact, the time frame I should be looking at?

MR. HOROWITZ:  Yes, Your Honor.

THE COURT:  I'm going to allow some supplemental briefing; maybe you can sort that around for me.  All right.

I don't need that answer right now, but do you happen to have that?

MS. MCLAUGHLIN:  I'm going to look.  I think I can get it --

THE COURT:  I'm going to --

MS. MCLAUGHLIN:  Yean.  I can represent to you --

THE COURT:  And if you don't, I don't need it -- it's not critical today.  You can just supply that -- I'll

allow some supplemental briefing and just plug that in.  It may not be important, but maybe it is.  And I want to know -- it seems to me, when I'm looking at everything as you've represented it, that Ms. Hilfiger is in place by the time Mr. Nobels is hired in November of 2017.  Dr. Heckman's already -- already in place at that point.

MS. MCLAUGHLIN:  I will check.

THE COURT:  May not be dispositive of anything.  I'm just curious, and it give me -- gives me a sense of when everyone is in place.

All right.  During -- during his deposition, Mr. Nobels testified that certain of Dr. Heckman's activities, prior to his eventual termination in April of 2020, were a needless distraction from the Defendants' attempts to respond to the COVID-19 pandemic.

While the Court can probably take judicial notice of the fact that the COVID-19 pandemic occurred, and I just referenced that, there appears to be limited evidence in the record that the Defendants were feeling a particular strain at the relevant time, which is -- which was really in the early dates of the pandemic.

So even if the Court assumes that the Defendants were struggling to respond to the pandemic, does that matter?  Does the COVID-19 pandemic excuse any violations of the False Claims Act or require Dr. Heckman to forego any concerns

regarding unfair compensation?

MS. MCLAUGHLIN:  Your Honor, the answer is yes.

THE COURT:  Do you follow my --

MS. MCLAUGHLIN:  I think so.  The answer to your question is does it require Dr. Heckman to forego valid protected activity concerns related to the FCA, his compensation under the FLSA or whistle blower activity, and the answer to that question is no, that's not required.  But what I think is really relevant, regardless of how significantly at the time the health systems were feeling the impact of the pandemic, this was yet another example of Dr. Heckman putting his interests and his needs before the needs of the overall health system.

Judge, you heard it from Mr. Horowitz.  He started the conversation as to whether or not North Penn should be directly providing OB services in February and March of 2020.  At that time, we were in the middle of a pandemic.  There was no -- the fact that he was even bringing that up is totally reflective of the way he behaved in 2019.  It had -- whether or not North Penn makes the decision to directly provide OB services has nothing to do with the FCA, has nothing to do with being a whistle blower under the Pennsylvania Whistle Blower Act, and certainly has nothing to do with the FLSA.

So the fact that he's raising this now at the time in which the health system is discussing which locations it's

going to keep open, from a staffing perspective, there's testimony in there that I think that at one point, Dr. Heckman and Mr. Nobels are both ill, and they're meeting together, in the middle of the pandemic. And it turns out, I think they both had Covid.

So it was absolutely a real thing. And then, Dr. Heckman is still pushing his agenda of North Penn directly providing OB services because that's what Dr. Heckman wanted to do. The same with when he submits a resignation in which he is refusing to provide certain services, he's doing that in the midst of a pandemic when staffing at medical -- at medical centers, health systems, was at its all time most critical point.

And so if he really had the interests of his patients and not himself at heart, he wouldn't have been doing those things. This, to me, demonstrates a pattern of activity that has nothing to do with protected activity and has everything to do with Dr. Heckman having his own personal interests at play and demanding that the health systems, whether it be North Penn or UPMC comply with those requests.

THE COURT: Do you want to expand on that at all?

MR. WHITE: Your Honor, I agree. I think that there -- there is in the -- in the transcripts and the record, there is a backdrop of Covid, which it was unavoidable; as everybody knows, it was happening. Because it was just sort

of part of our life and certainly more so for anyone who works in medicine, it's talked about just as a fact.  And I think that the Court can consider that in its decision because it's common knowledge.  And to the extent it's important, I think, you know, I think Ms.  -- Attorney McLaughlin covered that well.

THE COURT:  All right.  Mr. Horowitz, I assume you agree with me in that if I assume the Defendants were struggling to respond to the pandemic, and I conclude that they were in that time frame, particularly -- particularly by -- Ms. McLaughlin says February of 2020; I would peg it probably more really March of 2020, that -- and not -- I peg it this way.  Our Court was very aware of it and instituted what we called a COOP plan, as most federal courts around the country did, in the middle of March.  I think our date in the Middle District of Pennsylvania was March 16, 2020.  I was not the Chief Judge at the time, but I weighed in with my own views of what should happen, as we all did.

So February -- February -- they may have been aware of that in a more urban setting, say in New York City, Philadelphia, San Francisco, Los Angeles, where this pandemic sort of began, I think.  But in mid-state Pennsylvania, I think it was really more the month of March of 2020 is sort of the critical month, I believe.

But we acknowledge that.  So I can take judicial

notice of that. That's -- that would be error not to do that. But it wouldn't excuse any violation of the False Claims Act or require Dr. Heckman to forego any of his concerns regarding unfair compensation. And I think you agree with that premise, don't you?

MR. HOROWITZ: Of course, Your Honor. And I would also add that at no point was there any communication with Dr. Heckman of hey, look, can you see we're dealing with a pandemic now. Can we please, you know, table this for now? It was, you know, just okay; you're fired.

So, yeah, I think we're in agreement, Your Honor.

THE COURT: All right. I assumed as much. All right. Let me move on then.

Does the fact that there is limited evidence of how the Defendants were feeling the effects of the pandemic at that time not suggest that it could have been the sort of post-hoc rationalization that Dr. Heckman accuses Mr. Nobels of offering for his actions?

MS. MCLAUGHLIN: No, Your Honor. I think, regardless of whether you consider the pandemic to be -- have -- be having significant impact at that time, the fact of the matter was there was a pandemic. And Dr. Heckman --
Mr. Horowitz referenced a pattern of antagonism. And I think it's -- the antagonism was coming from Dr. Heckman. And Dr. Heckman, when he restarted those negotiations about

wanting to do OB -- OB services directly from North Penn, when he's refusing to perform certain aspects of his job, when he's resigning from certain places, it is more of same, Your Honor. It is more of Dr. Heckman acting -- behaving in an obstinate, unprofessional way that has been demonstrated throughout that time period.

So whether the health system at that time was dramatically being impacted by Covid, is really irrelevant. This is a pattern of behavior.

And to your question earlier, which I think is particularly on point here, an employer can fire an employee for any reason or no reason, so long as it's not an unlawful one. And so if Jim Nobels, at that point, had had enough of Mr. -- or Dr. Heckman's pedantic complaints, he was well within his right to make the decision at that time, whether or not the health system was dramatically being affected by Covid.

THE COURT:  Do you want to expand on that?

MR. WHITE:  I think Attorney McLaughlin covered it well.  Thank you, Your Honor.

THE COURT:  Your thoughts?

MR. HOROWITZ:  Your Honor, I think you're correctly proposing an inference in favor of Dr. Heckman as a non-moving party in summary judgment.

THE COURT:  All right.  Now I have some subsequent

legal questions.  I'll begin with North Penn and Ms. McLaughlin.

Is Dr. Heckman correct that the Defendants' arguments regarding the Pennsylvania Whistle Blower claims are not simply asking for reconsideration of the Court's prior ruling?  I appreciate that there's a divergence between Pennsylvania State Courts and Pennsylvania Federal Courts and I might even agree that the Federal Courts have the better argument.

MS. MCLAUGHLIN:  Your Honor --

THE COURT:  But the relevant inquiry is whether the Pennsylvania Supreme Court -- is to what the Pennsylvania Supreme Court would do if presented with the issue.  I believe that is the inquiry I conducted in my memorandum opinion at the Motion to Dismiss stage, as you recall.

MS. MCLAUGHLIN:  Your Honor, while I would have liked the results to be the same, I don't disagree with your analysis at the Motion to Dismiss stage.  But at the stage that we're at, Dr. Heckman was required to produce evidence that we are, in fact, a public body.  Totally absent from the record is any evidence that North Penn meets the definition of a public body, meaning that State funds flow through -- that are -- I'm sorry -- funds flow either through the State or are received directly from the State.  There is no evidence of that in the record, and, in fact, everything that we have been

discussing, HERSA is Federal.

THE COURT:  Mr. White?  Your thoughts?

MR. WHITE:  Your Honor, I believe that the Court's prior opinion tied UPMC to being an employer because of the flow through North Penn.  So the same -- the same argument applies.  If you -- if you don't -- if you don't determine that North Penn is a public body, then it stands that UPMC is not an employer because it's -- it flows downstream, so-to-speak.

THE COURT:  Mr. Horowitz?

MR. HOROWITZ:  I mean I think the Court correctly analyzed it at the Motion to Dismiss that the Pennsylvania Supreme Court, if asked, would hold that the receipt of State Medicaid funds as a healthcare provider makes an entity a public body.  And I don't see how it can be reasonably disputed that these two Defendants bill Medicaid, you know, for their -- to see their patients.

THE COURT:  Ms. McLaughlin, go ahead.

MS. MCLAUGHLIN:  Your Honor, nowhere in the record was North Penn ever asked about the funding they receive or how it receives such funding, or whether it qualifies as a public body under the definition of a whistle blower -- of the Whistle Blower Law.  In that regard, while it may be that ultimately North Penn would not dispute that, that's not part of the record -- the record that we have.

THE COURT: All right. Even if I am persuaded that I was mistaken in my arguments for summary judgment, should the law of the case not control?

MS. MCLAUGHLIN: I don't believe so. I believe Your Honor can analyze whether or not the Plaintiff met the pleading requirement, so as to allow the case to go forward to see if you can discover evidence to support those elements. whether or not we are a public body is an element that he has to establish. And so no, I don't believe law of the case applies here in a Motion to Dismiss, the same way it wouldn't apply in any other Motion to Dismiss.

Generally speaking, this is just a gateway. This is can you go on to the next step to try to find evidence of your claims.

And so no, I don't believe the law of the case would apply here.

THE COURT: Mr. White?

MR. WHITE: I agree, Your Honor. You're looking at a decision that was dependent upon and analyzing the Plaintiff's Complaint as far as what was alleged. And now we're at the summary judgment stage where they have to produce evidence to substantiate the allegations. And so the Court can revisit it, based upon what records it has in front of it.

MR. HOROWITZ: I -- Your Honor, I do think that the law of the case applies. I mean certainly we have an

obligation to produce a record.  But the question of whether, as a matter of law, receipt of Medicaid funds makes a -- an entity a public body is the law of the case.

THE COURT:  All right.  Thank you.  My next question is this.  A retaliation claim under the False Claims Act requires but-for causation.

The Pennsylvania Whistle Blower Law requires only, quote, Some evidence of a connection, end quote; and for that proposition I'm citing O'Rourke versus the Commonwealth, found at 778, Atlantic 2d, 1194, page 171, a decision of the Pennsylvania Supreme Court from 2001.  O'Rourke.  I think you're familiar with O'Rourke.

So the Pennsylvania Whistle Blower Law requires only, quote, Some evidence of connection, end quote, between a report of wrongdoing and the retaliatory act.  If this Court grants summary judgment on the False Claims Act Claim, and Dr. Heckman's Pennsylvania Whistle Blower Law claim survives or are the facts of this case -- this case -- such that if the FCA Claim fails, the PWL Claim must also fail without further analysis?

Ms. McLaughlin, I'll begin with you.

MS. MCLAUGHLIN:  I don't think the answer to your latter question is that both must fail.  But I think here they would fail.  And the reason that I think that they would fail here is Dr. Heckman, when you put aside all of the -- the

argue -- when you analyze the actual meat of the argument, Dr. Heckman alleges that he complained that UPMC had improper control over North Penn.  And that is a federal claim, federal statute.  That said, if you don't find that those complaints constituted protected activity, because I think that's the important thing, that those -- those -- that was not protected activity under the FCA.  It's also not going to be a protected activity under the Whistle Blower Law.  And so while -- I think your question is on the burdens of proof, I don't think you ever get there.

But putting that aside, we talked a lot about timing, and we're really still trying to figure out when that protected activity occurred.  And the critical thing under the Whistle Blower Statute is that it has a 180 day Statute of Limitations.  And so if we didn't have any protective activity back in November, the claims are barred.

THE COURT:  Mr. White?

MR. WHITE:  Yeah.  I agree with Attorney McLaughlin.  I think that -- yeah, I don't really have anything else to add that would be productive, Your Honor.  I think the time would be better spent with the rebuttal.

THE COURT:  Mr. Horowitz, you understand my question?

MR. HOROWITZ:  Yes, I do, Your Honor.

THE COURT:  Go ahead.

MR. HOROWITZ:  I think -- while it raises a very interesting legal question, I think that I agree with Counsel that really, the issue here is is the activity protected. And, you know, but-for causation is, you know, equivalent to cause-and-effect under Tort Law.  It's just that, you know, had he not done this, would he not have been fired.

So I think that it's unlikely that the Court would reach a conclusion that one burden of proof is satisfied and one is not, particularly on summary judgment.  Now, I mean, could a jury, you know, that's weighing credibility in theory make a determination like that?  Maybe.

Now I will also note in our response to Counsel's Statute of Limitations argument that our Complaint only lists the termination as protected -- or, I'm sorry, an adverse action under the Whistle Blower Act because of that Statute of Limitations.  The Motion is outside the Statute of Limitations for the Pennsylvania Whistle Blower Law.

But, you know, again, I mean he engaged in the protected activity that caused that, like, within a few days of when he was terminated by sending that e-mail.  Not -- in addition to all the -- the whole pattern of protected activity that started, you know, about a year earlier, as we discussed.

THE COURT:  Do you want to expand on that at all?

MS. MCLAUGHLIN:  No, Your Honor.

THE COURT:  Thank you.  All right.

If I conclude that North Penn and UPMC are joint employers, joint employers under the Fair Labor Standards Act, are they then jointly and severally liable for any blame, which is to say would Dr. Heckman only need to survive summary judgment against one in order to survive against the other? Mr. Horowitz?

MR. HOROWITZ:  Yes, I would agree with that.

MS. MCLAUGHLIN:  Yes, Your Honor.  I think that is -- if there is joint employer, I don't think you could then dismiss the claim, though.  If you determine that we are joint employers and that there was liability, we are both, then, in the case, at least for trial.  So I think from a dismissal perspective, that that's a challenge.  I would also posit it -- posit that I have yet to see protected activity under the FLSA asserted in this case.

So there's simply no evidence that under -- that Dr. Heckman complained about any violation of the FLSA.

MR. WHITE:  Agree, Your Honor.

THE COURT:  Those are the questions I have for you. Is there anything else you need to tell me today?  As I said, I already have some of the general draft of my memorandum opinion.  It's kind of the way I operate here.  I -- the oral argument helps.  I don't have a lot of oral arguments; I don't need them, frankly.  Lawyers complain about that that ask for oral arguments in the past.  But I just don't need them.  I

don't want to spend my time listening to oral argument if I don't need to listen it. And I don't want you to travel here for oral argument, although Mr. White, in his case, could simply walk over. But the rest of you have to travel some distance.

And, you know, it's beneficial -- this was beneficial to me. Is there anything else you need to tell me, because what I want to do is this. I want some supplemental briefing. I'm going to issue, realistically probably tomorrow, probably dictate it out this afternoon an order with some specific questions for you that I want some follow-up on.

Will you want a transcript of this oral argument today? Would that be helpful to you or not?

MS. MCLAUGHLIN: Yes. If we can get that, that will be great.

THE COURT: All right. We're going to talk about that. Let's go off the record.

(A discussion was held off the record.)

THE COURT: She'll have the transcript ready to you -- ready for you on Monday. Give her your business records or however you communicate with court reporters these days, and she'll have it ready by Monday, which is July 15th.

So if that's the case, I would be proposing briefing -- you're going to get the order from me tomorrow, so you can sort of start preparing this.

I'd like the briefing back -- simultaneous briefing in two weeks.  Is that possible, which is -- excuse me -- Friday, July 26th, two weeks from tomorrow?  Mr. Horowitz?

MR. HOROWITZ:  Yes.  That's certainly doable, Your Honor.  Thank you.

THE COURT:  I mean these are -- these are -- these are going to be sort of narrow-focused questions, I think, as sort of follow-up.  Does that work?

MS. MCLAUGHLIN:  No problem.

THE COURT:  Mr. White?

MR. WHITE:  Yes, Your Honor.

THE COURT:  All right.  So that's what the order will indicate, that I'd like the briefing of it by the close of business on Friday, July 26th, and then you can expect a detailed memorandum opinion from me at some point next month. I'm not sure when.  I have a busy couple of weeks, but at some point in the month of August you'll have a detailed opinion -- I hope fairly detailed opinion.  If the matter -- if the summary judgment is granted, that's all she wrote, you know. I'm happy if a party wants to take it up with the Court of Appeals.  If it survives the summary judgment, I'm going to give you a couple of weeks to look it over, go over it with your client, and then we will have a telephonic status conference call and you're going to tell me what you want to do with the case.

What I'm going to suggest that you do, again, I don't know if it will survive or not, but I'm just telling you logistically so you understand how I operate here, I'm going to strongly urge that you sit down with one of the magistrate judges in the Court and talk about getting the case settled in a settlement conference.

So again, I'll issue the memorandum opinion. Typically I'll give you three or four weeks. And I don't do anything by happenstance. Three or four weeks is designed. This allows Mr. Horowitz and his counsel to go back to Dr. Heckman, you know, read it -- read the opinion themselves twice. Go over it with Dr. Heckman; you've got to meet with him; you've got to go over that with him. Same thing with Defense Counsel need to go back to their respective clients, whoever you -- however you chat with them about this, and spoke, I expect, with inhouse Counsel. Go over this, decide what you want to do. This is -- do you agree; if you don't agree, it doesn't much matter. I've ruled.

And, again, this is -- if it survives summary judgment, and then conclude do you want to sit down with the magistrate judge and try to work something out. Because otherwise, it's basically trial ready. The case would not be tried immediately in any event. I am probably booked up with trial through -- as it stands right now, in early July through at least March of next year. There will be no trial -- the

earliest would be March.

Now, if you go off to a settlement conference, the settlement conference would be conducted probably -- I can't predict what my magistrate judge colleagues would be able to do, but I would think they would be able to conduct a settlement conference, assuming that you would be available, Dr. Heckman is available, the principals from the Defendants, I would suppose in the months of either September or October, in other words, within 60 days or so of the time that we have our discussion.  It actually might extend -- we may not speak until September.  So it might be into early November.  But they would do it relatively quickly.

The district is -- the magistrate judges are good about getting settlement conferences scheduled and conducted. Mr. White knows this, Mr. Horowitz, Ms. McLaughlin, I don't know what your familiarity has been with my magistrate judges, but they're generally pretty prompt.

Now bear in mind that we are short one magistrate judge.  We have one magistrate judge who is very ill, so we basically have three active magistrate judges, one who is -- just because of her illness -- I don't want to -- it's not that she's not doing any work, she is, but she's just exhausted most of the time.  And one -- and our Chief Magistrate Judge, Judge Saporito has been nominated by the President for a vacancy as a district judge.  We expect him to

be confirmed, we hope, sometime this fall; and that would create yet another vacancy.

So we're -- that's the issue in terms of who you would be assigned to.  It's just the current dynamics of the magistrate judge bench as it stands right now in midsummer of 2024.

So -- so I'm not telling you -- you're not mandated to go out and sit down with the magistrate judge, but, you know, you ought to think about getting it resolved at that point if you can.  And so while I've given you a March date right now, the earliest that I would be able to sit on trial for this case, the reality is by the time you conduct the settlement conference, which is probably what you're going to do, or try to resolve it on your own without the assistance of a magistrate judge, you know, I'm going to be backed up well into probably the summer of next year for trial.

So I don't want anyone to have the illusion -- particularly Dr. Heckman, who is not familiar with how things work because it is not his world, but you have the trial next week.  There's just not -- that's not in the cards, but it's also not going to be delayed endlessly.  It will be done relatively soon.

You would also want to think about if the matter goes to trial, you don't want -- if you don't want the assistance of the magistrate in trying to work things out, how

long would a trial take?  And don't give me a general estimation.  You need to really think how long will it take to try this case.  I move things along quickly.  I am -- I am -- I disguise my impatience, but I am as impatient a judge as you could deal with probably without -- without having some kind of clinical diagnosis.

But -- which means I'm going to cut to the chase.  So if I'm here to hear the case at trial, I'm here to hear the case at trial.  I'm not looking -- I don't have a tee time at the Williamsport Country Club at 4:00 in the afternoon.  I'm here.  We start the trial at 9:30 in the morning.  We take a mid-morning break.  We have an hour recess for lunch.  There's a break in the afternoon, and then we press on until at least 5:00 or 5:30, sometimes 6:00 in the evening.  And we repeat it the next day.  So my goal, if I'm trying the case, is to get about seven hours of testimony.  It's a full day.

So it's not -- you know, it's not piecemeal.  So what you want to do, you don't have to decide this now; it's not at this point.  But if you do tell me when we converse at the end of August, the beginning of September that, you know, we're not interested in settling it.  You should be interested in trying to resolve it, if it survives summary judgment in my estimation.  But if you're not, you need to think about how much time do you really need for the trial of the case.  It's not a long trial, as I see it.  It's a trial of a week or

less, as I see it.  It's also not a, you know, a day-and-a-half trial, but it's not an extremely long trial.  But you need to tell me, with some level of particularity, how much time will it take to try the case, which means Counsel will need to have conversed before you get me on the line to tell me we're ready.

And that may not be, you know, it may be after settlement talks, you know, break down, if there is, in fact, a desire for settlement talks if the matter needs to be set for trial at all.

I'm just -- I'm just charting that out for you so that -- so when you have a telephone conference call, it's a productive call.  For some reason, I guess, I assume the attorneys understand, Mr. White understands because he's been here before.  He's here on a regular basis.  But sometimes, I think, the attorneys call.  They don't really understand what the call is.  The first call is to determine do you have an interest in settlement with the magistrate judge.  And I will need a yes or no on that, and then we'll try to get that set up straightaway.

If the answer is no, we just don't -- you know, if passions are too high or too hot, which I understand they may well be in this case, we need to set this matter for trial, then we need to talk intelligently, how many days are we going to need for trial.  If I set the matter for trial, remember, I

practiced law.  Some judges have forgotten that they do.  But I have not.  And so I'm solicitous of the fact that you have other matters in other courts with other judges.  But what I will give you is a date certain trial date.  You are not going to be put on a cattle call list, as you've experienced regularly in the Court of Common Pleas in our fair Commonwealth and often enough, in federal trial court, I'm sorry to say, District Court.  That doesn't work here.  I will give you an exact date.  You will tell me yes, you're available; yes, you're available.  That date is booked and the date will not move, I mean unless I die, or if you do.  Don't tell me later, I didn't understand, somebody's -- my daughter is being married in Sardinia, you know, I have irritable bowl syndrome, No, no, no, no.  It's a firm and fixed date.

And again, I just make that -- I need to make that clear to the attorneys that don't appear before me regularly because I can't seem to convince people that I need this because it's a firm and fixed date for trial, which is also, if you need a trial, terrific.  When you think -- it's sometimes hard to get a fixed date from a judge.  I give you one, and we march toward it.  That's it.  All I want to hear from that point forward is that you've settled the case, not that I can't -- I didn't realize, no, no.  It -- it's fixed, which, I would suggest is actually a pretty good -- a pretty good way to operate.

You know, you know, and you can modify your own professional and personal schedules accordingly.

All right.  So we'll have the transcript ready. I'll let you make those arrangements with Mrs. Wentz, who is my court reporter.  I'll issue a detailed order that should be docketed, I think -- I'm looking at my Clerk -- we'll have that ready to be docketed by the close of business tomorrow. By the close of business tomorrow.  So you can sort of start thinking about how you're going to, you know, craft those answers.  You'll have the transcript by the close of business Monday, the 15th.

Anything else for today?

MS. MCLAUGHLIN:  No, Your Honor.

MR. HOROWITZ:  No, Your Honor.  Thank you.

THE COURT:  Counsel, thank you very much.  I appreciate it.  Court will rise.

(At 12:27 a.m., the proceedings were concluded.)

CERTIFICATION


          I, Colleen V. Wentz, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Middle District of Pennsylvania, do hereby certify

that pursuant to Section 753, Title 28, United States Code,

that the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter, and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United Sates.


                         _____
                         /s/ Colleen V. Wentz
                         Colleen V. Wentz, RMR, CRR
                         U.S. Official Court Reporter
                         570.259.2258



     (The Foregoing of this transcript does not apply to any
reproduction of the same by any means unless under the direct
control and/or supervision of the certifying reporter.)