**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW HECKMAN, | No. 4:20-CV-01680 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| NORTH PENN COMPREHENSIVE HEALTH SERVICES, and UPMC WELLSBORO, | |
| Defendants. | |

**MEMORANDUM OPINION**

**AUGUST 30, 2024**

## I.   PROCEDURAL BACKGROUND

On September 15, 2020, Heckman initiated this litigation with the filing of a Complaint against Defendants North Penn Comprehensive Health Services and UPMC Susquehanna.[1] Heckman subsequently amended his Complaint, substituting UPMC Susquehanna for UPMC Wellsboro and adding The Green Home as a Defendant.[2] In the Amended Complaint, Heckman alleged four claims for relief against North Penn and UPMC Wellsboro: Declaratory Judgment (Count I) and retaliation under the False Claims Act (Count II), Pennsylvania Whistleblower Law (Count III), and Fair Labor Standards Act (Count IV). Heckman also brought a claim

---

[1]   Compl. Doc. 1.
[2]   Am. Compl., Doc. 26.

for unpaid wages under the Pennsylvania Wage Payment and Collection Law against UPMC and The Green Home.[3]

The Court denied motions to dismiss the Amended Complaint filed by each Defendant.[4] The Defendants then filed Answers in which each brought counterclaims against Heckman for breach of contract.[5] On September 6, 2023, Heckman dismissed his claims against The Green Home, leaving North Penn and UPMC Wellsboro as the remaining Defendants.[6]

On November 20, 2023, North Penn and UPMC Wellsboro filed Motions for Summary Judgment as to each of Heckman's claims, and their own counterclaims against Heckman.[7] On January 19, 2024, while Defendants' Motions were pending the parties stipulated to the dismissal of Heckman's Declaratory Judgment claim against both North Penn and UPMC Wellsboro and UPMC Wellsboro's counterclaim.[8] Accordingly, the remaining live claims are the retaliation claims, Counts II-IV, against both North Penn and UPMC Wellsboro and North Penn's breach of contract counterclaim.

---

[3]  Am. Compl. Count V.
[4]  July 7, 2021 Mem. Op. and Ord., Docs. 64-65.
[5]  UPMC and The Green Home Ans., Docs. 68, 77; North Penn Ans., Docs. 69, 78.
[6]  Sept. 6, 2023 Stipulation of Dismissal, Doc. 114; Sept. 6, 2023 Ord. Approving Stipulation of Dismissal, Doc. 115.
[7]  UPMC Mot. Summ. J., Doc. 122; North Penn Mot. Summ. J., Doc. 125.
[8]  Jan. 19, 2024 Stipulation of Dismissal.

Concurrent with its Reply brief, North Penn also filed a Motion to Strike Heckman's Response to North Penn's Statement of Material Facts.[9] The Court denied that Motion prior to oral argument.[10] In the accompanying Memorandum Opinion, the Court also highlighted evidentiary issues which required resolution prior to reaching the merits of the pending Motions for Summary Judgment for the purpose of providing the parties notice of what it saw as the gating issues of the pending Motions.[11] Oral argument was held on July 10, 2024 and the parties submitted supplemental briefing on July 26, 2024.[12] North Penn's and UPMC Wellsboro's Motions are fully briefed and ripe for disposition.[13]

---

[9]   Mot. to Strike, Doc. 149.
[10]  June 10, 2024 Ord., Doc. 164.
[11]  June 10, 2024 Mem. Op. ("MTS Op."), Doc. 163.
[12]  Docs. 170-72
[13]  North Penn Supp. Br., Doc. 129; Pl. Opp'n. North Penn MSJ, Doc. 136; North Penn Reply, Doc. 152; Pl. North Penn Sur-Reply, Doc. 159; UPMC Supp. Br., Doc. 128; Pl. Opp'n. UPMC MSJ, Doc. 138, UPMC Reply, Doc. 151; Pl. UPMC Sur-Reply, Doc. 160.

## II.   RELEVANT FACTUAL BACKGROUND[14]

### A.   Cast of Characters

#### 1.   North Penn Comprehensive Health Services

North Penn Comprehensive Medical Services is a Federally Qualified Health Center.[15] FQHCs are non-profit health care providers which provide comprehensive primary and preventative health care medically underserved communities.[16] As an FQHC, North Penn is eligible for funding from the United Stated Department of Health and Human Services under Section 330 of the Public Health Service Act.[17]

To qualify for Section 330 funds, an FQHC must meet certain requirements under federal law.[18] For example, FQHCs must be operated by a board of directors and a CEO, a majority of whom are also consumers of the health product.[19] No member of the board of directors or any "employee, officer, or agent of the health center may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest."[20]

---

[14]   The factual background is largely derived from the parties' statements of fact. Where the parties agree on a fact, the Court will cite the corresponding paragraphs of the parties' statements together. *E.g.*, SMF and RSMF ¶ 1. If a fact is disputed, the Court will look to the cited portions of the record, make its own determination, and resolve any disputes in favor of Heckman. *Infra* Section II. Further, where Heckman denies a fact in part or as stated, the Court will treat such facts as admitted in part as appropriate.

[15]   NP SMF, Doc. 127, ¶ 1 and NP RSMF, Doc. 137, ¶ 1.

[16]   *Id.* ¶ 2 (citing 42 U.S.C. § 254b).

[17]   42 U.S.C. § 254b.

[18]   *See* Bureau of Primary Health Care, *Health Center Program Compliance Manual* 6 (2023).

[19]   NP SMF and RSMF ¶¶ 3, 6-7.

[20]   *Compliance Manual* 56. *Cf.* RSMF ¶ 8.

FQHCs must also make "every reasonable effort to establish and maintain collaborative relationships" with other health care providers within the service area.[21] Further, FQHCs must provide certain primary health services identified in Section 330, either directly or via an agreement or referral arrangement with a third party provider.[22] To ensure compliance with these requirements, FQHCs such as North Penn are subject to audits, or site visits, conducted by the Health Resources and Services Administration.[23]

### 2.   UPMC Wellsboro

UPMC Wellsboro operates Soldiers and Sailors Memorial Hospital in Wellsboro, Pennsylvania.[24] SSMH and related entities known as the Laurel Health System were acquired by Susquehanna Health System in 2012, and then by UPMC Wellsboro in 2016.[25] Historically, the Laurel Health System worked cooperatively with North Penn to provide health care services.[26] North Penn was, however, a distinct entity from the Laurel Health System, and remained so when the Laurel Health System was acquired by UPMC.[27]

---

[21]   NP SMF and RSMF ¶ 4 (quoting *Compliance Manual* 59).
[22]   *Compliance Manual* 25-26.
[23]   NP SMF and RSMF ¶ 5.
[24]   UPMC SMF, Doc. 123, and RSMF, Doc. 139, ¶ 1.
[25]   *Id.* ¶ 3.
[26]   *Id.* ¶ 7.
[27]   *Id.* ¶ 8. Heckman disputes that, despite being a distinct legal entity, North Penn operated independently from UPMC. UPMC RSMF ¶ 8. The Court emphasizes that it does not understand the assertion that the two entities are independent to mean anything more than that they are distinct legal entities.

### 3.   Dr. Matthew Heckman

Dr. Heckman received a bachelor's degree, master's degree, and Ph.D. from the University of Rochester and an M.D. from the Pennsylvania State College of Medicine.[28] Heckman is an obstetrician; he completed a "maternal child health fellowship"—often referred to as an "obstetrics fellowship" which includes specialized training enabling him to deliver babies.[29]

Dr. Heckman was hired by North Penn as a physician in 2016.[30] While employed by North Penn, Heckman served as the Medical Director and then Chief Medical Officer of North Penn.[31] As the Medical Director, Heckman was responsible for overseeing the clinical care delivery for North Penn.[32]

On June 1, 2018, North Penn and SSMH entered into a Staffing Agreement.[33] Months prior, on November 10, 2017, Heckman had consented to the Assignment of his Employment Agreement by North Penn to SSMH.[34] Therefore, as of June 1, 2018, Heckman was a UPMC employed physician who was leased back to North Penn through the Staffing Agreement.[35]

---

[28]   NP SMF and RSMF ¶ 9.
[29]   *Id.* ¶ 10; NP RSMF ¶ 10.
[30]   NP SMF and RSMF ¶ 11.
[31]   *Id.* ¶ 12.
[32]   *Id.* ¶ 13.
[33]   NP SMF and RSMF ¶ 33.
[34]   NP SMF and RSMF ¶ 46.
[35]   NP SMF and RSMF ¶¶ 49-50. The Court notes Heckman's objections regarding the "legal effect" of the Staffing Agreement, which are irrelevant.

### 4.   The CEOs

James Nobles was hired as the Chief Executive Officer of North Penn in November 2017.[36] During the relevant period, Janie Hilfiger was the Chief Executive Officer of UPMC Wellsboro.[37] Hilfiger also simultaneously maintained a seat on the North Penn Board of Directors.[38]

### B.   Relationship Between North Penn and UPMC

Broadly, the basis for Heckman's claims of wrongdoing by Defendants is North Penn's HRSA application and Form 990s.[39] Heckman believes that North Penn, by failing to disclose UPMC's influence on its operations—in particular the complete overlap between North Penn and UPMC Wellsboro Boards of Directors—made material misrepresentations to HRSA.[40] Heckman asserts that this influence manifested itself in several ways, including North Penn paying a premium for services provided by UPMC and North Penn being pressured by UPMC to provide patient referrals and discontinue obstetrics services.

### 1.   Board of Directors Overlap

From 2016 through 2018, each member of the North Penn Board of Directors also sat on the UPMC Wellsboro Board.[41] In 2019, only one North Penn Board

---

[36]   Nobles Dep., Doc. 141-7, 16:6-8.
[37]   UPMC SMF and RSMF ¶ 4.
[38]   Pl. Exh. 33, Doc. 141-33.
[39]   UPMC SMF and RSMF ¶ 36.
[40]   *Id.* 37; *accord* Heckman Aug. 29, 2023 Dep. ("3d Heckman Dep."), Doc. 141-3, 191:16-23.
[41]   Pl. Exh. 33.

member was not also a member of the UPMC Wellsboro Board.[42] The North Penn Board composition was significantly altered in 2020; eight UPMC Wellsboro Board members sat on the North Penn Board until October 2020, at which point the tenure of seven of those Board members on the North Penn Board ended.[43] From October 2020 through 2021, only one North Penn Board member sat on the UPMC Board.[44]

Glenn Poirier served on the North Penn Board from 2006 through October 2020.[45] During that time, Poirier served as Vice Chair of the North Penn Board in 2016 and 2017, and then as Chair of the Board from 2018 until he stepped down in October 2020.[46] When he joined the North Penn Board, Poirier also joined the Laurel Health System Board of Directors, eventually joining the Boards of Susquehanna Health System and then UPMC Wellsboro as those entities acquired Laurel Health.[47]

Poirier's membership on the North Penn and the UPMC Wellsboro Boards is consistent with the Affiliation Agreement entered into by North Penn and then-Susquehanna Health System. The Affiliation Agreement allowed for North Penn employees to participate in Laurel Health ERISA and benefit plans provided that "at least 80% of the members of some or all of the Laurel Entities' boards of directors are composed of individuals who are also members of the North Penn board of

---

[42]  *Id.*
[43]  *Id.*
[44]  *Id.*
[45]  Poirier Dep., Doc. 141-6, 16:4-9.
[46]  Pl. Exh. 33.
[47]  Poirier Dep. 11:21-12:4, 14:25-15:14, 16:4-9.

directors."[48] Though "[n]either LHS nor North Penn [were] obligated to maintain Board Overlap,"[49] the Benefits Arrangement would be discontinued if "there is no longer Board Overlap."[50]

The Affiliation Agreement also contained a Conflict of Interest Policy which emphasized that "a conflict of interest for NPCHS Directors who also serve on the Susquehanna Health Board of Directors exists for any action that involves both organizations."[51] It also emphasized, "[s]pecifically, any NPCHS Director who also serves on the Susquehanna Health Board of Directors will not participate in voting on any action that involves both organizations."[52] The Policy included procedures for reporting conflicts, and penalties for violations.

However, as to Director conflicts, the policy was unenforceable because the Laurel Health Board "was also serving as the North Penn Board."[53] Despite it being "important for overlapping board members to abstain when matters involved potential conflicts of interest,"[54] the composition of the Board made such abstention impossible because there would be nobody left to vote.

---

[48]   Affiliation Agreement, Attach. C., Mem. of Understanding, Doc. 141-16, at 16, ¶ 1.

[49]   *Id.* ¶ 3(e).

[50]   *Id.* ¶ 4.

[51]   Affiliation Agreement, Attach. A., Conflict of Interest Policy, Doc. 141-16, at 11, 1. The quoted text is emphasized in boldfaced font in the text of the Policy.

[52]   *Id.* ¶ I. Again, the quoted text is emphasized in boldfaced font in the text of the Policy.

[53]   Poirier Dep. 18:16-19; *see also id.* 20:6-9 (observing that it was a conflict of interest for UPMC Board members to serve on the North Penn Board).

[54]   NP SMF and RSMF ¶ 155. The Court notes that Nobles testified that "all actual or perceived conflicts of interest are addressed at the beginning of every board meeting, and that the chief compliance officer attended every meeting to ensure no conflicts arose." NP SMF ¶ 156.

Nevertheless, prior to its acquisition by UPMC, the relationship between Laurel Health and North Penn was a "perfect marriage."[55] Though there was Board overlap, there was limited overlap between the services Laurel Health and North Penn provided; "North Penn housed all the primary care in [the] county" whereas SSMH provided hospital services.[56] Accordingly, though "in theory" North Penn and Laurel Health perhaps "should have had . . . two boards," there were no perceived concerns regarding the independence of the two entities.[57]

However, once UPMC entered the picture, "Nobles and [Poirier], right from the get-go, understood . . . that . . . if North Penn was going to remain an independent organization, there was going to have to be . . . a separation at some point."[58] Nobles and Poirier understood HRSA guidelines to require North Penn have an independent

---

However, Nobles also testified that he could not recall an instance where UPMC board members had to abstain from a vote or board discussions. NP 30(b)(6) Dep., Doc. 141-10, 120:10-12, 120:25-121:8. Construing the record in Heckman's favor, a reasonable jury could conclude that the Conflict of Interest Policy was not followed because it could not be followed.

[55] Poirier Dep. 21:8-9.

[56] *Id.* 17:22-25, 21:20-23.

[57] *Id.* 21:8-23. *Cf.* UPMC SMF and RSMF ¶¶ 17-18 (referencing Heckman's allegations that "North Penn and Soldiers and Sailors historically enjoyed a close and symbiotic relationship" until UPMC arrived) (citing Am. Compl. ¶ 2); NP SMF ¶ 153 ("In 2016, North Penn did not consider the overlapping board positions to represent a conflict of interest.")

[58] Poirier Dep. 18:11-16; *accord id.* 66:7-15. *But see* NP SMF ¶ 154 ("Steve Johnson, prior President and CEO of Susquehanna Health, testified that he understood the Board for North Penn and the Board for UPMC to be entirely separate, despite having overlapping board members."). Even assuming that Johnson's belief is relevant, his testimony reveals a lack of familiarity with the board composition. *See* Johnson Dep., Doc. 141-13, 58:19-59-4 (Johnson's testimony that he did not know how many board members served on both boards but that "Whatever the rules articulated, that's what we followed. I think it's 51 percent, or something like that. And I may be thinking of a different issue. I don't know.") It appears that Johnson was indeed thinking of a different issue. *See supra* Section III.A.I (discussing that a majority, or at least 51%, of board members must be users of the healthcare product).

Board of Directors rather than having the "UPMC Wellsboro Board . . . also serving as the North Penn Board, as it always had."[59] Nobles was concerned that each of the North Penn Board members were also members of the UPMC Board of Directors.[60] HRSA, during the review process, noted that "separation between the two organizations . . . had to be maintained."[61] Mark Rivera, an HRSA consultant who participated in the site visit of North Penn, testified that the lack of independence would violate requirements regarding board authority.[62]

The change in the dynamic between the two entities is illustrated by UPMC's apparent belief that its acquisition of Susquehanna Health included the "asset of

---

[59] *Id.* 18:17-19, 66:3-5.

[60] Nobles Dep. 56:12-23.

[61] Poirier Dep. 74:9-14. North Penn suggests that "North Penn's Board composition was compliant with HRSA requirements." NP SMF ¶ 152. The cited deposition testimony does not support North Penn's assertion. Nobles testified that he "think[s] they felt our conflicts of interest policy, and our conflicts of interest procedures were in accordance with the HRSA Compliance Manual." NP Dep. 28:8-11. He further testified that the HRSA consultant was "comfortable" with North Penn's "specific policies and procedures." *Id.* 29:14-17. Nobles did not testify that North Penn's Board composition was compliant. As discussed above, whether the policy was facially compliant is beside the point because it was impossible to implement. Further, Nobles testified that HRSA "didn't say anything about [separating the boards] because it's not part of the HRSA site visit protocol." *Id.* 28:3-4. He also testified that he was not present for HRSA's meeting with the board and that he does not know what was discussed at that meeting. *Id.* 30:12-31:9. Finally, he also testified that he himself was concerned about what the overlap meant for North Penn's independence. Nobles Dep. 56:12-23. Construing the evidence in Heckman's favor, it cannot be said that HRSA gave North Penn's board composition its blessing.

[62] Rivera Dep., Doc. 141-12, 29:18-30:12.

North Penn."[63] Whereas North Penn had previously enjoyed a "symbiotic" relationship with SSMH,[64] UPMC was less comfortable with the arrangement.[65]

### 2.    Potential Transition from FQHC Status and Referrals

UPMC and the Board explored options for bringing "North Penn into the fold."[66] In particular, a presentation by UPMC to the UPMC Wellsboro Board suggested converting North Penn from an FQHC to a Rural Health Center.[67] As an FQHC, North Penn cannot be subordinated to a state licensed hospital such as UPMC Wellsboro.[68] Converting North Penn to a Rural Health Center would have allowed North Penn to become a part of UPMC.[69] Among the benefits to UPMC would have been the ability to control the flow of referrals from North Penn to UPMC Wellsboro.[70] UPMC Wellsboro, which provides hospital services, was "totally dependent upon [primary care] providers," such as North Penn, for

---

[63]  Poirier Dep. 54:15-19,

[64]  UPMC SMF and RSMF ¶¶ 17-18

[65]  *See* Poirier Dep. 64:9-22 (discussing proposal to convert North Penn from FQHC due to the issues that arose subsequent to UPMC's acquisition of Laurel Health).

[66]  Poirier Dep. 34:19-21.

[67]  UPMC SMF and RSMF ¶ 20. Whether this presentation was an "informational meeting" with the Board (as claimed by UPMC) or a "Board meeting" (as claimed by Heckman) strikes the Court as immaterial for present purposes. *Cf.* Doc. 138, at 13 n.14 (discussing disputed characterization of meeting between the parties).

[68]  Johnson Dep. 61:2-10.

[69]  Hilfiger Dep., Doc. 141-8 173:19-23.

[70]  Poirier Dep. 62:8-65:19.

referrals.[71] North Penn referrals to UPMC had been declining whereas referrals to other health systems had increased.[72]

As the presentation was given to the UPMC Wellsboro Board it was effectively also a presentation to the North Penn Board.[73] Though relieved that the Board "pushed back"—therefore "North Penn [would] remain a FQHC "for the foreseeable future"—Nobles believed that the proposal highlighted the need to urgently "resolve the conflicted board composition."[74] Dr. Heckman testified that, despite having recently demoted him from his position as Chief Medical Officer, Nobles enlisted his help in advocating against the proposal.[75] Ultimately, the proposal was rejected.[76] Hilfiger emailed another UPMC executive who was at the meeting: "I believe the board will not support converting the FQHCs at this time. I believe we should focus our attention on referrals outside of UPMC and why this is occurring and what we can do to make UPMC the primary referral."[77]

Heckman testified that UPMC, through Nobles and North Penn leadership, pressured North Penn physicians to refer patients exclusively to UPMC Wellsboro

---

[71]   UPMC SMF and RSMF ¶ 19; Poirier Dep. 64:24-65:2.

[72]   Pl. Exh. 43, Doc. 141-43 at 6.

[73]   *See* Pl. Exh. 45, Doc. 141-45 (Nobles stating "[t]here was a meeting last evening of the UPMC Soldiers and Sailors board (who are also all North Penn board members)").

[74]   *Id.*

[75]   3d Heckman Dep. 252:8-253:13.

[76]   UPMC SMF and RSMF ¶ 20.

[77]   Hilfiger Dep. 187:19-188:1; *accord* Nobles Dep. 219:9-18. According to Hilfiger, "[c]onverting the FQHCs" was a reference to the "meeting on the model of looking at rural health centers." Hilfiger Dep. 187:15-17.

to the exclusion of other competing health systems.[78] Heckman concedes that he was never directly instructed to do so by UPMC and that he was not required to refer all his patients to UPMC.[79] Rather, Heckman testified that Nobles said "that he was being pressured by Steve Johnson and Janie to make sure that the referrals went to UPMC in general and UPMC Wellsboro specifically."[80]

North Penn clinical providers who entered into employment contracts after North Penn and UPMC entered into the staffing agreement were encouraged, via a provision in their contract, to "keep referrals within the UPMC network."[81] Heckman further testified that he, Nobles, "and the executive committee had some very frank conversations that I believe that this was not only wrong for our patients but illegal."[82] Heckman believes that any illegal conduct was avoided because of North Penn's resistance to the pressure from UPMC.[83]

### 3.    UPMC Provision of Services

In his Amended Complaint, Heckman alleges that UPMC Wellsboro improperly siphoned North Penn's Section 330 Grant funds for ineligible purposes by charging North Penn above market rates for services such as technology support,

---

[78]  *E.g.*, 2d Heckman Dep., Doc. 141-2, 112:10-113:25.
[79]  NP SMF and RSMF ¶¶ 163-164.
[80]  2d Heckman Dep. 114:5-10. When asked if "any executive of any UPMC entity ever made a direct or implied request that North Penn encourage its providers to direct referrals to UPMC Wellsboro over other non-UPMC hospitals," Nobles said he couldn't say "with a high degree of certainty." NP Dep. 214:25-215:14.
[81]  *Id.* 215:17-18.
[82]  2d Heckman Dep. 116:22:117-4.
[83]  *Id.* 118:21-119:2.

physician recruitment and credentialing, and building lease and maintenance.[84] Heckman concedes that he has not personally reviewed the contracts for these services, does not know the rate North Penn was charged for the services, and does not know what the market rate for those services is.[85]

However, Heckman testified that "Jim [Nobles] was very concerned that [North Penn was being charged] above market and was very upset about it."[86] The North Penn executive team, including Nobles, Heckman, and CFO Ron Gilbert, was concerned that, by allowing the "syphoning" of funds via these service contracts, they "were not being good stewards of federal funds."[87] At one point Nobles was concerned that "financial support was being provided to the hospital."[88] Nobles "asked [Gilbert] to look into [it] very closely to make sure that there was no

---

[84]  Am. Compl. ¶ 53.

[85]  UPMC SMF and RSMF ¶ 38; 2d Heckman Dep. 109:22-110:5. The Court notes that Heckman disputes UPMC's statement on the grounds he was present when Nobles complained that North Penn was being charged above market rates. UPMC RSMF ¶ 38. While that may be sufficient for Heckman to form a good faith belief that North Penn was being overcharged, that is an issue distinct from whether North Penn was in fact being overcharged. Also, North Penn suggests that Heckman "admitted that he has no facts to support his Nobles contention that North Penn used Section 330 Grant funds" for the relevant services. NP SMF ¶ 143. North Penn quotes the following exchange during Heckman's deposition in support: "Q: My question is, you have no facts to support that North Penn used its Section 330 Grant funds to pay for any of those items . . . A: No." *Id.* (quoting 2d Heckman Dep. 109:16-21). Counsel did not, in fact, ask a question, and the Court, drawing all inferences in Heckman's favor, takes Heckman's response as disagreeing with counsel's statement.

[86]  2d Heckman Dep. 110:4-5.

[87]  *Id.* 111:1-2.

[88]  Nobles Dep. 237:18-24.

misappropriation of funds or no subsidies were being provided that would place us in violation with HRSA directives."[89]

During a January 2020 Board Meeting, Nobles raised issues related to both the cost and the quality of services it was receiving from UPMC.[90] Among those issues were concerns that North Penn was paying too much for office space leased from UPMC and that it was receiving a "lesser" version of EPIC—electronic medical record software—than was sold to other non-UPMC practices for the same price.[91] Hilfiger responded that none of Nobles concerns were founded.[92] Ultimately North Penn was satisfied that there was no misappropriation of any grant funding and that it was not overpaying for facilities leased from UPMC.[93]

### 4.    North Penn's Termination of Obstetric Services

During the summer of 2018, Drs. Monica Wilkins and Suzanne Stepanski raised concerns regarding the safety of North Penn's obstetric services.[94] Wilkins expressed concerns to Nobles that UPMC nursing staff did not have the depth of

---

[89]   *Id.* 240:14-21.
[90]   Pl. Exh. 38, Doc. 141-38.
[91]   *Id.* at 4419-20.
[92]   *Id.*
[93]   Nobles Dep. 237:13-238:25. *Cf.* UPMC SMF ¶ 24 ("There is no record evidence that any contracts were at 'above market rates' or otherwise that UPMC was diverting Section 330 funds to itself for any purpose."). Heckman disputes this paragraph on the basis that he "has a good faith belief that UPMC charged above-market rates to North Penn." UPMC RSMF ¶ 24. However, whether Heckman believes that North Penn was charged above market rates is an issue distinct from whether North Penn was in fact charged above market rates.
[94]   NP SMF and RSMF ¶ 56. *See also* Nobles Dep. 41:13-42:7, 46:7-47:3 (regarding timing)

experience required to perform complicated deliveries.[95] Stepanski was concerned about the obstetrics backup coverage provided by the hospital in cases where a family medicine provider was performing obstetrics services.[96]

Prior to a June 2018 Board meeting, Nobles informed Hilfiger that he would be initiating a discussion with the Board regarding Wilkins' and Stepanski's concerns, which Nobles and Hilfiger had also discussed previously.[97] Nobles told Hilfiger that he wanted to start the conversation at the Board level "so ultimately if we make any changes, . . . the first time the board hears of North Penn concerns is [not] when the [Family Medicine] providers are no longer doing OB."[98] Hilfiger responded that "[i]f they decide to stop OB coverage, it may help us with the OB/GYNs who feel they aren't busy enough."[99]

Nobles believed he was unable to satisfactorily address Wilkins' concerns because he does not have control over hospital operations.[100] Wilkins, Stepanski, and Heckman were the only North Penn providers performing obstetrics services.[101] Unlike Heckman, Wilkins and Stepanski were not fellowship trained in obstetrics,

---

[95]   NP SMF and RSMF ¶ 57; Nobles Dep. 41:13-42:7.
[96]   NP SMF and RSMF ¶ 58.
[97]   *See* Pl. Exh. 20, Doc. 141-20 (email from Nobles to Hilfiger that Wilkins would attend board meeting to discuss physician concerns that Nobles and Hilfiger had previously discussed).
[98]   *Id.*
[99]   *Id.*
[100]  Nobles Dep. 42:15-20. *See also* Pl. Exh. 19, Doc. 141-19 (July 31, 2019 email from Nobles to Hilfiger following up on coverage concerns).
[101]  1st Heckman Dep., Doc. 141-1, 149:19-22.

and therefore could not perform certain procedures without OB/GYN backup.[102]

Nobles discussed Wilkins' and Stepanski's concerns with Heckman and Hilfiger.[103]

North Penn's concerns regarding hospital coverage for obstetrics lingered for

a year. During a June 2019 Board meeting, Nobles and Heckman "ganged up on"

Hilfiger and UPMC regarding the issue.[104] Hilfiger investigated the staffing concerns

raised by Nobles and Heckman and memorialized her findings in a document that

she emailed to herself in July 2019.[105] Hilfiger concluded that, while staffing had

been a "challenge," Wilkins' concerns regarding lack of coverage were

unfounded.[106] Regarding a suggestion that North Penn provide OB/GYN services if

SSMH could not, Hilfiger noted that the hospital was unwilling to "give up" these

services and questioned whether North Penn would be able to do so if the hospital

could not provide the requested coverage.[107] Hilfiger believes that, if sufficient

---

[102]  NP RSMF ¶ 56.

[103]  Nobles Dep. 44:1-47:19.

[104]  Pl. Exh. 21, Doc. 141-21.

[105]  Hilfiger Dep. 117:8-118:14; Pl. Exh. 18, Doc. 141-18. It is unclear the extent to which the matter was discussed during the intervening year. *See* Nobles Dep. 47:15-19 (Nobles testifying that he met with Hilfiger frequently and discussed the issue but cannot recall any specific meeting or discussion); Hilfiger Dep. 117:8-14 (Hilfiger testifying that she cannot recall when or why she prepared the document of her findings).

[106]  Pl. Exh. 18. The Court assumes that the bullet points are the "issues" and that the sub-bullets are Hilfiger's findings. This is the most natural way of reading the document and consistent with a similar document Hilfiger drafted. *Compare id. with* Pl. Exh. 38, Doc. 141-38.

[107]  Pl. Exh. 18, at 3633.

volume can be maintained, it was in the economic interest of UPMC Wellsboro to maintain an OB practice.[108]

In the summer of 2019, Hilfiger "believe[d] it [was] time for [North Penn] to stop doing OB services."[109] Hilfiger questioned whether it was safe for North Penn providers to call an OB/GYN provider "when a problem occurs during the labor process."[110] This was supported by Wilkins' and Stepanski's lack of confidence in their obstetrics skills and concerns the pair had raised about Heckman's obstetrics practices.[111] Hilfiger noted that SSMH OB/GYNs expressed a willingness and a desire to "take all OB patients without North Penn."[112] Hilfiger expressed a preference that the hospital, rather than North Penn, provide obstetric services.[113] Hilfiger also noted that Heckman had "worked against" SSMH's efforts to recruit

---

[108] NP SMF and RSMF ¶ 62. The Court notes that SMF paragraph 62 and the cited testimony by Hilfiger suggest that she believed it was in UPMC Wellsboro's best interest "because providing OB services in rural areas is very important." NP SMF ¶ 62 (citing Hilfiger Dep. 43:9-19). While providing an important service may generate revenue, it is not clear to the Court how the importance of OB services in rural areas drove the economic benefit UPMC expected to realize in this context. The Court also notes that UPMC's obstetrics experienced increased losses after assuming the full provision of obstetric services in the community. UPMC SMF and RSMF ¶ 27; NP Exh. X, Doc. 126-21. The Court agrees with Heckman that the financial data reported by UPMC does not foreclose the possibility that UPMC may have suffered even greater losses had it needed to compete with North Penn. UPMC RSMF ¶ 27. The Court also notes that UPMC's assumption of obstetrics services overlaps with the beginning of the COVID-19 pandemic. While pregnancies would come to term and babies would make their appearances regardless, the same was likely not the case for non-emergency prenatal care.

[109] Pl. Exh. 18, at 3633

[110] *Id.*

[111] *Id.* The Court notes that Heckman was qualified to perform services that would have been outside of Wilkins' and Stepanski's training and that it is Heckman's position that their concerns about his own practices are attributable to this gap in skillset. NP RSMF ¶ 56.

[112] Pl. Exh. 18, at 3633.

[113] Johnson Dep. 77:13-80:8.

physicians by attempting to recruit them to join North Penn instead.[114] In August 2019, Nobles announced that North Penn would no longer directly provide obstetrics services.[115]

In February 2020, Hilfiger met with Heckman and said that it was Nobles' decision to terminate OB services.[116] Shortly thereafter, Heckman met with Nobles who "was very adamant" that Hilfiger's representation was untrue.[117]

### C.   Heckman's Complaints, Demotion, and Termination

#### 1.   Purported Whistleblowing

In contrast to the voluminous record of the relationship between North Penn and UPMC, there is relatively scant evidence of Heckman's purported whistleblowing activities. Broadly, Heckman asserts that he and Nobles "were aligned in trying to limit UPMC's influence"[118] until Heckman began objecting to North Penn discontinuing direct provision of obstetrics services. It was at that point that "a rift developed" between Nobles and Heckman.[119] This rift opened in the spring of 2019 when "the discussion about obstetrics started," and persisted until his termination a year later.[120]

---

[114] Pl. Exh. 18, at 3634.
[115] NP SMF and RSMF ¶ 60.
[116] 3d Heckman Dep. 110:5-18, 283:7-16.
[117] *Id.*
[118] Doc. 136, at 9.
[119] *Id.*
[120] Arg. Tr., Doc. 169, 27:2-4.

In November 2019, Nobles began the process—later abandoned—of terminating Heckman. As part of that process, he drafted a "Chronological History of Performance" memorandum which, purports to document Heckman's performance issues during the relevant period.[121] Heckman argues, and the Court agrees, that Nobles' account of the events described in the Performance Memo is unreliable.[122] Nevertheless, Heckman allows that the Performance Memo "provides a useful illustration of the chronology" of his complaints regarding North Penn's discontinuation of obstetrics.[123]

As related to the ongoing discussion regarding the future of obstetrics at North Penn, the first entry is in April 2019 in which Nobles indicates that Stepanski and Wilkins reported "issues with the risks [Heckman is] taking with regard to OB patients" by "accepting/keeping patients that exceed the capabilities of the team and placing the OB program and the system at risk."[124] In June 2019, Heckman expressed his displeasure that North Penn would discontinue its obstetrics program.[125]

Nobles reports a string of incidents beginning in August 2019, when the decision was made to discontinue obstetrics at North Penn.[126] Heckman testified that

---

[121] NP SMF ¶ 68.

[122] Doc. 163, Section III.

[123] Doc. 136, at 34.

[124] NP Exh. H, Doc. 126-8 at 310.

[125] *Id.* at 311; NP SMF and  RSMF ¶ 76. Heckman largely disputes the characterization of events by Nobles. NP RSMF ¶ 76. That dispute aside, it is uncontroverted that Heckman was opposed to discontinuing obstetrics at North Penn.

[126] NP Exh. H at 312-313. The Court emphasizes that it is not adopting Nobles' characterization of the incidents where properly contested; just observing that they occurred.

he was "very deflated" and "beside [him]self" at the time.[127] On August 29, 2019, Board Member Denny Murray met with Nobles and "inquired as to the longevity of Dr. Heckman with the company decision to stop FM/OB services."[128] Heckman advocated against the stoppage of obstetrics services at North Penn into September 2019.[129]

On September 5, 2019, Nobles advised Board Chair Glen Poirier that he intended to remove Heckman from his position as CMO.[130] The next day, Friday September 6, Nobles, along with North Penn CFO Ron Gilbert, met with Heckman and informed him of the decision.[131] Heckman was also placed on a Performance Improvement Plan which included a 3-day "pause period."[132] Nevertheless, Heckman reported to work the following Monday, September 11.[133]

---

[127] NP RSMF ¶ 82.

[128] NP SMF and RSMF ¶ 84. Heckman admits that the meeting occurred but disputes the underlying facts. NP RSMF ¶ 84. His denial in RSMF paragraph 84 does not say what he disputes about this meeting. The incorporation of paragraph 82 does not fill this gap. Hearsay is admissible at summary judgment if it could be presented at trial in an admissible form. *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014). Further, it is immaterial whether any criticism levied by Murray, or any other board member, is accurate, and thus it need not be admitted for the truth of the matter in any case. *Fuentes v. Perskie*, 32 F.3d 759, 766-67 (3d Cir. 1994). The question is whether Nobles believed those criticisms. If Heckman means to argue that the reports from Murray and other board members regarding his behavior never occurred, his objection is insufficient to do so.

[129] NP SMF and RSMF ¶ 85.

[130] *Id.* ¶ 87.

[131] *Id.* ¶ 89.

[132] *Id.* ¶¶ 89-90.

[133] *Id.* ¶ 94-95. Heckman asserts that he did not understand what was meant by a "pause period." In all events, it is uncontroverted that he was not expected to report to work and that he did so.

After meeting with Nobles regarding his apparent violation of his PIP, Heckman submitted a letter of resignation to Hilfiger.[134] In his letter, Heckman claims that his "resignation [is] a reaction of dismay to the types of actions that have historically contributed to physician turnover, barriers to recruitment and retention, disruption of continuity adversely affecting patients, and barriers to the coordination and delivery of excellent patient care in Tioga County and the Twin Tiers."[135] Heckman testified that he was referring to "physicians not feeling heard, not feeling they could advocate effectively for their patients, and harboring the same types of frustrations that Dr. Heckman was feeling when he delivered the letter."[136] Nevertheless, neither in his letter nor his testimony does Heckman state that he is resigning because of North Penn's discontinuation of obstetrics, let alone that UPMC improperly influenced that decision.[137] Heckman asserts that, because he was no longer providing the obstetrical care he believed he was contracted for, he did not need hospital privileges.[138] Heckman communicated to others that his decision to give up his hospital privileges in response to North Penn's decision to discontinue directly providing OB services.[139]

---

[134] *Id.* ¶ 96.
[135] *Id.*
[136] NP RSMF ¶ 98.
[137] NP SMF ¶ 98.
[138] NP SMF and RSMF ¶ 99.
[139] *Id.* ¶ 100.

The next day, Heckman met with Nobles and Hilfiger.[140] Prior to the meeting, Heckman drafted a list of "needs" that he saw as a starting point for a negotiation with Nobles and Hilfiger.[141] Among those needs were the ability of Laurel Health clinicians to see and deliver OB patients through January 31, 2020 and, broadly, culture changes regarding the relationship among leadership and between leadership and clinicians.[142] During the meeting, Heckman "questioned Hilfiger's leadership and her OB decisions."[143]

Despite having submitted a letter of resignation, Heckman continued to work at North Penn. He also continued to object to Hilfiger's leadership.[144] As a result, Nobles discussed with Hilfiger the protocol for terminating Heckman's contract.[145] Nevertheless, Nobles remained optimistic that termination would not be necessary.[146] He advised the Board of Heckman's ongoing "performance issues" and that he intended to allow Heckman a 30-day period to improve his performance.[147] A little over a month later, in early November 2019, Nobles decided to terminate

---

[140] *Id.* ¶ 102.

[141] *Id.* ¶¶ 102-103.

[142] NP Exh. M, Doc. 126-13.

[143] 3d Heckman Dep. 146:15-17, 150:10-16.

[144] NP Exh. H, at 315.

[145] NP SMF and RSMF ¶ 109.

[146] *Id.* ¶¶ 109, 113.

[147] *Id.* ¶¶ 112-114. Heckman disputes these paragraphs, but only on the grounds that the Board was merely advised of Nobles' intentions rather than asked for input. Thus, it is undisputed that Nobles met with the Board, informed them of what he described as performance issues, and that he would evaluate Heckman's performance over the next month.

Heckman.[148] However, before the termination process was completed, Nobles changed his mind.[149]

Meanwhile, as North Penn moved forward with discontinuing its obstetrics practice, it stopped taking new obstetrics patients in October 2019 and continued to care for current patients through January 2020.[150] Hilfiger represented to Poirier that an agreement had been reached to allow the UPMC OB/GYNs a year to build their practice, at which point they would consider adding Heckman.[151] However, in February 2020, Nobles requested that Heckman be able to provide obstetrics services "much sooner."[152] This followed discussions between Nobles and Heckman regarding the best way to approach Hilfiger about the issue.[153] Heckman was frustrated with what he perceived as Hilfiger "slow boating" his request to practice obstetrics services, and believed that the failure to permit him to do so was a breach of his employment agreement.[154]

Dissatisfied with a perceived lack of progress, in March 2020 Heckman requested that his compensation structure be modified to account for him no longer providing obstetrics services and that he be allowed to resume providing those

---

[148] *Id.* ¶¶ 117-121.
[149] *Id.* ¶ 124; Pl. Exh. 38 at 4423.
[150] Pl. Exh. 40, Doc. 141-40; Pl. Exh. 41, Doc. 141-41.
[151] Pl. Exh. 38, at 4423.
[152] *Id.*
[153] Pl. Exh. 37, Doc. 141-37.
[154] *Id.*

services in April 2020.[155] He also began inquiring about not being compensated as agreed for work he performed at The Green Home, as discussed below.[156] North Penn's COO, Krysta Wagner, responded on March 31, 2020 that, while the lack of compensation regarding his work at The Green Home was being explored, his "remaining requests have been discussed and no adjustments will be made."[157]

### 2.      Compensation Issues

In 2019, Heckman agreed to serve as Medical Director of Broad Acres and The Green Home, nursing homes within the Laurel Health System. North Penn was related to and provided services at both facilities.[158] Heckman agreed to serve as Medical Director of Broad Acres on a volunteer basis. As to The Green Home, Heckman entered into a contract with UPMC Wellsboro and The Green Home on August 1, 2019 which provided that he would be compensated for his role as Medical Director.[159]

---

[155] Pl. Exh. 47, Doc. 141-47.

[156] *Id.*

[157] *Id.*

[158] *See* NP Dep. 157:8-158:17 (discussing entities listed as "related" on IRS Form 990 Schedule R); Nobles Dep. 59:2-60:5 (Nobles testifying that "it was very necessary for us to continue . . . service[s]" at Broad Acres and about a "similar" lack of services at The Green Home), 132:4-20 (Nobles testifying that North Penn is "providing care at both The Green Home and Broad Acres skilled nursing facilities"). Further, in its SMF North Penn notes that "Heckman testified that he performed services for North Penn in . . . Broad Acres and The Green Home." NP SMF and RSMF ¶ 187. Though not an explicit admission that the services performed at Broad Acres and The Green Home were "for" North Penn, the Court finds that there is sufficient record evidence that the cited testimony is undisputed for present purposes.

[159] *See* Am. Compl. ¶¶ 31-32; UPMC Ans. ¶¶ 31-32 (alleging and admitting that there was an agreement between The Green Home and UPMC Wellsboro). Though UPMC responds to this paragraph as "denied," the substance of the denial is that "[t]he agreement between The Green Home, UPMC Wellsboro, and [Heckman] is in writing and its terms speak for themselves."

26

However, Heckman did not receive any payment for those services for several months.[160] In February 2020, Nobles and Heckman were scheduled to meet to discuss several issues.[161] Among those issues was that Heckman had not received compensation for work performed at The Green Home.[162] On March, 18, 2020, Heckman sent an email to Nobles, as well as Wagner and Lara Jaussi, to follow up on the issues raised in the February meeting.[163] Heckman further requested that a plan be put in place to transition him out of the role prior to July 1, 2020, or earlier if the compensation issue could not be resolved.[164] Wagner responded that day that she would "secure time . . . to connect."[165]

On March 31, Heckman again raised the issue and Wagner again replied the same day, this time with a more fulsome response.[166] She said that "The Green Home payments, or lack thereof, are being explored."[167] She further stated that, if Heckman was requesting "to transition out of The Green Home, a resignation letter will be

---

*Id.* Therefore, the fact of the agreement, to which UPMC, The Green Home, and Heckman were parties, is admitted. To the extent that UPMC or The Green Home purports to deny even that allegation, the denial is improper. *See Lauchle v. United Parcel Serv.*, No. 4:22-CV-00533, 2024 WL 643293, at *4 (M.D. Pa. Feb. 15, 2024) (citing *State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 279 (N.D. Ill. 2001)) (discussing impropriety of denials on the bases that documents "speak for themselves").

[160] *See* 3d Heckman Dep. 202:8-13 (testifying he was compensated after his termination).
[161] Pl. Exh. 30, Doc. 141-30, at 453.
[162] *Id.*
[163] *Id.* at 451-52.
[164] *Id.*
[165] *Id.* at 451.
[166] *Id.* at 450-51.
[167] *Id.* at 450.

required" and that she could facilitate the transition once he provided a written resignation.[168] The next day, on April 1, Heckman provided a letter of resignation "as Medical Director of Broad Acres and The Green Home."[169] In the letter Heckman stated that he "plan[ned] to continue to provide care for patients and clinical teams in these facilities for 30 days from the date of this letter or until formally notified of a transition of care that will meet their care needs."[170] In a separate email, Heckman also requested termination of other roles he had assumed voluntarily, a "transition to outpatient only (with weekend coverage) and termination of any other call responsibilities," "an accounting of any other ancillary responsibilities assumed," and "voluntary termination of all privileges associated with medical staff membership at UPMC Wellsboro."[171]

Heckman was eventually paid for services provided at The Green Home after his termination.[172]

### 3. Termination

On April 3, 2020, two days after Heckman sent his second letter of resignation and accompanying email, Nobles met with Heckman and advised him that he was "removed from service as a staff physician for NPCHS practicing at the Laurel

---

[168] *Id.*
[169] *Id.* at 455.
[170] *Id.*
[171] *Id.* at 450.
[172] 3d Heckman Dep. 202:8-13.

Health Centers" and "as the medical director for Broad Acres Skilled Nursing Facility and The Green Home Skilled Nursing Facility."[173] The letter provided to Heckman by Nobles further stated that, in accordance with the staffing agreement, "the president of Soldiers and Sailors Memorial Hospital (SSMH) has been notified of your immediate removal."[174]

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  As expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[175] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[176]

---

[173]   NP Exh. O, Doc. 126-15.

[174]   *Id.*

[175]   477 U.S. 317, 322 (1986).

[176]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[177] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[178] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[179] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[180]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[181] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[182] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[177] *Celotex*, 477 U.S. at 323.

[178] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[179] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[180] *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[181] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[182] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[183] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[184]

## IV.    DISCUSSION

### A.    False Claims Act

The False Claims Act "prohibits any person from, *inter alia*, knowingly presenting a 'false or fraudulent claim for payment or approval' to the United States government."[185] "It extends to all false claims resulting in the receipt of funds from the United States Treasury."[186] A claim under the FCA may be brought by a private citizen in a *qui tam* suit, or by the government in a direct action for damages.[187]

The FCA also protects employees who aid the government in investigating or prosecuting FCA violations, or who attempt to stop FCA violations before they happen or recur.[188] The FCA's "whistleblower" provision shields employees from retaliation in such circumstances because "[f]ew individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment" or any other adverse action.[189] Consequently, where an employer retaliates against its

---

[183] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[184] Fed. R. Civ. P. 56(c)(3).

[185] *U.S. ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 190 (3d Cir. 2022) (quoting 31 U.S.C. § 3729(a)(1)(A)).

[186] *Id.* (citing *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 185 (3d Cir. 2001)).

[187] *United States ex rel. Stinson, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir. 1991).

[188] 31 U.S.C. § 3730(h).

[189] *Hutchins*, 253 F.3d at 186 (internal citations omitted); *see also* 31 U.S.C. § 3730(h)(1).

employee for engaging in protected activity under the FCA, the employee is entitled to "all relief necessary to make that employee . . . whole."[190]

False Claims Act retaliation claims are analyzed through a Chinese nesting doll of multi-pronged tests. Broadly, to establish a claim for retaliation under the FCA, Heckman must show (1) "he engaged in protected conduct"; (2) "his employer had knowledge he was engaged in protected conduct; and [3] that his employer's retaliation was motivated, at least in part, by [his] engaging in protected conduct."[191]

The first prong is, itself, analyzed through a four-prong test. To establish that he engaged in protected conduct, Heckman must show (1) "that he believed his employer was violating, [or would soon violate] the FCA, (2) that . . . belief was reasonable, (3) that he took action based on that belief, and (4) that his actions were designed to stop one or more violations of the FCA."[192] At the core of this inquiry then is the possibility of a FCA violation by the employer, which is itself "includes four elements: falsity, causation, knowledge, and materiality."[193]

Under the second prong, Heckman must show that his protected conduct put Defendants on notice that Heckman was attempting to stop one or more violations

---

[190] 31 U.S.C. § 3730(h)(1).

[191] *U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110–11 (3d Cir. 2007); *accord U.S. ex rel. Sorenson v. Wadsworth Brothers Constr. Co., Inc.*, 48 F.4th 1146, 1158-59 (10th Cir. 2022).

[192] *U.S. ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201-02 (4th Cir. 2018) (numbering added).

[193] *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) (citing *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 182 (2016); *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011)).

of the FCA.[194] An employer can hardly be said to have retaliated against an employee for actions that it was unaware of. Then, under the third prong, retaliation is analyzed under the familiar three-step burden shifting framework:[195] First, to establish a *prima facie* case, the employee must show that he suffered an adverse employment action because he engaged in protected activity.[196] This showing requires proof of "but-for" causation.[197] Then, if the employee has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate reason for the adverse action.[198] Last, the burden returns to the employee to show that employer's proffered justification is mere pretext.[199]

## B.    Pennsylvania Whistleblower Law

The Pennsylvania Whistleblower Law "precludes a public body from taking any adverse employment action against an employee in retaliation for the employee's good faith report of wrongdoing or waste."[200] The wrongdoing that

---

194 *Ascolese*, 55 F.4th at 194.

195 The Third Circuit "ha[s] never held that this three-step framework governs False Claims Act claims," but has applied it where the parties, as here, do not dispute that it does. *Crosbie v. Highmark Inc.*, 47 F.4th 140, 144 (3d Cir. 2022). *See* Doc. 128, at 23 (noting that the burden would shift to UPMC if Heckman could establish a *prima facie* case); Doc. 129, Section IV.B (applying the burden shifting framework); Doc. 136, at 34 n.36 (suggesting that "this well-established method of proof applies to all retaliation claims").

196 *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

197 *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018).

198 *Hutchins*, 253 F.3d at 186.

199 *Crosbie*, 47 F.4th at 144 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *Hutchins*, 253 F.3d at 186).

200 Arg. Tr. 37:4-39:25.

Heckman purports to have reported are violations of the False Claims Act.[201] Because the Court will grant summary judgment as to Heckman's FCA retaliation claims, Defendants are also entitled to summary judgment as to the PWL claims.[202]

### C.   Analysis

As discussed above, claims of FCA retaliation must run a gauntlet of multi-factor tests to survive summary judgment. That is particularly true in cases such as this one, where the parties dispute most, if not all the preconditions for an FCA retaliation claim.

Heckman has pointed to various indicia of UPMC exerting influence over North Penn. A reasonable jury could conclude that certain aspects of the dynamic between the Defendants would have run afoul of the FCA. For instance, the complete overlap of the entities' Boards of Directors appears improper. To the extent that Nobles and the Board members themselves realized the situation was untenable, at a minimum, supports a finding that it would be reasonable to believe the relationship was improper. The same is true of concerns that UPMC was siphoning FQHC funds

---

[201] *See* MTD Op. 49-50 (finding allegations of FCA violations "sufficient to establish a plausible instance of wrongdoing"); Doc. 136 (discussing Court's prior holding and arguing that "repeated misrepresentations to the federal government in order to obtain federal funds and state Medicaid dollars" sufficient for PWL claim to survive summary judgment).

[202] *See* Arg. Tr. 39:1-11 (counsel agreeing that, at summary judgment, the FCA and PWL claims rise and fall together). Because the Court finds that Heckman's FCA claim, and therefore PWL claim fails, it need not reach issues regarding whether there is sufficient record evidence to show that Defendants received Medicare funds.

from North Penn. Though those concerns may have been unfounded, that Nobles shared them is evidence that such beliefs were reasonable.

Insofar as Heckman engaged in any whistleblowing regarding concerns that Nobles shared with him, there is no evidence from which a jury could conclude that such activities led to any adverse employment action. On the contrary, Heckman claims that Nobles actively recruited him for help in certain instances, such as pushing back on UPMC's efforts to transition North Penn from an FQHC to a rural health center. Thus, the purported whistleblowing activity at issue here is Heckman's objection to what he believed to be UPMC pressuring North Penn to discontinue the direct provision of obstetrics services.[203]

On that front, the record is clear that Heckman's actions were not calculated to stop or prevent UPMC overreach into North Penn affairs. Rather, Heckman's focus was solely on preventing the discontinuation of North Penn's obstetrics practice. What Heckman was asking for, broadly, was "the reinstatement of North Penn's obstetrics services."[204] At a minimum, Heckman was insistent that he was able to resume practicing obstetrics himself, whether with UPMC or North Penn.[205] When those negotiations in early 2020 failed to progress to his satisfaction, Heckman resumed his purported whistleblowing. Whether Heckman's

---

[203] *See* Arg. Tr. 27:9-15 (relevant period timeframe when "discussion about obstetrics started").

[204] Doc. 136, at 38. *See also* NP RSMF ¶ 81 (asserting that Heckman was "engaging in protected activity against the decision to discontinue North Penn's obstetrics services").

[205] *See* Pl. Exh. 30, Doc. 141-30, at 452; Pl. Exh. 37 at 815.

whistleblowing campaign would have also had the effect of securing North Penn's independence from UPMC was besides the point. Put differently, even if Heckman got what he was asking for, the broader relationship between North Penn and UPMC would have remained unchanged.

Even if the Court assumes that Heckman's actions were reasonably calculated to achieve both ends, that still is insufficient. He must also show that Defendants understood his purported whistleblowing to be aimed at the relationship between North Penn and UPMC, not simply to restart his own obstetrics practice. On that front, there is no record evidence that Nobles, Hilfiger, or anybody else did so.

The Court is satisfied that, at summary judgment, Heckman has done enough to show that North Penn did not operate independently from UPMC as is required of an FQHC. However, the Court, having independently conducted a thorough review of the record, does not find that there is sufficient evidence to show that Heckman's purported whistleblowing was targeted at securing North Penn's independence, much less that Defendants were aware that was his aim. Accordingly, Defendants are entitled to summary judgment on Counts II and III.

### D.    Fair Labor Standards Act

Employers are prohibited from retaliating against employees for asserting their rights under the Fair Labor Standards Act.[206] As above, FLSA retaliation claims

---

[206]  29 U.S.C. § 215(a)(3).

are analyzed under the familiar three-step *McDonnell Douglas*[207] burden-shifting framework.[208] Unlike the FCA, the FLSA only protects employees who have "filed" a "complaint" regarding an employer's violation of the FLSA.[209] A complaint may be made either orally or in writing[210] to either the employer or the government.[211] A complaint is considered filed when it is made in such a way that "'a reasonable, objective person would have understood the employee' to have 'put the employer on notice that [the] employee is asserting statutory rights under the [FLSA].'"[212]

### 1. UPMC

Addressing Heckman's FLSA retaliation claim, after reciting the relevant legal standards, UPMC offers only the tersest of arguments:

> In sum, plaintiff raised an issue about payment for his Green Home services, and he was paid by UPMC. He was then terminated by North Penn, a separate entity. As a consequence he has no claim.[213]

---

[207] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[208] *Cohen v. BH Media Group, Inc.*, 419 F. Supp. 3d 831, 850 (D.N.J. 2019) (citing *Cononie v. Allegheny General Hosp.*, 29 Fed. App'x. 94, 95 (3d Cir. 2002); *Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001)).

[209] 29 U.S.C. § 215(a)(3).

[210] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011).

[211] While the United States Supreme Court left the question unresolved in *Kasten*, the Court notes that most courts interpret FLSA's anti-retaliation provision as protecting intracompany complaints. *E.g.*, *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 115-16 (2d Cir. 2015); *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 439 (4th Cir. 2012); *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 626 (5th Cir. 2008); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44-45 (1st Cir. 1999); *EEOC v. Romeo Community Schools*, 976 F.2d 985, 989-90 (6th Cir. 1992); *Brock v. Richardson*, 812 F.2d 121, 124-25 (3d Cir. 1987).

[212] *Kasten*, 563 U.S. at 14.

[213] Doc. 128, at 29.

UPMC concedes that Heckman, by "rais[ing] an issue about payment for his Green Home services," filed a complaint. While it is true that Heckman was eventually paid for those services, that occurred *after* his termination, not before as UPMC suggests. UPMC cites no authority, nor is the Court aware of any, which stands for the proposition that belated payment of wages due moots a claim of retaliation. Indeed, unpaid wages claims are distinct from retaliation claims. Further, whether Heckman was terminated by North Penn ignores whether, as discussed below, the entities are joint employers. Thus, UPMC's argument, such as it is, runs contrary to the facts of the case and precludes summary judgment in favor of UPMC.

In its Reply brief, UPMC argues, for the first time, that Heckman did not actually suffer an adverse employment decision because he voluntarily relinquished his position at The Green Home. "Where a reply brief raises new arguments in support of a motion for summary judgment, the district court is justified in disregarding them."[214] In any event, that Heckman stepped down from a role for which he was not being paid is not a basis to dismiss his claim that he was terminated entirely for asking to be compensated for that work.

---

[214] *Gucciardi v. Bonide Prods., Inc.*, 28 F. Supp.3d 383, 393 (E.D. Pa. 2014).

## 2.    North Penn

Arguing that it was not Heckman's employer for the purposes of his FLSA claim, North Penn merely incorporates by reference its argument that it was not Heckman's employer for the purposes of his Pennsylvania Whistleblower claim.[215]

The only legal authorities cited in the incorporated section of North Penn's brief is the statutory definition of Employer and Employee under the Pennsylvania Whistleblower Law.[216] As the Court noted in its prior Opinion, "[t]he question of whether a person is an employee [under the FLSA] 'is not fixed by labels that parties may attach to their relationship nor by common law categories *nor by classifications under other statutes*.'"[217] Thus, the definition of employee under a Pennsylvania statute seems a poor foundation for North Penn's summary judgment argument.

And indeed it is. Whether an employee-employer relationship exists under the FLSA is dependent on the "economic reality" of the relationship.[218] Under the "economic reality" theory, "the FLSA defines employer 'expansively' . . . and with 'striking breadth.'"[219] "The Supreme Court has even gone so far as to acknowledge

---

[215]  *Id.* at 26 n.3.

[216]  *Id.* Section IV.C.1.

[217]  MTD Op. 51 (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950) (Frankfurter, J., dissenting); emphasis added).

[218]  *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).

[219]  *In re Enterp. Rent-A-Car Wage & Hour Emp. Prac. Litig.*, 683 F.3d 462, 467 (3d Cir. 2012) (internal citations omitted) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'"[220]

"Under the FLSA, multiple persons or entities can be responsible for a single employee's wages as 'joint employers' in certain situations."[221] This can occur where two employers "exert significant control" over an employee.[222] The Third Circuit, in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, set forth a four-factor test evaluating whether a joint-employment relationship exists under the FLSA.[223] Pursuant to the *Enterprise* test, courts must consider the following:

(1)   The alleged employer's authority to hire and fire relevant employees;

(2)   The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

(3)   The alleged employer's involvement in day-to-day employee supervision, including employee discipline; and

(4)   The alleged employer's actual control of employee records such as payroll, insurance, or taxes.[224]

---

[220]   *Id.* at 467-68 (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)).

[221]   *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) (quoting 29 C.F.R. § 791.2).

[222]   *Id.* (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)).

[223]   683 F.3d at 469.

[224]   *Id.*; *Thompson*, 748 F.3d at 149.

"[T]his list is not exclusive, and cannot be 'blindly applied.'"[225] Rather, "[i]f a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors" specified by the Third Circuit.[226]

North Penn does not apply this test, nor does it make any other meaningful argument that Heckman was not its employee under FLSA. To the extent that the facts recited in the relevant section of North Penn's brief are "indicia of Heckman's employment relationship with UPMC Wellsboro," they say nothing about whether North Penn can be held liable as a joint employer.[227] Previously, the Court found that Heckman's allegations that he served as North Penn's Chief Medical Officer, that North Penn directed and controlled his compensation, and that Heckman received a letter of termination from North Penn were sufficient to establish North Penn's status as joint employer.[228] Discovery adduced sufficient evidence supporting each of those allegations. Further, as before, Heckman's Employment Agreement, "which lays out Heckman's duties to North Penn as an *employee*," also supports the finding that North Penn was Heckman's employer under FLSA.[229]

---

[225] *Enterprise*, 683 F.3d at 469-70 (citations omitted).

[226] *Id.* at 470.

[227] Doc. 129, at 21.

[228] MTD Op. 52-53.

[229] *Id.* at 53 (emphasis supplied).

It appears that, having trudged through the whistleblower claims which predominate this suit, Defendants simply ran out of steam when it came to Heckman's FLSA claims. Though the Court, which itself has waded through the record and each party's briefing on three separate motions, may sympathize, "it is not the responsibility of the Court to either formulate arguments for a party or to search the record for evidence to support a party's arguments, particularly [those] represented by sophisticated counsel."[230] Therefore, where Defendants have not meaningfully addressed Heckman's claims, the Court will not formulate and flesh out their skeletal arguments for them.[231]

### E.     Breach of Contract

North Penn argues that it is entitled to summary judgment on its counterclaim against Heckman for breach of his Loan Agreement.[232] "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"[233]

Heckman asserts that the Loan Agreement was not a "garden variety loan," but "was intended to be a signing bonus and was intended to be forgiven."[234]

---

[230] *McClung v. 3M Co.*, No. CV162301ESSCM, 2019 WL 4668053, at *4 (D.N.J. Sept. 25, 2019) (collecting cases).

[231] *Id.*

[232] Doc. 129, at 28.

[233] *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999)).

[234] Doc. 136, at 41.

However, Heckman does not actually dispute that the Loan Agreement was a contract, that his termination resulted in a breach of the terms of the contract, or that the breach resulted in damages under the contract. Instead, Heckman argues that any recovery is barred by the doctrine of unclean hands and that the penalty provided for in the contract—repayment of the entire original amount plus interest regardless of when Heckman's employment terminated—is unlawful.[235]

North Penn neglected to address Heckman's defenses to the breach of contract counterclaim in its Reply brief.[236] To the extent that North Penn's assertion that "Heckman's well-documented performance and behavioral deficiencies resulted in his termination" is intended to be a response to the above defenses, that argument, such as it is, is not well taken.[237] As Heckman's FLSA retaliation claim survives summary judgment, it is equally applicable to Heckman's defenses to the breach of contract counterclaim. Further, even if all of Heckman's retaliation claims fail, Heckman's argument that the liquidated damages penalty is unlawful may nonetheless have merit.

As a party is not required to file a reply brief,[238] the failure to respond to an argument made in an opposition brief is not ordinarily deemed waiver of the

---

[235] *Id.* at 42-43.

[236] *See generally* Doc. 152.

[237] *Id.* at 6. In any case, this argument is largely without support. *See* MTS Op. Section III.

[238] *See* LR 7.7 ("A brief in reply to matters argued in a brief in opposition *may* be filed by the moving party . . .") (emphasis added).

argument.[239] However, the failure to respond to an issue where a party has filed a brief is, as a practical matter, a concession of the issue.[240] Two additional factors further militate in favor of finding that North Penn has conceded the issue at summary judgment. First, Heckman, by raising only defenses, does not contest that North Penn has established a *prima facie* case for breach of contract. North Penn's briefing, then, does little to aid the Court in resolving the issue.[241] Second, the claim at issue is one brought by North Penn.[242]

Therefore, North Penn's motion for summary judgment as to its breach of contract counterclaim is denied.

---

[239] *Progressive Sterilization, LLC v. Turbett Surgical LLC*, No. CV 19-627-CFC, 2020 WL 3071951, at *2 (D. Del. June 10, 2020) (citing *Law v. Medco Research, Inc.*, 113 F.3d 781, 787 (7th Cir. 1997); *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994)). *See also Sabra v. Maricopa Cnty. Community College Dist.*, 44 F.4th 867, 909 (9th Cir. 2022) (Bress, J., dissenting) (dissenting from holding that appellee forfeited claim by not addressing "every issue raised in the answering brief"). Unlike *Sabra*, the Court does not hold that North Penn has forfeited its claim altogether, only that it has conceded the issue at summary judgment.

[240] *Progressive Sterilization*, 2020 WL 3071951, at *2; *accord Transamerica Life Ins. Co. v. Daibes Gas Holdings Atlanta, L.L.C.*, No. CV 18-10869 (SRC), 2021 WL 1541150, at *25 (D.N.J. Apr. 20, 2021).

[241] *See United States v. Johnson*, 732 F. App'x 638, 655 n.13 (10th Cir. 2018) (failure to respond to argument in reply brief "'waive[s], as a practical matter anyway,' any non-obvious reasons for rejecting it") (quoting *Hardy*, 39 F.3d at 771).

[242] *See Sabra*, 44 F.4th at 881 (failure to respond to arguments in reply brief deemed abandonment of claim on appeal).

## V.      CONCLUSION

For the foregoing reasons, North Penn's and UPMC's Motions for Summary

Judgment are granted in part and denied in part.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge